04 CV 2128

JUDGE LEISURE

# UNITED STATES DISTRICT COURT
### *for the*
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

WILLIAM HENNEBERRY,

Case No.:

Plaintiffs,

- against -



COMPLAINT &
DEMAND FOR JURY
TRIAL

SUMITOMO CORPORATION OF AMERICA;
ROBERT GRAUSTEIN; SUMITOMO CORPORATION;
And, John Does 1-50 (fictitiously named individuals),

MAR 1 7 2004

U.S.D.C. S.D.N.Y.
CASHIERS

Defendants.

-----------------------------------------------------------------x

Plaintiff, WILLIAM HENNEBERRY, an individual residing at 14 Dogwood Lane, Darien,

Connecticut, by and thorough his attorneys Mendes & Mount, LLP, as and for his complaint against

defendants: SUMITOMO CORPORATION OF AMERICA and SUMITOMO CORPORATION,

both believed to have a business address at 600 Third Avenue, New York, New York 10016;

ROBERT GRAUSTEIN, an individual, believed to be residing at 8 Sterling Road, Harrison, New

York 10528 and, JOHN DOES 1-50 (fictitiously named individuals), hereby alleges and says as

follows:

### NATURE OF ACTION

1)      This is an action for detrimental reliance, injury to character and breach of contract.

### THE PARTIES

2)      Plaintiff William Henneberry is an individual residing at 14 Dogwood Lane, Darien,

CT 06820.

3)      Upon information and belief, Defendant Sumitomo Corporation of America is a New

York corporation having a principal place of business at 600 Third Avenue, New York, New York 10016.

4)      Upon information and belief, Defendant Sumitomo Corporation is a Japanese Corporation licensed to do business in the State of New York with a principal place of business at 600 Third Avenue, New York, New York 10016.

5)      Upon information and belief, Robert Graustein is an individual with a residence of 8 Sterling Road, Harrison, New York 10528.

## JURISDICTION AND VENUE

6)      This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332 (a) because there is complete diversity between plaintiff and defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7)      Upon information and belief, this Court has personal jurisdiction over defendants because all defendants are present and doing business in this district.

8)      Upon information and belief, defendants are doing business in this district; transact business within this district; derive substantial revenue from intrastate and interstate commerce; have otherwise committed tortious acts within this district; and, defendants are otherwise within the jurisdiction of this Court.

9)      Venue is proper in this judicial district under 28 U.S.C. §1391 (a).

## GENERAL ALLEGATIONS

10)     At all times relevant herein, William Henneberry was an individual residing at 14 Dogwood Lane, Darien, Connecticut.

11)     Mr. Henneberry is a creative entrepreneur in the field of marketing.  He has, over

2

his career, been instrumental in developing new ways to market and use credit cards.

12)    At all times relevant herein, Mr. Henneberry was a stockholder and, until December 31, 2003, was the Chairman of Smartix International Corp. (hereinafter "Smartix").

13)    At all times relevant herein, Smartix was a New York Corporation with offices at 245 and then 298 Fifth Avenue, New York, New York.

14)    Prior to becoming involved in Smartix, Mr. Henneberry had eleven years of marketing experience though various positions at Colgate Palmolive and Hertz Rent-a Car, progressing from Sales/Product Management on major brands such as Colgate toothpaste, to Vice President of Marketing at Hertz.

15)    Mr. Henneberry then went on to become the CEO of Communications Diversified, a major promotional marketing agency, which serviced high profile clients, including many of the major professional sports leagues and Fortune 500 companies such as Pepsi, Procter & Gamble, Nabisco, General Motors, Time Warner and Avon . In this capacity, he also served as CEO of his subsidiary event production company, Ovation, which produced corporate meetings and major sports promotional events such as the NHL's All Star Weekend and Larry Bird's retirement special.

16)    Mr. Henneberry's many accomplishments include developing and marketing the first Sports Affinity Credit Cards for the National Football League (NFL) and the National Basketball Association (NBA), as well as the first National Free Standing Insert Couponing program for the NFL, NBA and Major League Baseball (MLB), which are all recognized as some of the leading affinity programs in the sports industry.

17)    One of his most widely successful accomplishments followed his conception and development of the General Motors Credit Card, which became the world's most significant

loyalty/credit card programs.

18)     Following the sale of Communications Diversified's portfolio in 1996, Mr. Henneberry served as a marketing consultant for both MLB and MasterCard.   Among his responsibilities at MLB was the establishment of national sponsorship programs with MasterCard and MBNA.  Most Recently, Mr. Henneberry directed the creation of MLB's "All-Century Team" program, which received widespread acclaim as one of the most successful sponsorship/marketing programs in league history.

19)     Mr. Henneberry has received numerous awards for his companies' innovative promotional work in the field of marketing, across many product categories, which include: "POPAI" (Point-of-Purchase); "ANDY" (New York Advertising Club); "REGGIE" (PMAA – Promotional Marketing Association); "GOLDEN SPIRE"; and "EDISON" (AMA - American Marketing Association).

20)     As Chairman of Smartix, Mr. Henneberry was entitled to receive an annual salary of $150,000.

21)     At all times relevant herein, stock in Smartix was not traded publicly.

22)     As of September 9, 2003, Mr. Henneberry owned 1,740,666 shares of Smartix stock.

23)     At all times relevant herein, Smartix was engaged in creating an electronic ticket promotion for Major League Baseball which, *inter alia*, included the ability for season ticket holders to sell their unused tickets to member credit card holders through the use of the internet and freestanding computerized kiosks.

24)     This promotional program was generally known as the "Smartfan" program.

25)     The Smartfan program was to undergo testing with the Boston Red Sox and the St.

Louis Cardinals, two teams affiliated with MLB.

26)     In order to support the development of the Smartfan program, Smartix solicited investments from private individuals and groups.

27)     One of the initial private investors was Cramer Berkowitz Partners, L.P., 909 Third Avenue, New York, New York (hereinafter "Cramer Berkowitz").

28)     Cramer Berkowitz, generally speaking, is an investment firm which, as part of its business, makes venture capital investments.

29)     Generally speaking, a venture capitalist will invest monies to help "start up" new companies in exchange for stock in the "start up" company.

30)     At all times relevant herein, Smartix was a "start up" company.

31)     Another entity which agreed to invest in Smartix was defendant, Sumitomo Corporation of America (hereinafter "SCOA").

32)     At all times relevant herein, SCOA maintained offices for the transaction of business at 600 Third Avenue,  New York, New York 10016-2001.

33)     SCOA is a New York Corporation.

34)     At all times relevant herein, SCOA was a wholly owned subsidiary of Sumitomo Corporation.

35)     Upon information and belief, Sumitomo Corporation provided SCOA with direction and control concerning SCOA's involvement with, and investment in, Smartix and its dealings with Mr. Henneberry.

36)     Sumitomo Corporation is licensed to do business in the State of New York.

37)     Sumitomo Corporation maintains offices for the transaction of business at 600 Third

Avenue, New York, New York.

38)    At all times relevant herein, Robert Graustein, an individual, was a Senior Vice President of SCOA.

39)    At all times relevant herein, Hirohiko Imura, an individual, was a Vice President of SCOA.

40)    As of at least August 2002, Jeffrey Frank, an individual, was an employee of SCOA.

41)    At all times relevant herein, William Fornshell, Esq. was corporate counsel for SCOA.

42)    At all times relevant herein, fictitious defendants John Does 1-10 are as yet presently unknown agents or employees of SCOA and/or Sumitomo Corporation.

43)    At all times relevant herein, Donald Montuori, an individual, was Secretary of Smartix.

44)    At all times relevant herein Norman Snyder, an individual, was a consultant and/or a creditor of Smartix who held certain warrants for the purchase of Smartix stock.

45)    At all times relevant herein, Michael Dee was the Executive Vice President / Business Affairs for the Boston Red Sox.

46)    Prior to defendants' tortious actions described below, Mr. Henneberry had successful relationships with MasterCard and MLB and an excellent reputation for managing and operating major marketing events and promotions within both the MasterCard and the MLB communities. However, the tortious actions of defendants have induced an unsavory opinion of Mr. Henneberry in the minds of Master Card, and the MLB community, including the Boston Red Sox.  As a result of defendants' actions, Mr. Henneberry has had his reputation severely damaged.

47)     Furthermore, due to the tortious actions of defendants, Mr. Henneberry has incurred financial losses, including but not limited to: the loss of loans made to Smartix; the loss of un-reimbursed expenses incurred on Smartix business; the diminution in the value of Smartix stock; the loss of both deferred and future salary associated with his position as chairman of Smartix; and, the loss of future income as a consultant for MasterCard and MLB.

## SCOA Invests in Smartix.

48)     In the Spring of 2002, SCOA agreed to invest certain monies in Smartix, with a maximum investment of Five Million Dollars ($5,000,000) and a minimum investment of Three Million Dollars ($3,000,000).

49)     Through the agreement surrounding this investment, Smartix and SCOA agreed to share in the profits and losses of Smartix.

50)     Prior to committing to make the above-referenced investment, SCOA conducted certain due diligence, which included an economic valuation of Smartix.

51)     The pre-investment valuation by SCOA valued Smartix at Ten Million Dollars ($10,000,000), or one dollar fifty cents ($1.50) per share.

52)     Under the pre-investment valuation performed by SCOA, Mr. Henneberry would, as of September 9, 2003, own Smartix stock valued at $2,610,999.

53)     In reliance upon SCOA's agreement to invest in Smartix, Smartix changed its position by, *inter alia*, performing the following: a) Smartix filed a re-stated certificate of incorporation with the New York Secretary of State reflecting changes to same required by SCOA; b) Smartix convinced its original investors, including Cramer Berkowitz, to subordinate their class of shares to those that were to be issued to SCOA; c) Smartix convinced its original investors to reduce

their dividend percentages, forego dividends and invest additional cash into Smartix;  d) Smartix advised other potential investors that it had accepted SCOA's offer and that any future investment would have to be at a later round, at a presumably higher valuation; e) Smartix finalized its agreement with Hank Aaron allowing him to become a Member of the Smartix Board of Directors; and, f) Smartix ordered special stock certificates bearing legends specifically requested by SCOA.

54)    As a result of, and in reliance upon, SCOA's agreement to provide the above-referenced investment to Smartix, William Henneberry, among others, agreed to provide an initial bridge loan to Smartix in the amount of $100,000.

55)    In reliance upon SCOA's ongoing representations of diligence and fealty, Mr. Henneberry would, through the period of October 2003, make further loans to Smartix in the following amounts: $47,500.00; $52,500.00; $50,000.00; $150,000.00; $27,500.00; $30,000.00; $190,000.00; $12,754.83; and, $2,170.54.

56)    At all times relevant herein, SCOA was aware that Mr. Henneberry was loaning monies to Smartix.

57)    On June 4, 2002, after documents memorializing the above-referenced agreement had been sent by SCOA to the various shareholders of Smartix for execution,  William Henneberry was advised, via telephone, that SCOA would not make the above-referenced investment.

58)    Mr. Henneberry advised William Fornshell, Robert Graustein and Hirohiko Imura of SCOA that SCOA was in breach of its agreement with Smartix.

59)    SCOA did subsequently invest in Smartix in an amount less than previously agreed.

60)    SCOA did invest $1,000,000 in Smartix pursuant to an investment agreement which provided for, *inter alia*, a sharing of profits and losses among the various classes of Smartix

stockholders.

61)     Subsequently, SCOA advised Smartix that SCOA was its lead investor and would actively solicit and obtain new investment for Smartix.

62)     Throughout the period of  July 2002 through October 2003, SCOA continually advised Mr. Henneberry that it had located investors who were interested in investing in Smartix. In connection with these alleged "investors," SCOA continually requested revised and updated documents from Smartix to present to these "investors."

63)     In June 2003, Smartix advised SCOA that it would be unable to continue its operations without additional funding.

64)     In an early June 2003 meeting held at SCOA's offices, which was attended by Mr. Frank and Mr. Graustein, Mr. Graustein stated to William Henneberry, Donald Montuori and Norman Snyder that SCOA, as the lead investor, "would not let you [Smartix] fail."

65)     Additionally, at this June 2003 meeting, SCOA agreed to pursue a plan for matching investments and agreed to provide a letter confirming its position to Smartix.

66)     Based upon SCOA's representations, Mr. Henneberry reasonably believed that SCOA would not let Smartix fail and would use its best efforts to locate investors and/or infuse additional capital into Smartix.

67)     Additionally, SCOA requested that Mr. Henneberry prepare new plans for future investments by SCOA reflecting various terms and conditions imposed by SCOA.

68)     The plan presented by Smartix, at the request of SCOA, called for an investment of $1,000,000 and the implementation of the Smartfan program with ten sports teams. SCOA indicated that it would be amenable to this plan and course of action.

69)     Based upon SCOA's representations concerning this plan, and its ability to obtain such an investment, Mr. Henneberry continued to loan his personal funds to Smartix to cover operating expenses and Mr. Henneberry continued to incur reimbursable expenses on Smartix business.

70)     Throughout the period of approximately June through September 2003, Mr. Henneberry continued to inform SCOA of Smartix' dire financial condition.

71)     Indeed, on June 16, 2003, Mr. Henneberry informed Mr. Graustein that one of the options that must seriously be considered was a cessation of operations by Smartix.

72)     Mr. Graustein responded to this possibility by writing to Mr. Henneberry and informing him that such action was not within Mr. Henneberry's legal rights.

73)     Throughout this same June through September 2003 period of time, SCOA was informed that Smartix was being forced to use all available sources of revenue to fund operating expenses.

74)     SCOA was advised that this practice would eventually place Smartix in the position of being unable to perform all of its obligations owed to the Red Sox and St. Louis Cardinals.

75)     SCOA never objected to this course of action.

76)     During the morning of September 8, 2003, one day before a planned Smartix Board of Directors Meeting (which would include SCOA and Cramer Berkowitz), SCOA arranged for Mr. Henneberry to come to its offices and presented him with a new investment proposal.

77)     Despite being led to believe that SCOA was in favor of the $1,000,000 investment proposal discussed above, Mr. Henneberry was now advised that he must, *inter alia*, convert his outstanding loans to company stock prior to any further investment by SCOA.  Further, SCOA

refused to provide further investment itself, except on a "matching" basis, and then only up to $500,000.

78)     The September 8, 2003, proposal did not, in the opinion of Mr. Henneberry, provide sufficient capital to fund the Smartfan program on a going forward basis.

79)     Further, this new investment plan attributed a significantly lower valuation to Smartix, thereby allowing SCOA to trigger its right to obtain additional Smartix shares (commonly known as a "ratchet") and significantly increase its holdings in the company, even to the extent of controlling the company.

80)     On September 9, 2003, Mr. Henneberry was called to a meeting with Michael Dee of the Boston Red Sox in Baltimore, Maryland to discuss the Smartfan program.  Mr. Dee had called for this meeting to discuss Smartix' continuing the program into the following year due to its success.

81)     Because Mr. Dee called for this meeting on the afternoon of September 8, 2003, the previously scheduled Board Meeting planned for September 9, 2003 was postponed.

82)     Instead of being able to report to Mr. Dee that Smartix had the financing to move forward into the new year, as he had expected to be able to do, Mr. Henneberry was forced to report that Smartix was having difficulties with its financing and could not guarantee its financial stability for the upcoming season.

83)     In response, Mr. Dee was understandably concerned that Smartix would not be able to perform its obligations to the Red Sox.

84)     Mr. Dee's reaction was communicated to SCOA and the other shareholders of Smartix by Mr. Henneberry.

85)     On September 19, 2003, Mr. Henneberry wrote to Mr. Frank and addressed, *inter alia*, SCOA's September 8, 2003 about-face. Mr. Henneberry wrote, in part, as follows:

> I also find it particularly disturbing that (after 90+ days of discussions about the critical nature of our situation) virtually immediately after my announcement, to Sumitomo, that we were "out of cash"; Smartix receives a term sheet from Sumitomo at a valuation level 25% of the one which Sumitomo gave us in the last round. Moreover, it is a term sheet that allows Sumitomo to more than quadruple its holdings in Smartix for a figure of only one half of what Sumitomo originally invested.

> (September 19, 2003 e-mail attached hereto as Exhibit "A" and incorporated herein by reference)

86)     It should also be noted that, in that September 19, 2003 e-mail, Mr. Henneberry also made reference to his personal loans to the company, which were being made in reliance upon SCOA's continued representations concerning the existence of outside investors and SCOA's willingness to cooperate with Smartix.

### SCOA's improper meetings with the Red Sox and MasterCard.

87)     Shortly after Mr. Henneberry's September 19, 2003 e-mail, and with full knowledge that Mr. Henneberry was away on vacation at the time, SCOA surreptitiously arranged to meet with Mr. Dee (of the Boston Red Sox) and MasterCard.

88)     Upon information and belief, SCOA held those meetings as part of a plan to destroy the faith these organizations had in Mr. Henneberry and improperly to take control of Smartix.

89)     SCOA did not provide Smartix management with prior notice of its September 2003 meetings with Mr. Dee or MasterCard.

### SCOA meets with the Red Sox.

12

90)    On or about September 22 or 23, SCOA, by and through its employee Mr. Graustein, met with Mr. Dee and falsely informed Mr. Dee that Mr. Henneberry lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen. Further, Mr. Graustein placed blame for Smartix' present financial condition, and inability to pay monies owed to the Red Sox, upon the purported mismanagement of Smartix by Mr. Henneberry.

91)    Mr. Graustein was acting within the scope of his employment with SCOA at the time of, and throughout, his September 2003 meeting with Mr. Dee.

92)    Upon information and belief, Mr. Graustein met with Mr. Dee in September 2003 with the full knowledge and consent of SCOA's Mr. Imura and Mr. Fornshell.

93)    Upon information and belief, Sumitomo Corporation was aware of  the above-referenced meeting between Mr. Graustein and Mr. Dee in September 2003.

94)    Upon information and belief, John Does 1-10 also advised Mr. Dee that Mr. Henneberry lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen.

95)    In that September 2003 meeting, SCOA maligned Mr. Henneberry's ability and business acumen to the extent that it caused Mr. Dee to question and lose faith in Mr. Henneberry's skill in his trade and profession.

96)    At that same meeting, SCOA informed Mr. Dee that SCOA would be taking over Smartix and making changes in management so as to remove Mr. Henneberry.

97)    Subsequent to SCOA's meeting with Mr. Dee, the Red Sox called Mr. Graustein directly seeking information concerning the Smartfan program.

98)    Prior to SCOA's meeting with Mr. Dee, that call would have been placed directly to

13

Mr. Henneberry, or to the Smartix offices, and not to SCOA. The fact of this call is confirmed by the e-mail of Eric Petrocenelli (an employee of Smartix) dated September 30, 2003, attached hereto as Exhibit "B" and incorporated herein by reference.

### SCOA meets with MasterCard.

99)     Also on or about the period of September 19, 2003 through September 23, 2003, SCOA surreptitiously met with MasterCard.

100)    At that meeting, SCOA, by and through its employee Mr. Graustein, falsely informed MasterCard that Mr. Henneberry lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen. Further, SCOA placed blame for Smartix' present financial condition, and inability to pay monies owed to the Red Sox and St. Louis Cardinals, upon the purported mis-management of Smartix by Mr. Henneberry.

101)    Mr. Graustein was acting within the scope of his employment with SCOA at the time of, and throughout, his September 2003 meeting with MasterCard.

102)    Upon information and belief, Mr. Graustein met with Master Card in September of 2003 with the full knowledge and consent of SCOA's Mr. Imura and Mr. Fornshell.

103)    Upon information and belief, Sumitomo Corporation was aware of the above-referenced meeting between Mr. Graustein and MasterCard in September of 2003.

104)    Upon information and belief, John Does 1-10 also advised MasterCard that Mr. Henneberry lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen.

105)    In that September 2003 meeting, SCOA maligned Mr. Henneberry's ability and business acumen to the extent that it caused MasterCard to question and lose faith in Mr.

14

Henneberry's skill in his trade and profession.

106)   That meeting between SCOA and MasterCard was attended by, *inter alia*, John Stuart, Senior Vice President of Global Sponsorship and Event Marketing for MasterCard.

107)   Subsequent to its meetings with Mr. Dee (of the Boston Red Sox) and MasterCard, SCOA met with Mr. Henneberry on or about September 24, 2003, and informed him that they had met with Mr. Dee and MasterCard.

108)    SCOA, through its employee Mr. Graustein, advised Mr. Henneberry that Mr. Dee would now not do business with Smartix if Mr. Henneberry was involved with the company in any capacity.

109)   That statement is contrary to Mr. Dee's previously held and expressed excellent opinion of Mr. Henneberry's business acumen, typified by Mr. Dee's e-mail to Mr. Henneberry dated July 2, 2003 wherein Mr. Dee stated: "We have taken a leap of faith by aligning ourselves with Smartix, in large part due to my confidence and trust in you personally."

110)   Shortly after that September 24, 2003 meeting, Mr. Henneberry drafted and sent an e-mail to, *inter alia*, Robert Graustein, Jeffrey Frank, and William Fornshell of SCOA, outlining SCOA's improper actions and their devastating effect. A copy of Mr. Henneberry's September 26, 2003 e-mail (with attachments) is annexed hereto as Exhibit "C" and is incorporated herein by reference.

111)   On October 9, 2003, a meeting of Smartix shareholders was held, with SCOA in attendance, and it was agreed, *inter alia*, that Smartix would continue to pursue the Smartfan program with the Red Sox.

112)   At that meeting, and at times subsequent thereto, SCOA represented that it had

investors who had expressed significant interest in making an investment into Smartix.  Further, SCOA explicitly stated that it was interested in having Smartix survive and succeed.

113)   In reliance upon those continued affirmations of good faith and intent to obtain investment, Mr. Henneberry continued to loan personal funds to Smartix, and incur expenses, in order to keep the company viable and able to provide its services to the Red Sox.

## FIRST COUNT
## (Detrimental Reliance)

114)   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered 1 through 113 as if set forth at length herein.

115)   At all times relevant herein, SCOA was aware of Mr. Henneberry's actions with regard to his making personal loans to Smartix and incurring expenses on Smartix business.

116)   Mr. Henneberry's actions in providing the above-referenced loans to Smartix and incurring expenses, were reasonable and were made in reliance upon the statements and actions of SCOA concerning its own investment or ability to obtain investments from third-parties.

117)   Mr. Henneberry relied upon the statements and actions of SCOA to his detriment as SCOA never made an investment in Smartix after June 2002 and never produced a third party who invested in Smartix at any time.

118)   Due to this lack of investment in Smartix, as well as the otherwise tortious actions of defendants, Mr. Henneberry lost the ability to recoup his loans to Smartix and his unreimbursed expenses incurred on Smartix business.

119)   Plaintiff demands judgment against defendants on the FIRST COUNT as follows:

   a. Reimbursement of Mr. Henneberry's loans to the company in the amount of $662,425.37;

b.  Reimbursement of Mr. Henneberry's costs and expenses incurred on company business in the amount of $18,000.00;

c.  Applicable interest, costs, attorneys fees and expenses; and,

d.  Such other and further relief as the Court deems fair and appropriate.

## SECOND COUNT
### (Defamation)

120)    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered 1 through 119 as if set forth at length herein.

121)    SCOA's statements to Mr. Dee and MasterCard were false, and were known to be false at the time they were published.

122)    The statements published to Mr. Dee by SCOA at the September 2003 meeting were slanderous per se.

123)    The statements published to MasterCard by SCOA at the September 2003 meeting were slanderous per se.

124)    Upon information and belief, the actions of defendants were part of an improper scheme to obtain control of Smartix to the benefit of defendants and the detriment of plaintiff.

125)    The tortious actions of defendants have exposed Mr. Henneberry to the aversion and contempt of MLB and MasterCard and have caused said entities to hold an evil or unsavory opinion of Mr. Henneberry.

126)    As a result of defendants' tortious actions, Mr. Henneberry's reputation has been irreparably damaged.

127)    In addition to sustaining general damage to his reputation caused by SCOA's per se slanderous statements to Michael Dee and MasterCard, Mr. Henneberry has also incurred special damages in the form of the diminution in the value of his Smartix stock; the loss of certain loans

17

made to Smartix; the loss of expenses incurred on Smartix business; the loss of salary as Chairman of Smartix and, the loss of prospective income from MLB and MasterCard.

### Lost Value of Smartix Stock; Lost Loans; Lost Expenses; and Lost Salary.

128)    As of September 9, 2003, Mr. Henneberry owned 1,740,666 shares of Smartix stock.

129)    In 2002, SCOA assessed the value of the stock as $1.50 per share.

130)    Due to the tortious actions of defendants, Smartix was not able to perform under the Smartfan program and was caused to fail.

131)    Because defendants' actions caused Smartix to fail, Mr. Henneberry's Smartix stock is presently worthless.

132)    As of the time of this Complaint, Mr. Henneberry has outstanding loans to Smartix in the amount of $662,425.37.

133)    As of the time of this Complaint, Mr. Henneberry is owed unreimbursed expenses from Smartix in the amount of $18,000.

134)    Because defendants' tortious actions caused Smartix to fail, Mr. Henneberry has lost the opportunity to be repaid upon his loans to Smartix and to be reimbursed for his expenses incurred on behalf of the company.

135)    As Chairman of Smartix, Mr. Henneberry was entitled to an annual salary of $150,000.

136)    For portions of Mr. Henneberry's time as Chairman, he drew a reduced salary, or no salary, due to the dire financial condition of Smartix.

137)    Because defendants' tortious actions caused Smartix to fail, Mr. Henneberry has lost the salary he would have deferred as Chairman of Smartix.

18

### Loss of prospective income from MLB and MasterCard.

138) As a result of the tortious actions of defendants, Mr. Henneberry has had his reputation with MLB, and with MasterCard, damaged to the extent that he no longer has access to the opportunity to present promotions and be retained as a consultant as he had regularly done in the past with both entities.

139) Prior to the malicious actions of the defendants, Mr. Henneberry had long and successful relationships with both MLB and MasterCard as represented by the fact that, for the period of December 1995 though January 2000, Mr. Henneberry deferred $10,000 to $25,000 per month from MLB or MasterCard as a consultant on various projects including the establishment of the Hank Aaron award for the best offensive player in baseball; the twenty-fifth anniversary of Hank Aaron breaking Babe Ruth's home-run record; the selection of an official credit card sponsor and issuer for MLB; the selection of an official rent-a-car company for MLB; the All-Century Team; a program of free standing insert couponing known as "Grand-Slam Savings"; and, the development of new credit-card based promotions for MasterCard as an official sponsor of MLB.

140) Due to the actions of defendants, Mr. Henneberry is now no longer considered for consultancies with MasterCard or MLB and has lost his prior position of respect and confidence with those institutions.

141) As a result of defendants' actions, Mr. Henneberry has suffered special damage in the form of the lost ability to consult with MLB and MasterCard and has lost the prospective income associated therewith.

142) As a result of the defendants' tortious actions, Mr. Henneberry has, *inter alia,* lost the value of his Smartix stock had the company succeeded; lost his future income as Chairman of

19

Smartix; been deprived of the use and enjoyment of certain monies used to fund loans and advance costs to Smartix in reliance upon SCOA's representations; and, suffered great and irreparable injury to his reputation.

143)    As a result of defendants' tortious action Plaintiff demands judgment against defendants on the SECOND COUNT as follows:

    a.  damages in the amount of Twenty-million Dollars ($20,000,000.00) representing lost future business opportunities with MasterCard and Major League Baseball;

    b.  damages in the amount of Twenty-million Dollars ($20,000,000.00) for injury to Mr. Henneberry's reputation;

    c.  damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);

    d.  damages in the amount of $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;

    e.  damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;

    f.  damages for lost salary in the amount of $150,000 per annum;

    g.  punitive damages;

    h.  applicable interest, costs, attorneys fees and expenses; and,

    i.  such other and further relief as the Court deems fair and appropriate.

## THIRD COUNT
### (Injurious Falsehood)

144)    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered 1 through 143 as if set forth at length herein.

145)    Upon information and belief, the statements by SCOA to Mr. Dee were made with the intent to cause harm to Mr. Henneberry or, alternatively, were of such a nature that SCOA should have recognized that they would cause harm to Mr. Henneberry if published.

146)    Upon information and belief, the statements by SCOA to Mr. Dee were made with the knowledge that they were false, or alternatively, were made with a reckless disregard as to whether

they were true or false.

147)   Upon information and belief, the statements by SCOA to MasterCard were made with the intent to cause harm to Mr. Henneberry or, alternatively, were of such a nature that SCOA should have recognized that they would cause harm to Mr. Henneberry if published.

148)   Upon information and belief, the statements by SCOA to MasterCard were made with the knowledge that they were false, or alternatively, were made with a reckless disregard as to whether they were true or false.

149)   SCOA's statements to Mr. Dee and Master Card constituted an injurious falsehood compensable under New York Law.

150)   As a result of the defendants' tortious actions, Mr. Henneberry has, *inter alia*, lost the value of his Smartix stock had the company succeeded; lost his future income as Chairman of Smartix; been deprived of the use and enjoyment of certain monies used to fund loans and advance costs to Smartix in reliance upon SCOA's representations; and, suffered great and irreparable injury to his reputation.

151)   As a result of defendants' tortious actions Plaintiff demands judgment against defendants on the THIRD COUNT as follows:

    a.   damages in the amount of Twenty-million Dollars ($20,000,000.00) representing lost future business opportunities with MasterCard and Major League Baseball;
    b.   damages in the amount of Twenty-million Dollars ($20,000,000.00) for injury to Mr. Henneberry's reputation;
    c.   damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);
    d.   damages in the amount of  $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;
    e.   damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;
    f.   damages for lost salary in the amount of $150,000 per annum;

g.  punitive damages;

h.  applicable interest, costs, attorneys fees and expenses; and,

i.  such other and further relief as the Court deems fair and appropriate.

## FOURTH COUNT
### (Tortious interference with Prospective Advantage)

152)  Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered 1 through 151 as if set forth at length herein.

153)  Defendants used improper means to attempt to take over and control Smartix.

154)  Defendants' actions were conducted for the sole purpose of causing injury to Mr. Henneberry's reputation and thereby affording SCOA with the opportunity to take control of Smartix.

155)  As a result of defendants' actions, Smartix was caused to fail.

156)  As a result of the tortious actions of defendants, Mr. Henneberry has, *inter alia*, lost the value of his Smartix stock had the company succeeded; lost his future income as Chairman of Smartix; been deprived of the use and enjoyment of certain monies used to fund loans and advance costs to Smartix in reliance upon SCOA's representations; lost future earnings as a consultant for MLB and MasterCard; and, suffered great and irreparable injury to his reputation.

157)  As a result of defendants' tortious actions, Plaintiff demands judgment against defendants on the FOURTH COUNT as follows:

a.  damages in the amount of Twenty-million Dollars ($20,000,000.00) representing lost future business opportunities with MasterCard and Major League Baseball;

b.  damages in the amount of Twenty-million Dollars ($20,000,000.00) for injury to Mr. Henneberry's reputation;

c.  damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);

d.  damages in the amount of  $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;

e.  damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;

f.  damages for lost salary in the amount of $150,000 per annum;

g.  applicable interest, costs, attorneys fees and expenses; and,

h.  such other and further relief as the Court deems fair and appropriate.

## FIFTH COUNT
### (Breach of Contract)

158)   Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered 1 through 157 as if set forth at length herein.

159)   A contract for the investment of at least three million dollars existed as between Smartix and SCOA as of the Spring of 2002.

160)   This contract anticipated the success of Smartix and, at a minimum, the maintenance of the share price of Smartix stock.

161)   The shareholders of Smartix were intended beneficiaries of this contract.

162)   Prior to entering into this contract, SCOA valued Smartix stock at a price of $1.50 per share.

163)   On June 4, 2003, SCOA breached its contract to provide a minimum investment of three million dollars to Smartix.

164)   SCOA's failure to perform under its contract with Smartix also constituted a breach of the implied covenant of good faith contained in said contract.

165)   As a result of SCOA's failure to perform under this contract, Smartix was caused to fail.

166)   As a result of the failure of Smartix, Mr. Henneberry has, *inter alia*, lost the value of his Smartix stock had the company succeeded; lost his future income as Chairman of Smartix; been

23

deprived of the use and enjoyment of certain monies used to fund loans and advance costs to Smartix

in reliance upon SCOA's representations; and, suffered great and irreparable injury to his reputation.

167)    The injuries sustained by Mr. Henneberry were reasonably foreseeable consequences

of SCOA's breach of contract.

168)    As a result of defendants' tortious actions, Plaintiff demands judgment against

defendants on the FIFTH COUNT as follows:

    a.   damages representing the diminution in the value of Smartix stock held by Mr.
        Henneberry in the amount of no less than $2,610,999 (calculated using number of
        shares as of 9/9/03);
    b.   damages in the amount of  $662,425.37 representing the failed loans by Mr.
        Henneberry to Smartix;
    c.   damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed
        costs and expenses incurred on Smartix business;
    d.   damages for lost salary in the amount of $150,000 per annum;
    e.   applicable interest, costs, attorneys fees and expenses; and,
    f.   such other and further relief as the Court deems fair and appropriate.

## SIXTH COUNT
### (Breach of Fiduciary Duty)

169)    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1

through 168 as if set forth at length herein.

170)    Smartix and SCOA formed a joint venture in the Spring of 2002.

171)    As joint venturers, defendants owed plaintiff a fiduciary duty of utmost good faith and

fair dealing.

172)    Defendants breached their fiduciary duty owed to Mr. Henneberry.

173)    As a result of defendants' breach of their fiduciary duty, Mr. Henneberry has, *inter*

*alia*, lost the value of his Smartix stock had the company succeeded; lost his future income as

Chairman of Smartix; been deprived of the use an enjoyment of certain monies used to fund loans

and advance costs to Smartix in reliance upon SCOA's representations; lost future earnings as a

consultant for MLB and MasterCard; and, suffered great and irreparable injury to his reputation.

174)   As a result of defendants' tortious actions, Plaintiff demands judgment against

defendants on the SIXTH COUNT as follows:

    a.  damages in the amount of Twenty-million Dollars ($20,000,000.00) representing lost future business opportunities with MasterCard and Major League Baseball;

    b.  damages in the amount of Twenty-million Dollars ($20,000,000.00) for injury to Mr. Henneberry's reputation;

    c.  damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);

    d.  damages in the amount of  $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;

    e.  damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;

    f.  damages for lost salary in the amount of $150,000 per annum;

    g.  punitive damages;

    h.  applicable interest, costs, attorneys fees and expenses; and,

    i.  such other and further relief as the Court deems fair and appropriate.

**WHEREFORE,** Plaintiff demands Judgment against the Defendants on each and every

count, as follows:

On the FIRST COUNT:

    a.  reimbursement of Mr. Henneberry's loans to the company in the amount of $662,425.37;

    b.  reimbursement of Mr. Henneberry's costs and expenses incurred on company business in the amount of $18,000.00;

    c.  applicable interest, costs, attorneys fees and expenses; and,

    d.  such other and further relief as the Court deems fair and appropriate.

On the SECOND COUNT:

    a.  damages in the amount of Twenty-million Dollars ($20,000,000.00) representing lost future business opportunities with MasterCard and Major League Baseball;

    b.  damages in the amount of Twenty-million Dollars ($20,000,000.00) for injury to Mr. Henneberry's reputation;

c. damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);

d. damages in the amount of $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;

e. damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;

f. damages for lost salary in the amount of $150,000 per annum;

g. punitive damages;

h. applicable interest, costs, attorneys fees and expenses; and,

i. such other and further relief as the Court deems fair and appropriate.

On the THIRD COUNT:

a. damages in the amount of Twenty-million Dollars ($20,000,000.00) representing lost future business opportunities with MasterCard and Major League Baseball;

b. damages in the amount of Twenty-million Dollars ($20,000,000.00) for injury to Mr. Henneberry's reputation;

c. damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);

d. damages in the amount of $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;

e. damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;

f. damages for lost salary in the amount of $150,000 per annum;

g. punitive damages;

h. applicable interest, costs, attorneys fees and expenses; and,

i. such other and further relief as the Court deems fair and appropriate.

On the FOURTH COUNT

a. damages in the amount of Twenty-million Dollars ($20,000,000.00) representing lost future business opportunities with MasterCard and Major League Baseball;

b. damages in the amount of Twenty-million Dollars ($20,000,000.00) for injury to Mr. Henneberry's reputation;

c. damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);

d. damages in the amount of $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;

e. damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;

f. damages for lost salary in the amount of $150,000 per annum;

g.  applicable interest, costs, attorneys fees and expenses; and,

h.  such other and further relief as the Court deems fair and appropriate.

On the FIFTH COUNT:

a.  damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);

b.  damages in the amount of  $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;

c.  damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;

d.  damages for lost salary in the amount of $150,000 per annum;

e.  applicable interest, costs, attorneys fees and expenses; and,

f.  such other and further relief as the Court deems fair and appropriate.

On the SIXTH COUNT:

a.  damages in the amount of Twenty-million Dollars ($20,000,000.00) representing lost future business opportunities with MasterCard and Major League Baseball;

b.  damages in the amount of Twenty-million Dollars ($20,000,000.00) for injury to Mr. Henneberry's reputation;

c.  damages representing the diminution in the value of Smartix stock held by Mr. Henneberry in the amount of no less than $2,610,999 (calculated using number of shares as of 9/9/03);

d.  damages in the amount of  $662,425.37 representing the failed loans by Mr. Henneberry to Smartix;

e.  damages in the amount of $18,000.00 representing Mr. Henneberry's unreimbursed costs and expenses incurred on Smartix business;

f.  damages for lost salary in the amount of $150,000 per annum;

g.  punitive damages;

h.  applicable interest, costs, attorneys fees and expenses; and,

i.  such other and further relief as the Court deems fair and appropriate.

## JURY DEMAND

Please be advised that plaintiff demands a jury trial upon all issues.

Respectfully submitted,

**MENDES & MOUNT, LLP**
Attorneys for the Plaintiff

By:

John M. Deitch, Esq. (JD5221)
MENDES & MOUNT, LLP.
One Newark Center, 19th Floor
Newark New Jersey, 07102
(973) 639-7300

Dated:  Newark, New Jersey
        March 17, 2004

**EXHIBIT "A"**

| | |
|---|---|
| **From:** | Henneberryw@aol.com |
| **Sent:** | Friday, September 19, 2003 4:02 PM |
| **To:** | jeffrey.frank@sumitomocorp.co.jp |
| **Cc:** | robert.graustein@sumitomocorp.co.jp; Don Montuori; rinaldolaw@aol.com |
| **Subject:** | Reply to your memo on tickets.com |

Jeff,There is no update on the structure of the deal with Tickets.com;as they have not made any offer  to date.
Certainly I will advise you when an offer is discussed. As I told you when I explained to the Red Sox the basic structure of the terms of the term sheet/matching investment program (proposed by Sumitomo) they indicated that they would not renew the Smartfan program with Smartix. They are now the main proponent of establishing a "relationship" with Tickets.com ,as the only viable alternative for Smartix.(to fulfill our financial obligations)
.   I am quite concerned that Sumitomo does not seem to understand that the effect of their term sheet,and its conditions was to eliminate our ability to resign the Red Sox .
Over the last few months I have been quite clear on the fact that the teams would not resign if they were not made "whole" financially (first). Further I have been equally clear that they had to have confidence  that Smartix would be/remain financially/organizationally stable  for next season,before they would resign. The terms that Sumitomo proposed clearly did not provide that financial security or stability.
   In attempting to establish this financial security I find it particularly disturbing that to this date I do not know (nor have I met) any of these potential investors that Sumitomo keeps telling us that they are talking to on our behalf. (this fact also hurt our ability to explain our ongoing financial stability)Furthermore I find it particularly disturbing that in the fifteen months since Sumitomo reneged on its $5,000,000 term sheet (and invested only $1,000,000) that we have only been introduced (by Sumitomo) to one potential investor(USPL). In fact Sumitomo has not really introduced us to anyone ,as USPL was brought to us by you(Jeff) based on a commission agreement which Sumitomo "blessed". Considering the fact that Sumitomo had a 25% matching offer and was treated as our lead investor in this round it is particularly confusing as to why they would not bring anyone to the table.(Smartix in the same time met with many groups on our own-see my previous memo)
   I also find it particularly disturbing that (after 90+ days of discussions about the critical nature of our situation)virtually immediately after my anouncement, to Sumitomo, that we were "out of cash";Smartix receives a term sheet from Sumitomo at a valuation level 25% of the one which Sumitomo gave us in the last round. Moreover it is a term sheet that allows Sumitomo to more than quadruple its holdings in Smartix for a figure of only one half of what Sumitomo originally invested. Is this what you categorize in your memo as trying to "see if there is any way that you can help"
   To be very specific "as a major shareholder" I think that Sumitomo should be looking for more than "information" due to (your) investment level. There are significant potential liabilities inherent in our situation. To date you and our other "major shareholders" have ignored this fact.At our June 4tha meeting Bob Graustein said to Don Montuori,Norm Snyder and myself that "you would not let us fail".We genuinely believed (at that time ) that Sumitomo wanted to ,and would, help the company to succeed;and reduce the liabilties we were mutually facing. I hope that you realize that we have until 9/30/03 to develop a workable plan to address these issues.

     Bill Henneberry

PS. This week I loaned the company another $25,000 to cover payroll ,so that we would not renege on our obligations to the teams to operate through the final home games. I have also advanced $15,000 in expenses (unreimbursed) and have not been taking salary. This follows my other loans of $400,000 to the firm. I am therefore the only shareholder in the company to provide financial support for the firm in well over a year. Something is wrong with this picture.

**EXHIBIT "B"**

**Bill Henneberry**

| | |
|---|---|
| From: | Eric Petrosinelli |
| Sent: | Tuesday, September 30, 2003 10:38 AM |
| To: | Bill Henneberry |
| Cc: | Don Montuori |
| Subject: | RE: Discussions with Sumitomo or Cramer Berkowitz |

1. I have never spoken or conversed via email with Cramer Berkowitz since I have been at the Company, with the exception of one meeting with Brad Berowitz and individual investor probably two years ago. I doubt I or he would recognize one another

2. Since Don, you and I met with SCOA last Fall, I have not spoken or conversed via email with the exception of the following two occasions

(i) On 9/4/03 you requested that I email SCOA with documentation on the Los Angeles Dodgers and Houston Astros discussions concerning 2003 programs. I          followed your order, they responded back to me later on 9/4/03 asking for further clarification. I forwarded you the email on 9/5/03 and I never responded to SCOA          question.

(ii) Late in the evening on 9/25/03 I received a call at home from Bob Graustein. He said he was calling because the Red Sox had called him following my meeting          with the Club in Boston (you were briefed on the ride home after your meeting with Kessler) He said the Club expressed to him concern about getting information they requested and that it was important to cooperate with the Club during this period. I said I would provide them standard information but not any proprietary          information. he agreed. Further I said the Red Sox were going to send an email with their information request, and I would be forwarding it to Bill H. and he could          get the information request form Bill H. Lastly, he said he was trying to get all the different parties on the same page, address their issues, in order to secure new financing and have the Company survive. My only response was time is running out. By the end of next week all the parties/issues need to be resolved and we          need to go and "re-sell" the Red Sox on SmartFan for the 2004 Season Otherwise the Red Sox have a proposal with Tickets.com and will go that way. All this was          conveyed to you the morning of 9/26/03. I have had no conversation since.

That's all. Call me if questions
        Eric

-----Original Message-----

| | |
|---|---|
| From: | Bill Henneberry |
| Sent: | Monday, September 29, 2003 9:26 PM |
| To: | Eric Petrosinelli |
| Cc: | Don Montuori |
| Subject: | Discussions with Sumitomo or Cramer Berkowitz |

I appreciate your call tonite. I do want to reemphasize the point that it is not appropriate for Sumitomo or Cramer Berkowitz to be having conversations with you regarding the direction/ conducting of Smartix business while I am the CEO of Smartix. If this happens you should tell them to contact me to set up any dialogue that they wish to have with personnel in the firm. At this point there can be no exceptions to this unless I give the approval in writing. I am sure that you understand the serious nature of this situation. These parties have been notified in writing to cease this type of contact. Thanks Bill

**EXHIBIT "C"**

| | |
|---|---|
| **From:** | Bill Henneberry |
| **Sent:** | Friday, September 26, 2003 4:52 PM |
| **To:** | 'robert.graustein@sumitomocorp.co.jp'; 'jeffrey.frank@sumitomocorp.co.jp'; 'william.fornshell@sumitomocorp.co.jp'; 'Brad@cberk.com' |
| **Cc:** | 'rinaldolaw@aol.com'; Don Montuori |
| **Subject:** | Reply to your letter |

I suggest that you reread my of 9/25/03 letter again. I stand by what it says. I also strongly suggest that you immediately cease your unauthorized activity with regard to Smartix. It is duly noted that you have had unauthorized meetings/conversations with shareholders,noteholders,clients,strategic partners, vendors, employees,and potential asset purchasers without advising Smartix of the meetings,agendas,or results. It is obvious that during the course of those meetings etc. that "information" has been provided to these groups/individuals which is detrimental/damaging to the management of Smartix, individual employees, our ongoing business relationships with these parties,and our ability to have these entities participate in a positive/unprejudiced manner in fund raising activities with groups brought in by them or Smartix ,or any activity aimed at improving the business of Smartix/its shareholder value.

I will not spend the time now in addressing your comments about Mike Dee except to say that over three years we had a successful business relationship. On 9/7/03 he called me to a meeting in Baltimore where he told me his agenda was to discuss the marketing of the program( SmartFan) for next year. When the topic of our financing came up and I told him about your term sheet (which I believed then ,and still do today, is unexecutable under the conditions imposed ,and does not provide Smartix or its clients with the financial/organizational security necessary ) and the potential for our business failure, if it could not be executed, he became very upset. When you couple this with your direct and ongoing conversations with the Red Sox of the last week ,you effectively did irreparable damage to my relationship with him ,and my ability to represent Smartix in the business negotiations.

Your letter of (9/25/03) seems to indicate that I have not responded to your term sheet . Nothing could be further from the truth! I have responded, I have told you ,and am telling everyone again that it is an unexecutable term sheet. It also does not provide the appropriate capitalization for the firm. Further it is not an investment offer but a matching investment one and other than $75,000 from Cramer Berkowitz you do not have a matching investor for the other funding. Further it carries a set of conditions that are simply not capable of providing the teams with the assurance that Smartix can stay financially secure for the next season. Any reasonable business person can see these facts. It is obvious that not only was it created to attempt to take over the company at the "eleventh" hour in a coercive power play; but failing that, it was fashioned to give the appearance that Sumitomo did in fact try to "help" the firm achieve its business financing needs. The net effect of it and your actions may ultimately be the ruin of Smartix and a number of careers/reputations (including my own) but the sad fact remains that this will happen because you did not make a viable offer or for that matter a real one. It is a shame as this did not have to happen this way, based on a program with the successful business model of SmartFan.

Attached your will find two documents. The first contains information on Sumitomos' unauthorized activities with the shareholders of the firm. The other is a recap of some of the events leading up to your presentation of a term sheet on 9/08/03.

With regard to your demand that I honor my fiduciary responsibilities and step down as CEO of the firm . I am considering that possibility and whether it is in my best interests and those of the firm and its shareholders.I expect to make a decision after consultation with my independent counsel .I expect that you hold open a number of times next week for the emergency Board meeting we need.

Sumitomo activity
with Shareho...

Sumitomo events
leadig up to t...

### Unauthorized activity between Sumitomo and other shareholders in Smartix

It is duly noted that Sumitomo has had numerous meetings (beginning as early as second quarter 2003)with individuals/shareholders of Smartix(specifically Messrs.Huber ,Metzger and Katz) without advising Smartix of the meetings, or their agenda's/results. Information has recently come to our attention that these meetings have had the potential of doing serious harm to Smartix and/or were put together with the sole purpose of fulfilling a plan whereby Sumitomo would gain a greater ownership/controlling position in Smartix ,to the disadvantage of other shareholders. It appears that the purpose of some of this activity is aimed at eliminating Smartixs' capability to raise funds from parties not "controlled " directly or indirectly by Sumitomo. This activity would allow Sumitomo to control the setting of the valuation level for Smartix and therefore "ratchet" their ownership of Smartix to higher levels at the least possible cost.Examples of this activity include ,but are not limited to the following:

1) Sumitomos' meetings or conversations with Mr. Metzger/his attorney which may seriously compromise our position in regard to the defense against claims being made by them in their ongoing lawsuit

2)Information/direction was given by Sumitomo to these shareholders which has led to activity on their parts specifically aimed at/capable of creating shareholder disagreements,which effectively eliminate the ability of Smartix management to provide investor confidence in Smartix. This confidence is necessary to raise money from sources outside of Sumitomos' "control". This behavior on Sumitomos' part is directly related to Sumitomos' apparent attempt to control the valuation of the next investment,and to keep the ability to exercise their full ratchet rights at their discretion and to the detriment of the holdings of other shareholders.

3)Sumitomo has attempted to influence certain of these aforementioned shareholders with statements (often malicious and inflamatory) about current Smartix management that:

- led these individuals to believe that they (Sumitomo) would provide these shareholders with a larger/continuing role in Smartix in exchange for their cooperation with Sumitomos' plans..

-led them to believe that Smartix management would be replaced by Sumitomo

-suggested that their support of Sumitomos' plans was the only way for the company to become worth/make hundreds of millions of dollars.

(it also appears that this suggestion was also made to Smartix noteholders,clients,and strategic partners by Sumitomo.)

4)Sumitomo apparently attempted to coerce these individuals into cooperating with Sumitomos' plans through inferences such as:

-Indicating that these individuals were liable in regards to certain issues involved in Sumitomos' investment in Smartix.

-stating that Sumitomo had "deep pockets" and could afford to spend the necessary money to make these allegations "stick".

I do not think that it is necessary to point out to you the seriousness of the implications from this behavior on the part of Sumitomo!

**Background on events leading up to Sumitomos' 9/8/03 term Sheet**

I believe that it is important for Smartix to advise you of our position regarding the events leading up to your presentation of a term sheet on 9/08/03. On Wednesday 9/03/03 ,after 3 plus weeks of waiting for "approval" of an investment recommendation based on our work with you,Jeff Frank and John Degen, I called Jeff to advise him that Smartix was "out of cash/not capable of paying our bills".

However it is important to also point out that in addition to this fact that you were aware of our situation for the previous three months. We also feel that we have been misled by Sumitomo during the process of reviewing our situation and seeking financial assistance/investment over those last few months. Specifically:

1) In our meetings of 6/4,7/1,and 7/21/2003 we reviewed the Smartix financial Status, and reported to you our cash needs. At each meeting we told you that without new funding we would need to use cash flows from ticket resales to fund overhead. I suggest that you review the meeting outlines an/or the follow up letters to these meetings. Some of these include specific charts on our overhead, prioritizing of accounts payable, and how we would utilize funding. In our 6/4/03 meeting you specifically stated that "you would not let Smartix fail". We felt confident that you would help us put an appropriate plan together quickly.

2) On 6/16/03(having received no reply to our written proposal to Sumitomo) I called you up to report that we were bankrupt and without funding. I told you that I believed that our options were to sell assets or proceed to a Bankruptcy declaration. You immediately wrote me back to "put me on notice" that I could not legally do this without your approval. Further you told us that what we should be doing is focusing on a plan to raise funds (from Sumitomo and elsewhere.)

3)On 8/4/03 after 6 weeks of " focusing on raising those funds" we wrote to Sumitomo again declaring that we were "broke and in debt".It is duly noted that during those six weeks ,that Sumitomo never produced a letter for us indicating that they would match an investment by others. This fact made it "virtually impossible for Smartix to raise funds from our own sources. It appears ,now, that Sumitomos' withholding of that "matching" letter may be part of their plan to gain "control" of Smartix,at a valuation set by Sumitomo.

4) Between 8/4/03 and 8/12/03 we worked with you, John Degen ,and Jeff Frank to prepare a complete set of financials for Sumitomos' use in internal review with your "investment committee". A simple review of the 2003 Balance Sheet from these "jointly prepared/reviewed" financial documents clearly shows that (here again) Sumitomo knew the nature and extent of our liabilities. Specifically, these documents show a specific line item "ticket resale payable" of over $260,000 as of September 2003. Further it shows that we showed Sumitomo that we intended to pay this payable after September with the capital from the investment from Sumitomo .

5) We reviewed in great detail with Jeff Frank and John Degen these previously mentioned financial exhibits, between 8/4/03 and 8/12/03. At their direction we created the plan utilizing a $1,000,000 investment from Sumitomo. That investment level is also

clearly shown on the 2003 Balance Sheet as being put in $600,000 in August, $200,000 in Sept., and $200,000 in October. Furthermore the balance sheet shows that capital being used to help to pay down the other $645,000 in payables. However it is duly noted that these financials were created with Sumitomo based on an investment to begin in August. Further after waiting 3+ weeks for an offer based on those terms we received a term sheet, on 9/08/03 ,offering terms that were not even close to that plan and clearly not based on the facts or assumptions used in creating it. The reasoning behind these actions appears to be directly related to Sumitomos' ,"apparent" plan to withhold a funding offer until Smartix had no other choices. It is now obvious that just such an offer followed my phone call of 9/3/03 when I advised Sumitomo that we were out of cash

Bill Henneberry

| | |
|---|---|
| **From:** | Bill Henneberry |
| **Sent:** | Friday, September 26, 2003 5:03 PM |
| **To:** | Bill Henneberry; 'robert.graustein@sumitomocorp.co.jp'; 'jeffrey.frank@sumitomocorp.co.jp'; 'william.fornshell@sumitomocorp.co.jp'; 'Brad@cberk.com' |
| **Cc:** | 'rinaldolaw@aol.com'; Don Montuori |
| **Subject:** | RE: Reply to your letter |

Please not that the meeting referred to with Mike Dee was held on 9/9/03 and not 9/7/03 Sorry for the typo.

-----Original Message-----

| | |
|---|---|
| **From:** | Bill Henneberry |
| **Sent:** | Friday, September 26, 2003 4:52 PM |
| **To:** | 'robert.graustein@sumitomocorp.co.jp'; 'jeffrey.frank@sumitomocorp.co.jp'; 'william.fornshell@sumitomocorp.co.jp'; 'Brad@cberk.com' |
| **Cc:** | 'rinaldolaw@aol.com'; Don Montuon |
| **Subject:** | Reply to your letter |

I suggest that you reread my of 9/25/03 letter again. I stand by what it says. I also strongly suggest that you immediately cease your unauthorized activity with regard to Smartix. It is duly noted  that you have had unauthorized meetings/conversations with shareholders,noteholders,clients,strategic partners, vendors, employees,and potential asset purchasers without advising Smartix of the meetings,agendas,or results. It is obvious that during the course of  those meetings etc. that "information" has been provided to these groups/individuals which is detrimental/damaging to the management of Smartix, individual employees, our ongoing business relationships with these parties,and our ability to have these entities participate in a positive/unprejudiced manner in fund raising activities with groups brought in by them or Smartix ,or any activity aimed at improving the business of Smartix/its shareholder value.

I will not spend the time now in addressing your comments about Mike Dee except to say that over three years we had a successful business relationship. On 9/7/03 he called me to a meeting in Baltimore where he told me his agenda was to discuss the marketing of the program( SmartFan) for next year. When the topic of our financing came up and I told him about your term sheet (which I believed then ,and still do today, is unexecutable under the conditions imposed ,and  does not provide Smartix or its clients with the financial/organizational security necessary ) and the potential for our business failure, if it could not be executed, he became very upset. When you couple this with your direct and ongoing conversations with the Red Sox of the last week ,you effectively did irreparable damage to my relationship with him ,and my ability to represent Smartix in the business negotiations.

Your letter of (9/25/03) seems to indicate that  I have not responded to your term sheet . Nothing could be further from the truth! I have responded, I have told you ,and am telling everyone again that it is an unexecutable term sheet. It  also does not provide the appropriate capitalization for the firm.  Further it is not an investment offer but a matching  investment one and other than $75,000 from Cramer Berkowitz you do not have a matching investor for the other funding. Further it carries a set of conditions that are simply not capable of  providing the teams with the assurance that Smartix can stay financially secure for the next season. Any reasonable business person can see these facts. It is obvious  that not only was it  created to attempt to take over the company at the "eleventh" hour in a coercive power play; but failing that, it was fashioned  to give the appearance that  Sumitomo did in fact try to "help" the firm achieve its business financing needs. The net effect of it and your actions may ultimately be the ruin of Smartix and a number of careers/reputations (including my own) but the sad fact remains that this will happen because you did not make a viable offer or for that matter a real one. It is a shame as this did not have to happen this way, based on a program with the successful business model of SmartFan.

Attached your will find two documents. The first contains information on Sumitomos' unauthorized activities with the shareholders  of the firm. The other is a recap of some of the events leading up to your presentation of a term sheet on 9/08/03.

With regard to your demand that I  honor my fiduciary responsibilities and step down as CEO of the firm . I