UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/27/05

WILLIAM HENNEBERRY,

    Plaintiff,

    - against -

SUMITOMO CORPORATION OF
AMERICA, ROBERT GRAUSTEIN,
SUMITOMO CORPORATION, and JOHN
DOES nos. 1-50 (fictitiously named
individuals),

    Defendants.

**OPINION AND ORDER**

04 Civ. 2128 (PKL)

**APPEARANCES**

JOHN M. DEITCH, ESQ.
Mendes & Mount LLP
One Newark Center, 19th Floor
Newark, New Jersey 07102

Attorneys for Plaintiff

STUART M. RIBACK, ESQ.
Siller Wilk LLP
675 Third Avenue
New York, New York 10017
Stephen D. Hoffman, Esq.
Pamela L. Kleinberg, Esq.

Attorneys for Defendants Sumitomo Corporation of America and Robert Graustein

**LEISURE, District Judge:**

Plaintiff William Henneberry brings this action against all named defendants for: (1) detrimental reliance, including promissory estoppel and negligent misrepresentation; (2) breach of contract; (3) breach of fiduciary duty; (4) defamation, including slander *per se*; (5) injurious falsehood; and, (6) tortious interference with prospective economic advantage. Plaintiff's claims arise out of a business investment relationship between the company of which Henneberry was Chief Executive Officer ("CEO") and majority shareholder, Smartix International Corp. ("Smartix"), and defendants Sumitomo Corporation of America as investor, its Senior Vice President Robert Graustein,[1] and Sumitomo Corporation as the parent company of SCOA.

Defendants SCOA filed the instant motion to dismiss for failure to state a claim for which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), on May 24, 2004.[2] Defendants make a series of arguments, in effect claiming that plaintiff's suit is a "strike suit" wherein plaintiff is litigating claims that are the sole province of Smartix as a company allegedly wronged and are not properly brought by Henneberry in his personal capacity as CEO and shareholder. Defendants also allege that the alleged defamatory utterances were mere opinion. SCOA finally takes issue with plaintiff's claim for damages which allegedly do not flow directly from the tort alleged. The parties' arguments for and against the instant motion to dismiss are addressed in turn below.

---

[1] Because the claims against Sumitomo Corporation of America and Graustein are indistinguishable, the Court will refer to both defendants collectively as "SCOA" or "defendants" hereinafter.

[2] On August 16, 2004, defendant Sumitomo Corporation filed its own motion to dismiss. The Court will address the merits of that motion in a companion Opinion and Order to follow.

# BACKGROUND

## I.     The Parties

Plaintiff William Henneberry is a Connecticut resident and a creative marketing entrepreneur specializing in developing new marketing strategies for credit cards. (Plaintiff William Henneberry's Complaint ("Compl.") ¶¶ 10-11.) His successes involving athletic teams and credit cards are numerous. (Id. ¶¶ 15-19.) Further, prior to the parties' involvement here, Henneberry worked as a consultant for Major League Baseball and MasterCard from December 1995 through January 2000, earning between $10,000 and $25,000 per month. (Id. ¶ 139.) At all times relevant to this action, Henneberry was the Chairman and a stockholder of Smartix, a non-publicly traded New York corporation. (Id. ¶¶ 12-13, 21.) As chairman, Henneberry was entitled to $150,000 per year in salary. (Id. ¶ 20.) As of September 9, 2003, Henneberry owned 1,740,666 shares of Smartix stock. (Id. ¶ 22.)

Defendant Sumitomo Corporation of America is a New York corporation and a wholly owned subsidiary of defendant Sumitomo Corporation. (Id. ¶¶ 3, 34.) Defendant Robert Graustein is a New York resident and was Senior Vice President of defendant Sumitomo Corporation of America at all times relevant to this lawsuit.

## II.     The Program

Smartix was purposed to create an electronic ticketing promotion for Major League Baseball with MasterCard which, *inter alia*, allowed season ticket holders to sell unused tickets on the internet and at designated kiosks (the "Smartfan program"). (Id. ¶¶ 23, 24.) The Smartfan program was tested with the Boston Red Sox and the St. Louis Cardinals baseball teams. (Id. ¶ 25.) Pursuant to this aim, Smartix sought and obtained investors including SCOA. (Id. ¶ 31.)

III.    SCOA's Investment Activities

    A.    Spring of 2002 Investment Agreement

In anticipation of its future investment agreement, SCOA conducted an economic valuation of Smartix which valued Smartix at $10,000,000, or $1.50 per share. (Id. ¶¶ 50, 51.) In the Spring of 2002, SCOA agreed to invest at least $3,000,000 and at most $5,000,000 in Smartix, and SCOA agreed to share in the profits and losses of Smartix. (Id. ¶¶ 48, 49.) Based on this agreement, Smartix engaged in the following actions: (1) filed a restated certificate of incorporation with the Secretary of State of New York as required by SCOA; (2) convinced its original investors to subordinate their class of shares to those to be issued to SCOA; (3) convinced its original investors to reduce dividend percentages, forego dividends, and invest more cash into Smartix; (4) advised potential investors of SCOA's offer and that future investment would have to wait and suffer a higher valuation; (5) agreed to allow Hank Aaron to serve as a member of Smartix's Board of Directors; and, (6) ordered special stock certificates with legends as specifically requested by SCOA. (Id. ¶ 53.) In addition to Smartix's actions resulting from SCOA's anticipated investment, Henneberry also personally acted in reliance, loaning Smartix $100,000. (Id. ¶ 54.) However, after documents memorializing this agreement were sent by SCOA to Smartix's shareholders for execution, SCOA advised Henneberry that SCOA would not continue with the investment on the present terms. (Id. ¶ 57.) This advisement was made on June 4, 2002. (Id.)

    B.    Subsequent Investment Agreement by SCOA

SCOA ultimately invested $1,000,000 in Smartix and agreed to share profits and losses with the other classes of Smartix stockholders. (Id. ¶ 60.) SCOA also stated that it was now Smartix's lead investor and would actively seek out new investments for Smartix. (Id. ¶ 61.) In

fact, when faced with Smartix's financial troubles at a meeting in June 2003, Graustein stated that SCOA "would not let you [Smartix] fail." (Id. ¶¶ 63, 64.) At this meeting, SCOA also agreed to provide matching investments and to send a letter confirming this position. (Id. 65.) However, no letter was received. Smartix advised SCOA that Smartix would require a further $1,000,000 investment and the implementation of the Smartfan program with ten sports teams. (Id. ¶ 68.) Based on SCOA's expressed support for this plan, Henneberry continued to personally loan Smartix money through October 2003, consisting of nine loans (ten in total, counting the initial loan of $100,000 in the Spring of 2002): (1) $47,500; (2) $52,500; (3) $50,000; (4) $150,000; (5) $27,500; (6) $30,000; (7) $190,000; (8) $12,754.83; and (9) $2,170.54. (Id. ¶¶ 55, 69.) SCOA was repeatedly warned of Smartix's financial situation which was forcing Smartix to reneg on its financial obligations to the Red Sox and Cardinals. (Id. ¶¶ 70, 74.) Also, early on in this struggle, on June 16, 2003, Henneberry advised Graustein that Smartix may need to cease operations; however, Graustein informed him Smartix did not have the legal power to do so without shareholder approval. (Id. ¶¶ 71, 72.)

Finally, on September 8, 2003, SCOA presented Smartix with a new investment proposal wherein SCOA would provide matching investments up to $500,000 and would require that Henneberry convert his personal loans into company stock. (Id. ¶¶ 76, 77.) Smartix and Henneberry rejected this offer because it did not provide sufficient capital and it was based on a lower valuation of the company. (Id. ¶¶ 78, 79.)

The next day, Henneberry was called into a meeting with Michael Dee, Executive Vice President of Business Affairs for the Boston Red Sox, regarding the continuation of the Smartfan program for the next year. (Id.¶¶ 45, 80.) Henneberry was forced to concede Smartix's financial

difficulties and its potential instability in the coming baseball season, causing Dee to express concern about the business relationship going forward. (Id. ¶ 82.)

IV.  SCOA's Meetings with the Red Sox and MasterCard and Final Dealings with Smartix

On September 22 or 23, 2003, Graustein and other SCOA employees met with Dee and informed him, in sum and substance, that Henneberry "lacked the necessary skill and ability to manage Smartix[,] otherwise disparaged his business acumen," and blamed Smartix's financial troubles and failure to pay monies owed to the Red Sox on Henneberry's mismanagement of the company. (Id. ¶ 90.) SCOA also stated that it would be taking over Smartix and removing Henneberry. (Id. ¶ 96.) Thereafter, Dee lost faith in Henneberry and began using Graustein as the contact for the Smartfan program. (Id. ¶¶ 95, 97, 139-40, Ex. B.) Dee also refused to do business with Smartix if Henneberry was involved with the company (id. ¶ 108), which directly contradicted Dee's earlier statement on July 2, 2003 that the Red Sox had "taken a leap of faith by aligning ourselves with Smartix, in large part due to my confidence and trust in you personally" (id. ¶ 109).

At some point between September 19 and 23, 2003, Graustein met with MasterCard, including, *inter alia*, John Stuart, MasterCard's Senior Vice President of Global Sponsorship and Event Marketing, and informed it, in sum and substance, that Henneberry lacked the necessary skill and ability to manage Smartix, disparaged his business acumen, and blamed Smartix's financial condition and failure to pay the Red Sox and Cardinals monies owed on Henneberry's mismanagement of the company. (Id. ¶¶ 99, 100, 106.) MasterCard similarly lost faith in Henneberry. (Id. ¶¶ 105, 139-40.)

SCOA did not notify Smartix regarding either of these meetings (id. ¶ 89) until after the fact, at a meeting with Henneberry on September 24, 2003 (id. ¶ 107). Thereafter, Henneberry sent a letter to SCOA outlining its perceived bad acts and effect on the company. (Id. Ex. C.)

On October 9, 2003, Smartix held a shareholder's meeting wherein it was decided that Smartix would continue to pursue the Smartfan program with the Red Sox. (Id. ¶ 111.) SCOA represented that it had been in contact with investors who had expressed interest in investing in Smartix. (Id. ¶ 112.) SCOA again reiterated that it wanted Smartix to survive and succeed. (Id.) Based on SCOA's representations made at this meeting, Henneberry continued to personally loan money to Smartix. (Id. ¶ 113.) There is no evidence SCOA invested any further monies in Smartix (id. ¶ 117) and Smartix's stock is presently worthless (id. ¶ 131).

## DISCUSSION

Defendants SCOA claim that plaintiff has failed to state a claim for which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), and seek dismissal of the Complaint against them. The legal standard for this motion and plaintiff's six claims against SCOA are discussed, in turn, below.

### I.   Motion to Dismiss Standard

When determining whether plaintiff's claim should be dismissed on motion for failure to state a claim for which relief may be granted, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (quoting Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000)); see also Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740 (1976); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992), cert. denied, 507 U.S. 961, and, 507 U.S. 972 (1993). Thus,

"[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59, 62-63 (2d Cir. 1997). Plaintiff's Complaint should not be dismissed in this instance "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 894-95 (2d Cir. 1976). However, plaintiff's Complaint "must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." Huntington Dental & Med. Co. v. Minnesota Mining & Mfg. Co., No. 95 Civ. 10959, 1998 WL 60954, at *3 (S.D.N.Y. Feb. 13, 1998).

Accordingly, the factual allegations set forth in the Complaint and repeated above do not constitute findings of fact by the Court, but rather are presumed to be true for the purpose of deciding the motion to dismiss. See Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 165 F. Supp. 2d 615, 625 (S.D.N.Y. 2001). When deciding a motion to dismiss, the Court may consider:

> the factual allegations in [the] complaint . . . , documents attached to the complaint as an exhibit or incorporated in it by reference . . . , matters of which judicial notice may be taken . . . , or documents . . . of which plaintiff[] had knowledge and relied on in bringing suit.

Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); see also Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is part thereof for all purposes."); Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); Gregory, 243 F.3d at 691.

The decision of whether to hold an oral hearing regarding a motion to dismiss lies in the sound discretion of the district court. Greene v. WCI Holdings Corp., 136 F.3d 313, 316 (2d Cir.

1998). If the district court decides to dismiss any claims, that dismissal is generally considered a judgment on the merits, unless dismissed for "curable defect." Criales v. Am. Airlines, Inc., 105 F.3d 93, 98 (2d Cir. 1997). The Second Circuit reviews a district court's determination of whether a motion to dismiss should be granted *de novo*. Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998) (citing Sykes v. James, 13 F.3d 515, 518-19 (2d Cir. 1993)). With this legal parameter in mind, the Court turns to plaintiff's six claims against SCOA.

II.     Plaintiff's Claims Against SCOA

SCOA avers that plaintiff's Complaint against SCOA should be dismissed for failure to state a claim insofar as it alleges that SCOA, (1) caused plaintiff to detrimentally rely on its statements, stating alternative claims for promissory estoppel and negligent misrepresentation; (2) breached its contract with plaintiff; (3) breached its fiduciary duty to plaintiff; (4) defamed plaintiff to the Red Sox and MasterCard; (5) uttered an injurious falsehood under New York State law in its conversations with the Red Sox and MasterCard; and, (6) tortiously interfered with Henneberry's prospective economic advantage.[3]

A.     Detrimental Reliance

Plaintiff claims, pursuant to two different legal theories, that defendants improperly induced plaintiff's reliance on defendants' statements to plaintiff's detriment. (Plaintiff Henneberry's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint ("Pl.'s Opp'n") at 3-6.) First, plaintiff asserts a claim under a theory of promissory estoppel. (Id. at 3-5.) Also, plaintiff claims that his detrimental reliance claim sounds in

---

[3]     Plaintiff's claims are governed by state law, but the parties have not raised choice of law issues. Instead, the parties' briefs assumed that New York State law applies. Where the parties so assume, the Court need not address choice of law *sua sponte*. See In re Chateaugay Corp., 139 B.R. 598, 602 n.3 (Bankr. S.D.N.Y. 1992) (citing Deep S. Pepsi-Cola Bottling Co. v. Pepsico, Inc., No. 88 Civ. 6243, 1989 U.S. Dist. LEXIS 4639, at *24 (S.D.N.Y. May 2, 1989)). Therefore, the Court applies New York State law in accordance with the parties' briefs.

negligent misrepresentation. (Id. at 5-6; see also Compl. ¶¶ 114-19.) The Court addresses each theory in turn.

1.    Promissory Estoppel

Both parties agree that in order for plaintiff to assert a claim under a theory of promissory estoppel, plaintiff must plead the following elements: (1) there was a clear and unambiguous promise; (2) plaintiff's reliance on that promise was reasonable and foreseeable to defendants; and, (3) plaintiff sustained injury due to his reliance on defendants' promise. See Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995); R.G. Group v. Horn & Hardart Co., 751 F.2d 69, 78 (2d Cir. 1984); Restatement (Second) of Contracts § 90 (1981).

a.    Henneberry's Standing to Assert this Argument

Defendants first argue that SCOA's alleged promises were to Smartix, and not to Henneberry personally and, therefore, Henneberry cannot assert a claim of promissory estoppel. While defendants are correct that the majority of promissory estoppel caselaw does not deal with promissory estoppel as asserted by a third party, that does not foreclose the possibility at this preliminary stage in the litigation that plaintiff could assert a claim of promissory estoppel as a third party to the promise. The Restatement (Second) of Contracts defines promissory estoppel as:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90 (1981) (emphasis added). In addressing the availability of a claim of promissory estoppel to a third person other than the promisor or promisee, comment c of the Restatement asserts that courts have allowed this claim

10

where the third party was a beneficiary of the promise at issue. Id. cmt. c. However, the Restatement also states that, in rare cases, promissory estoppel might be justifiable for third parties that were not beneficiaries of the promise. Id.

Caselaw from this Court also supports this position. In von Kaulbach v. Keoseian, 783 F. Supp. 170 (S.D.N.Y. 1992), defendants, potential trustees, asserted a promissory estoppel claim against the future decedent who was to include funding for the trust in his will. Id. at 172, 177. The defendants were lawyers who came out of retirement in order to set up the trust. Id. at 177. When it was not funded, they asserted claims for the "thousands of hours" they spent in anticipation of the will. Id. There, the Court held that von Kaulbach was required to fund the trust under a theory of third party promissory estoppel. Id. Likewise, in a much older case, the New York Court of Appeals granted a third party the power of promissory estoppel to enforce a contract. See Mt. Vernon Trust Co. v. Bergoff, 272 N.Y. 192, 5 N.E.2d 196 (1936). In Mount Vernon, the Court estopped defendant from asserting the defense of no consideration where defendant had issued a note to a bank which the bank had stipulated was unenforceable. Id. Despite opining that the defendant may have had no intent to deceive the public, the Court held that, in issuing the note, defendant perpetrated a continuing fraud and third parties could enforce the note against her. Id. at 196, 5 N.E.2d at 197 ("Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.")

Defendants will protest that the cases above are readily distinguishable and that the Restatement's edict that third parties who are not intended beneficiaries of the contract can assert a promissory estoppel argument is only to be applied in the rarest of situations. While true, at this stage of the proceeding the Court must only determine whether plaintiff has stated a claim which he should be allowed to support factually. Because precedent does exist for third parties to assert promissory estoppel arguments, and plaintiff could supply further facts gained from discovery to liken his case to the ones above, the Court will allow plaintiff to proceed on this theory for the time being.

b.      The Alleged Promises and Reliance

Defendants next argue that the statements plaintiff hinges his argument on were not clear and unambiguous promises. Plaintiff does not explicitly identify which statements allegedly constituted promises under the first count in the Complaint. However, in its opposition brief, plaintiff identified the following statements as possible "promises": (1) SCOA contracted to invest at least $3,000,000 and at most $5,000,000 ("June 2002 agreement") (Pl.'s Opp'n at 3), and to share in the profits and losses of Smartix (Compl. ¶ 49); (2) SCOA stated "we won't let you fail" at a June 2003 meeting with Smartix employees including Henneberry where SCOA also represented it would "pursue a plan to match investments and agreed to provide a letter confirming its position to Smartix" (Pl.'s Opp'n at 3); and, (3) "SCOA repeatedly communicated to Mr. Henneberry that it was actively soliciting outside investment and had investors who were willing to invest" (id. at 4).

i.   Promise to Invest $3,000,000 to $5,000,000
and Share in Smartix's Profits and Losses

Defendants challenge plaintiff's characterization of this alleged promise, arguing that it only constituted an agreement to agree while they were negotiating with Smartix. (Defendants SCOA and Graustein's Memorandum of Law in Support of Motion to Dismiss the Complaint ("Defs.' Mot.") at 12.) Defendants claim that this argument is supported by plaintiff's Complaint because plaintiff does not point to any written document evidencing the June 2002 agreement wherein SCOA agreed to invest $3,000,000 to $5,000,000 and share in the profits and losses. Further, SCOA eventually did memorialize in writing an agreement to invest $1,000,000 on July 2, 2002 ("July 2nd agreement"). (Id.) Defendants further contend that the July 2nd agreement contained a merger clause which superseded any alleged promise made by SCOA to invest $3,000,000 to $5,000,000 and to share in the profits and losses. (Defendants Sumitomo Corporation of America and Graustein's Reply Memorandum of Law in Further Support of Motion to Dismiss ("Defs.' Reply") at 1-2.) Plaintiff claims that the June 2002 agreement was memorialized by SCOA and sent to Smartix shareholders for execution. (Compl. ¶ 57).

In deciding the motion to dismiss, the Court can look at any document relied on by plaintiff in making his Complaint. Brass, 987 F.2d at 150. Plaintiff specifically mentions the July 2nd agreement in his Complaint; therefore, that agreement is properly considered by the Court at this time. (See Compl. ¶ 60.) The identified merger clause of the July 2nd agreement states: "This Agreement and the documents referred to herein constitute the entire agreement and understanding among the parties hereto and supercede all prior negotiations and agreements, whether oral or written." (Reply Declaration of Stuart M. Riback, Esq. ("Riback Reply Decl."), Ex. A § 8.12.) Defendants also point to § 3.15 of the July 2nd agreement, which states that,

[e]xcept for the agreements explicitly contemplated by this Agreement . . . there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company [Smartix] is bound that may involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000.

(Id. § 3.15 (emphasis added).)

"Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide,'" Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A., No. 01 Civ. 1047, 2002 U.S. Dist. LEXIS 18115, at *62-63 (S.D.N.Y. Sept. 25, 2002) (quoting Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998)). Absent ambiguity in the contract, the Court will not look to extrinsic evidence, but rather will interpret the contract on its face, giving the words their ordinary meaning. See Kinek v. Paramount Communications, Inc., 22 F.3d 503, 509 (2d Cir. 1994). The question of ambiguity is a question of law to be decided by the Court. See Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002); Readco v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996); Fleet Capital, 2002 U.S. Dist. LEXIS 18115, at *62-63 ("Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.'. . . 'Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous.'") (quoting Alexander & Alexander, 136 F.3d at 86). The Court should find a contract unambiguous where an examination of the "entire integrated agreement" reveals "a definite meaning" and the Court finds "no reasonable basis exists for a difference of opinion about that meaning." Fleet Capital, 2002 U.S. Dist. LEXIS 18115, at *63-64 (internal citations and quotations omitted).

The merger clause is inapposite to the present analysis because, as stated in the Complaint, the relevant promise was affirmatively rescinded on June 4, 2002, almost a full month prior to the effective date of the merger clause. (See Compl. ¶ 57.) Therefore, the merger

language to the effect that there are no other agreements to which Smartix is bound does not conflict with a claim for promissory estoppel based on a prior wrong. Further, taking the factual allegations of the Complaint as true, the June 2002 agreement to invest $3,000,000 to $5,000,000 in Smartix is clear and unambiguous; therefore, defendants' arguments go to the reasonableness of plaintiff's reliance on the promise.

The Court finds that plaintiff has failed to state a claim for reasonable and foreseeable reliance regarding what he terms the June 2002 agreement. (See Compl. ¶ 57.) The claimed actions in reliance on this promise are: (1) Smartix filed a re-stated Certificate of Incorporation reflecting changes required by SCOA; (2) Smartix convinced original investors to subordinate their shares to those to be issued to SCOA, reduce their dividend percentages, forego dividends, and invest additional cash in Smartix; (3) Smartix advised additional investors that future investments would be postponed until a later round at a higher valuation; (4) Smartix allowed Hank Aaron to become a Member of the Smartix Board of Directors; and, (5) Smartix ordered special stock certificates with legends that SCOA requested. (Compl. ¶ 53.) Henneberry also personally loaned $100,000 to Smartix in reliance on SCOA's promised investment. (Compl. ¶ 54.) Even as a third party beneficiary, Henneberry cannot assert injury based on Smartix's actions taken in reasonable reliance. The only action Henneberry personally took in reliance was the loan. However, plaintiff did not plead that it would be foreseeable to SCOA that Henneberry, the CEO, would make a personal loan to Smartix while waiting for a promised investment from SCOA. Nor does it appear to the Court to be an ordinary course of conduct that SCOA should have anticipated. Therefore, the Court finds that plaintiff has failed to properly plead promissory estoppel. Moreover, the Court notes that any purported reasonable and foreseeable action taken by plaintiff in reliance on this promised investment would only be

reasonable up until June 4, 2002 when SCOA affirmatively disavowed their promise to invest $3,000,000 to $5,000,000. All action after that time would be neither reasonable, based on SCOA's expressed intent, nor foreseeable, based on SCOA's expressed understanding of the parties' status.

ii.    <u>"We Won't Let You Fail," Matching Investments and Confirmation Letter</u>

Plaintiff claims that he continued to loan his own money to Smartix based on SCOA's guarantee, at a meeting in June 2003, that it would not allow Smartix to fail and SCOA's representation that it would pursue a plan to match investments and send a confirmation letter to that effect. (Compl. ¶¶ 64, 69.) Defendants claim that the above only evidenced a willingness to cooperate with Smartix, but did not constitute an enforceable oral promise. As above, the Court must determine whether this quote constituted a clear and unambiguous promise on which plaintiff reasonably and foreseeably relied to his detriment. <u>Cyberchron</u>, 47 F.3d at 44.

The Court finds that these cannot, as a matter of law, be construed as clear and unambiguous promises. "We won't let you fail" is vague and ambiguous on its face for it could mean, as plaintiff contends, that SCOA would invest the amount necessary for Smartix to continue its Smartfan program; or it could mean, as defendants contend, any manner of things including a willingness to work with Smartix in order to come to an agreement regarding investments. It does not clearly mean that SCOA was guaranteeing Smartix's survival, but rather appears more of a policy statement akin to that in <u>Ward v. New York Univ.</u>, No. 97 Civ. 8733, 2000 U.S. Dist. LEXIS 14067, at *10 (S.D.N.Y. Sept. 25, 2000) (finding that the University's alleged promises, "i) to provide a great learning environment for adult students; ii) to respect adult students and treat them with respect; iii) to not discriminate against adult students; iv) to provide supervision and teaching by honest and unbiased instructors; and v) to

16

provide and to follow guidelines for student treatment," were not clear and unambiguous but rather policy statements which could not support a claim for promissory estoppel). See also United States v. Rosario, 237 F. Supp. 2d 242, 248 (S.D.N.Y. 2002) (finding no clear and unambiguous promise where the prosecutor represented to defendant that he would "'go to bat' with the Police Department" to ensure defendant was granted transactional immunity); Media Sport & Arts s.r.l. v. Kinney Shoe Corp., No. 95 Civ. 3901, 1997 U.S. Dist. LEXIS 12394, at *47-48 (S.D.N.Y. Aug. 19, 1997) (finding no clear and unambiguous promise where defendant stated that plaintiff "may proceed to act on the enclosed offer without limitation," and that defendant and plaintiff "are going to make a great team").

Plaintiff also claims that at the June 2003 meeting, SCOA represented that it would pursue a plan to match investments and send a confirmation letter to Smartix to that effect. (Compl. ¶ 69.) These statements similarly cannot be construed as clear and unambiguous promises. A promise to pursue is nothing more than a preliminary representation that SCOA would look into whether it felt a matching investment strategy was prudent. Further, that SCOA never sent a confirmation letter evidences that it did not intend to be bound to a matching investment program. These statements do not evidence SCOA's intent to be bound and therefore, cannot constitute promises for purposes of Henneberry's promissory estoppel argument.

   iii. <u>SCOA's Representations That They had Located Investors Interested in Investing in Smartix</u>

Plaintiff asserts that SCOA's representations that they had located investors interested in investing in Smartix constituted clear and unambiguous promises on which Smartix and Henneberry relied by revising and updating documents for presentation to these investors and by Henneberry's continued provision of personal loans to Smartix. However, it is clear to the Court

that these statements as pleaded in plaintiff's Complaint were not clear and unambiguous promises to obtain investors. Rather, at most, they constituted representations that SCOA had already contacted interested investors. Therefore, plaintiff cannot argue promissory estoppel as to these statements. Plaintiff's claim of negligent misrepresentation, assuming these statements constituted false representations of then-present fact, is arguably more tenable but ultimately fails, as discussed below.

### 2. Negligent Misrepresentation

As an alternative to his promissory estoppel argument, plaintiff contends that his complaint supports a claim for negligent misrepresentation. Specifically, plaintiff argues that the statements discussed above were false and he reasonably relied on them to his detriment. Defendants argue that plaintiff's claim is meritless because the Complaint did not allege any "special relationship" between defendants and plaintiff as necessary for a claim of negligent misrepresentation.

To state a claim for negligent misrepresentation, plaintiff must allege that:

> 1) the defendant had a duty, as a result of a special relationship, to give correct information; 2) the defendant made a false representation that he . . . should have known was incorrect; 3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; 4) the plaintiff intended to rely and act upon it; and 5) the plaintiff reasonably relied on it to his or her detriment.

(Pl.'s Opp'n at 5 (citing Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000); King v. Crossland Sav. Bank, 111 F.3d 251, 257-58 (2d Cir. 1997)).) "The particularity requirements of Rule 9(b) apply to claims for negligent misrepresentation." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., No. 02 Civ. 1312, 2003 U.S. Dist. LEXIS 12351, at *11-12 (S.D.N.Y. June 4, 2003) (citing, inter alia, Maalouf v. Salomon Smith Barney, Inc., No. 02 Civ. 4770, 2003 U.S. Dist. LEXIS 5913, at *4 (S.D.N.Y. Apr. 10, 2003), AIG Global

Sec. Lending Corp. v. Banc of Am. Sec. LLC, 254 F. Supp. 2d 373, 380 (S.D.N.Y. 2003), and Northwestern Mut. Life Ins. Co. v. Banc of America Sec. LLC, 254 F. Supp. 2d 390, 394 (S.D.N.Y. 2003)), aff'd on relevant grounds, rev'd in part, 375 F.3d 168 (2d Cir. 2004).

Plaintiff claims that a special relationship sufficient to support a claim of negligent misrepresentation existed between himself and SCOA because SCOA, in holding themselves out as the "lead investor," also held themselves out as having special expertise, akin to an investment banker. Defendants dispute this contention, instead stating that the relationship was solely contractual and SCOA was nothing more than an investor in Smartix. In Kimmel v. Schafer, 89 N.Y.2d 257, 264, 675 N.E.2d 450, 454 (1996), the New York Court of Appeals set forth three factors for determining whether a special relationship existed between the parties absent privity of contract: "[(1)] whether the person making the representation held or appeared to hold unique or special expertise; [(2)] whether a special relationship of trust or confidence existed between the parties; and [(3)] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Id. Because the statements plaintiff claims he relied on were made outside the context of the only written contract of which the Court is aware, the July 2nd agreement, the Court applies the Kimmel factors to the instant Complaint and finds that plaintiff has not sufficiently alleged a special relationship with defendants.

Plaintiff relies heavily on EBC I, Inc. v. Goldman Sachs & Co., 777 N.Y.S.2d 440, 7 A.D.3d 418 (App. Div. 2004), wherein the court found that a relationship between a client and an investment banker is sufficiently "special" under Kimmel, to argue that SCOA should similarly be held to possess special skill, knowledge and expertise. (Pl.'s Opp'n at 6.) The Court first notes that plaintiff did not plead that SCOA was akin to an investment banker in his Complaint. In fact, there is absolutely no mention in the pleading of what SCOA's business

19

actually entails. However, even if plaintiff did so plead, it is plain to the Court that SCOA was merely a common investor, despite the use of the term "lead investor." "Lead investor" is not, as plaintiff would have the Court believe, a magical term transforming SCOA and Smartix's common contractual relationship into a special relationship sufficient to sustain a claim for negligent misrepresentation. Nor does that term endow SCOA with unique expertise on the subject of investing. Supporting this conclusion is the parties' July 2nd agreement where SCOA is termed only an investor. (Riback Reply Decl. Ex. A § 1.19).

Plaintiff does sufficiently allege that SCOA knew that plaintiff would use the information regarding SCOA's potential future investment and the investment of third parties in Smartix to float personal loans to Smartix. This is because SCOA was aware of Smartix's financial difficulty and Henneberry's past provision of personal loans. It is unclear whether SCOA supplied the information in order to induce Henneberry to provide loans to Smartix but it is certainly conceivable that SCOA wished Smartix to survive long enough for SCOA to take over its operation, as this was SCOA's goal as alleged in the Complaint. However, this pleading alone does not justify a claim for negligent misrepresentation, even at this early stage. "This Court has held that a 'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in Kimmell.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 188 (2d Cir. 2004) (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001)). "Suez Investors thus suggests that where, as here, a 'special relationship' is nowhere pled, and the allegations with respect to the other Kimmell factors are soft, a claim for negligent misrepresentation is dismissible under Rule 12(b)(6)." Id.

In Suez Investors, the Court found plaintiff had impliedly pled a special relationship where defendants initiated contact with plaintiff, induced plaintiff's actions in reliance on the misrepresentations, and repeatedly asserted their false statements were true. 250 F.3d at 103 ("[P]laintiff's complaint implies a relationship between the parties that extended beyond the typical arm's length business transaction."). Conversely, here plaintiff's Complaint specifically states that plaintiff sought out SCOA as an investor (Compl. ¶¶ 26, 31) and does not allege that SCOA encouraged Henneberry to make personal loans to Smartix.[4] Moreover, this is not a case wherein the parties' positions are such that SCOA would have an advantage over Henneberry. See Lasalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc., No. 02 Civ. 7868, 2003 U.S. Dist. LEXIS 4315, at *17-18 (S.D.N.Y. Mar. 19, 2003) (citing Fleet Bank v. Pine Knoll Corp., 736 N.Y.S.2d 737, 741, 290 A.D.2d 792, 795 (App. Div. 2002), and distinguishing similar cases to support the Court's dismissal of plaintiff's negligent misrepresentation claim). In short, the Court finds that plaintiff has not alleged "a relationship so close as to approach that of privity" and, therefore, must dismiss plaintiff's claim for negligent misrepresentation.[5] See In re Sterling Foster & Co. Sec. Litig., 222 F. Supp. 2d 216, 284 (S.D.N.Y. 2002) (citing Parrott v. Coopers & Lybrand, L.L.P., 95 N.Y.2d 479, 483, 741 N.E.2d 506, 508 (2000)); see also Banque Arabe Et

---

[4]    The Court notes that SCOA did allegedly repeat its assurances that it would seek out investors and would not allow Smartix to fail. However, those assurances are irrelevant to the present inquiry as they were not misrepresentations of present fact as required for a claim of negligent misrepresentation. See Eternity, 2003 U.S. Dist. LEXIS 12351, at *10 (quoting Hydro Investors, 227 F.3d at 21, as holding that the "negligent misrepresentation claim failed as a matter of law because the misrepresentations at issue, which related to predictions of energy output, 'were mere promises of future output as opposed to present representations of existing fact'"). The only alleged misrepresentation of then-present fact is SCOA's statement that it was in contact with interested investors. (Compl. ¶ 62.) However, simply stating that SCOA was lying when they made this statement is insufficient for Rule 9(b) purposes, see id. at *12; and, in fact, plaintiff no where alleges that this statement was untrue.

[5]    Because the Court finds that plaintiff failed to sufficiently plead the first element of negligent misrepresentation, the Court will not address the other four elements defined, supra.

Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 158 (2d Cir. 1995) ("Generally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care" amongst similarly sophisticated parties.); In re Time Warner Sec. Litig., 9 F.3d 259, 271 (2d Cir. 1993) ("New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity.'") (quoting Ossining Union Free School District v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 419, 539 N.E.2d 91, 91 (1989)), superseded on other grounds as stated in, In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 885 (W.D.N.C. 2001).

### 3. Conclusion

Thus, for the reasons stated above, plaintiff's claim for detrimental reliance is dismissed. Plaintiff has failed to sufficiently state a claim under either a theory of promissory estoppel or negligent misrepresentation. (See Compl. ¶¶ 114-19 ("First Count").)

### B. Breach of Contract

Plaintiff also alleges that SCOA is liable for breach of contract stemming from the June 2002 agreement that SCOA would invest $3,000,000 to $5,000,000 in Smartix. Plaintiff claims that breach occurred on June 4, 2003 when SCOA informed plaintiff they would not invest more than $1,000,000. This claim, like that for promissory estoppel, is unaffected by the merger clause in the July 2nd agreement because the purported wrong occurred prior to that agreement. Therefore, the Court only addresses whether plaintiff has sufficiently alleged the elements for a breach of contract claim.

In order to state a claim for breach of contract, plaintiff must allege an intent to be bound demonstrated by an offer, acceptance, and supported with consideration. Deutsche Asset Mgmt.

v. Callaghan, No. 01 Civ. 4426, 2004 U.S. Dist. LEXIS 5945, at *47 (S.D.N.Y. Apr. 7, 2004).

The Court finds that, on the present record, plaintiff has sufficiently alleged that a contract for

SCOA to invest $3,000,000 to $5,000,000 existed between the parties up until SCOA breached

by repudiation on June 4, 2002. Plaintiff's allegations that SCOA agreed to invest and that

plaintiff acted in reliance on that agreement to their detriment are sufficient. (Compl. ¶¶ 48-54.)

Defendants' point that the written memorialization of this promise remained unsigned at the time

of breach is not fatal to plaintiff's claim at this time. The Second Circuit has enforced contracts

against non-signatories "where the non-signing party 'has accepted [the] written agreement and

has acted upon it.'" Argo Marine Sys., Inc. v. Camar Corp., 755 F.2d 1006, 1011 (2d Cir. 1985)

(citation omitted) (alteration in original). Further, where only an informal writing was created,

the Court has left it to the finder of fact to determine whether the parties intended to be bound.

See Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 575 (2d Cir. 1993) ("For the

purposes of determining whether the parties intended to be bound absent a written agreement, . . .

evidence show[ing] partial performance [is] sufficient to contribute to the factual dispute over

the ultimate issue of the parties' intent.").

However, defendants rightly point out that, in order to sue for breach of contract, plaintiff

must be a party to the contract, which is not alleged, or an intended third party beneficiary to the

contract. See Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 600 (2d Cir. 1991). In order

to claim third party beneficiary status, plaintiff must allege: "'(1) the existence of a valid and

binding contract between other parties, (2) that the contract was intended for his benefit and (3)

that the benefit to him is sufficiently immediate, rather than incidental, to indicate the

assumption by the contracting parties of a duty to compensate him if the benefit is lost.'" State

of Cal. Publ. Employees' Ret. Sys. v. Sherman & Sterling, 95 N.Y.2d 427, 434-35, 741 N.E.2d

101, 104 (2000) (quoting Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 451 N.E.2d 459 (1983)); Mortise v. United States, 102 F.3d 693, 697 (2d Cir. 1996). The Restatement (Second) of Contracts further guides New York courts, stating that a third party is an intended beneficiary if: "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) of Contracts § 302(b) (1981). Finally, the intention to create a third party beneficiary need not be expressed in the contract, Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir. 1991); however, "the parties' intent to benefit a third party must be shown on the face of the agreement," In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 733 (S.D.N.Y. 1989). Absent any facts to this effect, plaintiff may, at best, be deemed an incidental beneficiary with no enforceable rights under the alleged contract. See, e.g., McPheeters v. McGinn, Smith & Co., Inc., 953 F.2d 771, 773 (2d Cir. 1992) ("A third-party beneficiary exists, however, 'only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him.") (quoting Kyung Sup Ahn v. Rooney Pace, Inc., 624 F. Supp. 368, 371 (S.D.N.Y. 1985)).

The alleged contract at issue was one which, on its face, was only intended to benefit the signatories. SCOA, as investor, benefited from the possibility of reaping the rewards of Smartix's possible success. Smartix, as the recipient of the investment, benefited from an injection of liquidity, a sorely needed boon to the beleaguered start-up company. Plaintiff's sole argument supporting his assertion that he was an intended third party beneficiary of this contract is that he suffered a unique injury distinguishable from that suffered by all Smartix's

shareholders. (Pl.'s Opp'n at 15-16.) Plaintiff claims that his status as employee, earning a $150,000 salary, and creditor, loaning the company $100,000, sets him apart from other shareholders and supports the contention that SCOA intended to benefit him personally through this investment contract. The Court cannot discern how Smartix's decision to employ plaintiff, and plaintiff's decision to loan money to Smartix, in any way implicates SCOA's intent to benefit plaintiff. Plaintiff points to, and the Court has discovered, no caselaw which enforced a contract on behalf of a third party in this situation. Therefore, plaintiff has not alleged a claim for breach of contract as an intended third party beneficiary and the Court dismisses the claim. (See Compl. ¶¶ 158-68 ("Fifth Count").)

## C. Breach of Fiduciary Duty

In his Complaint, plaintiff asserts that SCOA owed and breached a fiduciary duty of utmost good faith and fair dealing owed to him by virtue of the relationship between Smartix and SCOA as joint venturers. (Compl. ¶ 171.) Plaintiff asserts two further theories of fiduciary relationship in his opposition to the instant motion to dismiss: (1) SCOA was an investment banker; and, (2) SCOA was the *de facto* majority shareholder of Smartix owing a duty to all other shareholders, including Henneberry. As to the joint venturers theory, defendants argue that, at best, Henneberry does not assert a fiduciary duty between himself and SCOA, but rather only asserts a duty between Smartix and SCOA. Defendants further argue that there is no factual support for Henneberry's claim that SCOA was an investment banker nor that SCOA was the *de facto* majority shareholder.[6]

---

[6] Defendants also argue that plaintiff should be barred from arguing these last two theories because they were not represented in the Complaint. However, as stated above, for purposes of a motion to dismiss, the Court may properly consider all factual allegations in the Complaint, attached documents, matters of judicial notice, or documents the plaintiff relied on in bringing suit. Brass, 987 F.2d at 150. Further, plaintiff realleged each preceding allegation in the

To establish a breach of fiduciary duty, plaintiff must plead that, (1) a fiduciary duty was breached; (2) defendant knowingly aided the breach; and, (3) damages resulted from the breach. See Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir. 1986). As a predicate consideration, finding a breach of fiduciary duty requires finding that a fiduciary relationship existed between the parties. See Flickering v. Harold C. Brown & Co., Inc., 947 F.2d 595, 599 (2d Cir. 1991); Whitney, 782 F.2d at 1115. Moreover, plaintiff must allege a relationship of trust or special confidence imposing obligations beyond the express agreements between the parties. See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996). Fiduciary relationships have been found where: defendant had unique access to material information, Powers v. British Vita, P.L.C., 57 F.3d 176 (2d Cir. 1995); defendant was a stockbroker and plaintiff a customer, Conway v. Icahn & Co., Inc., 16 F.3d 504 (2d Cir. 1994); defendant's status added special credibility to his representations to plaintiff, ABKO Music v. Harrisongs Music, Inc., 508 F. Supp. 798, 803 (S.D.N.Y. 1981) (assigning fiduciary status to the former manager of the Beatles music group); the parties were joint ventures, Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928); and, defendant was a majority shareholder in a closely-held corporation and plaintiff was a minority shareholder, Barbour v. Knecht, 743 N.Y.S.2d 483, 490, 296 A.D.2d 218, 227 (App. Div. 2002). In short, "'[a] fiduciary relationship involves discretionary authority and dependency' and . . . 'at the heart of the fiduciary relationship lies reliance, *and defacto control and dominance.*'" United States v. Brennan, 183 F.3d 139, 150 (2d Cir. 1999) (alterations in original) (quoting United States v. Chestman, 947 F.2d 551, 569 (2d Cir. 1991)). Thus, the Second Circuit finds a fiduciary relationship even where the relationship is informal so long as it can be "readily seen that one party reasonably

---

Complaint as part of his fiduciary duty claim (Compl. ¶ 169) and the Court properly makes all reasonable inferences in favor of plaintiff.

trusted another." <u>Brass</u>, 987 F.2d at 150-151 (noting that relationships such as those between priest and parishioner, bank and depositor, majority shareholder and minority shareholder, and close friends and family members, generally give rise to fiduciary duties). However, there is generally no fiduciary relationship between sophisticated parties involved in an arm's length transaction. <u>Id.</u>; <u>Mia Shoes, Inc. v. Republic Factors Corp.</u>, No. 96 Civ. 7974, 1997 U.S. Dist LEXIS 12571, at *5-6 (S.D.N.Y. Aug. 20, 1997).

The Court finds as a matter of law that plaintiff has not alleged that SCOA owed him a fiduciary duty. First, plaintiff is correct that joint venturers owe each other a fiduciary duty, as conceded by defendants. (Defs.' Reply at 9, ¶ 2.) However, it is also true that, at best, plaintiff only alleges that SCOA and Smartix entered into a joint venture, specifically failing to allege that Henneberry himself and SCOA entered into any agreement, much less a joint venture. (Compl. ¶¶ 60, 170.) Without assessing the merits of whether the relationship between SCOA and Smartix in fact constituted a joint venture, the Court finds that plaintiff has not alleged that SCOA owed him a fiduciary duty personally and, therefore, plaintiff cannot prevail on this theory as a matter of law.

Second, plaintiff's vague reference to New York courts' recognition that investment bankers have "special skill, knowledge and experience in their field" is inapposite, for, as stated above, plaintiff's Complaint does not allege any circumstances wherein SCOA could be considered an investment banker. <u>See</u> <u>supra</u> Discussion Part II.A.2.

Finally, plaintiff argues that SCOA was a *de facto* majority shareholder based on its power over Smartix, as stated in Smartix's Re-Stated and Amended Certificates of Incorporation (<u>see</u> Compl. ¶ 53; Declaration of John M. Deitch, Esq. ("Deitch Decl.") Exs. 3-5), to: (1) control whether Smartix could sell, convey, or dispose of its Intellectual Property license; (2) prevent

Smartix from reorganizing, consolidating or merging; (3) prevent Smartix from declaring dividends; and, (4) prevent Smartix from amending its Bylaws or Articles of Incorporation.[7] Defendants argue that these powers were also held by Series A preferred shareholders. Further, defendants note that Henneberry was Chairman and CEO of Smartix, exerting considerable control, and owned three times as many shares as SCOA, though concededly those shares were of common, rather than preferred stock. The Court finds defendants' arguments persuasive as courts have almost exclusively found that a shareholder held a *de facto* majority where that shareholder maintained overwhelming control over the operation of the company. See Gould v. Ruefenacht, 471 U.S. 701, 705 (1985) ("*de facto* operational *control* may be obtained by the acquisition of less than 50%" of the company's shares) (emphasis added); Box v. Northrop Corp., 459 F. Supp. 540, 547-48 (S.D.N.Y. 1978). Nothing in plaintiff's complaint alleges that SCOA maintained overwhelming control over the operation of Smartix to be considered the *de facto* majority shareholder.

Thus, for all these reasons, the Court dismisses plaintiff's claim for breach of fiduciary duty. (See Compl. ¶¶ 169-74 ("Sixth Count").)

D.     Defamation

Plaintiff claims that defendants defamed him during meetings with both the Boston Red Sox and MasterCard held between September 19, 2003 and September 23, 2003. Plaintiff

---

[7]     Plaintiff asserts that SCOA's status as majority shareholder is further evidenced by his own e-mail communication to SCOA employees, dated September 19, 2003, wherein he refers to SCOA as a "major shareholder." (Pl.'s Opp'n at 17; Compl. Ex. A.) However, plaintiff's e-mail reference cannot supplant this Court's determination of matters of law. See Papasan v. Allain, 478 U.S. 265, 286 (1986). Further, the Court notes that plaintiff appears to be speaking from both sides of his mouth, as, in one breath he prays the Court disregard portions of this same e-mail that refer to a "term sheet" and in another, argues the Court should pin a finding that SCOA was a *de facto* majority shareholder on an ostensibly analogous representation made in this same e-mail. (Pl.'s Opp'n at 1, 17.)

alleges that, while he was on vacation out-of-town, defendants, represented by Graustein and John Does 1-10, surreptitiously met with both the Red Sox Executive Vice President of Business Affairs, Michael Dee, and, at a separate meeting, with MasterCard Senior Vice President of Global Sponsorship and Event Marketing, John Stuart. At these meetings, defendants made statements that, in sum and substance, alleged that Henneberry "lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen." (Compl. ¶¶ 90, 100.) Further SCOA "placed blame for Smartix' present financial condition, and inability to pay monies owed to the Red Sox and St. Louis Cardinals, upon the purported mis-management of Smartix by Mr. Henneberry." (Id.) Plaintiff argues this constituted defamation *per se* and also that he suffered special damages. Defendants counter that the statements were nothing more than opinion, and, in the alternative, were protected by the privilege of common interest.

1. Defamation Law

To plead defamation under New York law, the plaintiff must establish four elements regarding the statements at issue: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by defendants; and, (4) resulting in injury to the plaintiff. See Dellefave v. Access Temps., Inc., No. 99 Civ. 6098, 2001 WL 25745, at *3 (S.D.N.Y. Jan. 10, 2001) (citing Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 61 (2d Cir. 1993)). A defamatory statement is one that leaves an individual vulnerable to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . [which] induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society." Celle v. Filipino Reporter Enters., 209 F.3d 163, 177 (2d Cir. 2000). At the pleadings stage, the Court must determine only whether the complaint "is detailed and informative enough to enable defendant to respond and to

raise the defense of res judicata if appropriate." Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986); see Fed. R. Civ. P. 8. Plaintiff need not directly quote the defamatory statements. Kelly, 806 F.2d at 46.

In addition to the aforementioned elements, the plaintiff in a defamation action must also plead special damages,[8] unless the language at issue qualifies as defamation *per se*. Defamation *per se* is a statement that casts aspersions upon the basic character and integrity of an individual or business. Thus, a statement "which *tends* to disparage a person in the way of his office, profession or trade" is defamatory *per se* and does not require proof of special damages because injury is assumed. Davis v. Ross, 754 F.2d 80, 82 (2d Cir. 1985) (quoting Nichols v. Item Publishers, Inc., 309 N.Y. 596, 602, 132 N.E.2d 860, 862 (1956)); see also Four Star Stage Lighting, Inc. v. Merrick, 56 A.D.2d 767, 768, 392 N.Y.S.2d 297 (App. Div. 1977) (holding that "words are libelous if they affect a person in his profession, trade, or business, by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof").

At this stage of the proceeding, where the plaintiff's allegations must be accepted as true and all reasonable inferences must be drawn in his favor, see Conley, 355 U.S. at 46, the Court's task is clear: Determine whether the statements at issue are "reasonably susceptible of a defamatory connotation." Armstrong v. Simon & Schuster, Inc., 85 N.Y.2d 373, 380, 649 N.E.2d 825, 829 (1985); see also Celle, 209 F.3d at 177 (observing that whether particular words are defamatory is a legal question to be decided by the court as a threshold matter); Kelly, 806

---

[8]     Special damages constitute "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation . . . ." Matherson v. Marchello, 100 A.D.2d 233, 235, 473 N.Y.S.2d 998 (App. Div. 1984) (citations and quotations omitted); Robert D. Sack, 1 Sack on Defamation: Libel, Slander and Related Problems § 2.8.7.1, at 2-113 (3d ed. 2004) ("Special damages refers only to pecuniary damages such as out-of-pocket loss.").

F.2d at 46 ("[O]n a motion to dismiss or for summary judgment, the issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction."). If the Court deems the statements to be reasonably susceptible to a defamatory interpretation, then "it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average" listener. See James v. Gannett Co., Inc., 40 N.Y.2d 415, 419, 353 N.E.2d 834, 837-38 (1976) (citation omitted).

Further, because the Court accepts plaintiff's allegations as true, it assumes that defendants' statements are false and that defendants were culpable in making the statements. See Lucking v. Maier, No. 03 Civ. 1401, 2003 U.S. Dist. LEXIS 23060, at *8 n.4 (S.D.N.Y. Dec. 23, 2003) ("The falsity of the accused passage and defendants' fault are both presumed at this [motion to dismiss] juncture."); Daniels v. Provident Life & Cas. Ins. Co., No. 02 Civ. 0668, 2002 U.S. Dist. LEXIS 24704, at *15-16 (W.D.N.Y. Dec. 22, 2002) (denying defendant's motion to dismiss due to a dispute as to the truth of alleged facts).

In interpreting allegedly defamatory utterances, the Court must view the statements in context as the literal meaning of the words does not always coincide with their meaning in a grander setting. See Mr. Chow of New York v. Ste. Jour Azur S.A., 759 F.2d 219, 226 (2d Cir. 1985). The statement in question should not be viewed in isolation, but instead should be interpreted in light of the "whole apparent scope and intent" of the statement. November v. Time Inc., 13 N.Y.2d 175, 178, 194 N.E.2d 126, 128 (1963). "[T]he words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood *by the public to which they are addressed*." Id. at 178-79, 194 N.E.2d at 128 (alteration in original) (citation omitted). Finally, if the statement in question is reasonably susceptible to more than one interpretation, one of which is not defamatory, "it is then for the

trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." Davis, 754 F.2d at 82.

### 2. Protected Speech: Opinion and Common Interest Privilege

The New York State Constitution, unlike the Federal Constitution, provides for absolute protection of pure opinions. See Flamm v. Am. Assoc. of Univ. Women, 201 F.3d 144, 147-48 (2d Cir. 2000); compare Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990) (rejecting the argument that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment") with Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235, 567 N.E.2d 1270 (1991) (Kaye, C.J.) (holding that expressions of "pure" opinion are afforded absolute protection under the New York State Constitution). In the realm of defamation, this constitutional shield requires that assertions of fact, not opinion, form the basis of a claim. See Brian v. Richardson, 87 N.Y.2d 46, 51, 660 N.E.2d 1126, 1129 (1995) (citations omitted). Thus, the Court must decide as a matter of law whether any of the statements at issue are protected opinion and therefore not actionable. See Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 397, 366 N.E.2d 1299, 1306 (1977) ("Whether a particular statement constitutes fact or opinion is a question of law.").

The Court's "essential task" in this inquiry is to determine whether the allegedly defamatory statements "may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion," when considering the statements in the immediate context of the communication as a whole and the broader context in which the statements were published. Steinhilber v. Alphonse, 68 N.Y.2d 283, 292, 501 N.E.2d 550, 553 (1986); see also Brian, 87 N.Y.2d at 51, 660 N.E.2d at 1129; Immuno, 77 N.Y.2d at 254, 567 N.E.2d at 1281. If one of the statements may be viewed as implying undisclosed facts, then it is not protected as opinion under

the New York Constitution. See Steinhilber, 68 N.Y.2d at 292, 501 N.E.2d at 554. Notably, the

Court should examine the material in question from the perspective of an ordinary listener. See

Mr. Chow, 759 F.2d at 224.

The New York Court of Appeals has considered the following factors when

distinguishing between assertions of fact and non-actionable expressions of opinion:

> (1) whether the specific language in issue has a precise meaning which is readily
> understood; (2) whether the statements are capable of being proven true or false;
> and (3) whether either the full context of the communication in which the
> statement appears or the broader social context and surrounding circumstances are
> such as to "signal . . . readers or listeners that what is being read or heard is likely
> to be opinion, not fact."

Gross v. N.Y. Times Co., 82 N.Y.2d 146, 153, 623 N.E.2d 1163, 1167 (1993) (quoting

Steinhilber, 68 N.Y.2d at 292, 501 N.E.2d at 553) (alteration in original).

New York also recognizes a qualified privilege protecting defendants from liability for

making what would otherwise be considered defamatory statements. "Statements made by a

defendant to a third party on matters relating to their mutual business interests" qualify for this

privilege. Posa, Inc. v. Miller Brewing Co., 642 F. Supp. 1198, 1207 (E.D.N.Y. 1986); see also

Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 62 (2d Cir. 1993). The New York Court of

Appeals explained the privilege as follows:

> A communication made *bona fide* upon any subject matter in which the party
> communicating has an *interest*, or in reference to which he had a *duty*, is
> privileged if made to a person having a corresponding *interest* or *duty*, although it
> contained incriminating matter which, without this privilege, would be
> slanderous and actionable; and this though the duty be not a legal one, but only a
> moral or social duty of imperfect obligation.

Shapiro v. Health Ins. Plan, 7 N.Y.2d 56, 60-61, 163 N.E.2d 333, 335-36 (1959). Courts have

found privilege to lie where an insurance carrier warned its client that an autobody shop was

disreputable, East Point Collision Works, Inc. v. Liberty Mut. Ins. Co., 706 N.Y.S.2d 700, 271

A.D.2d 471 (App. Div. 2000), and where a car purchaser warned the parent company that its dealership was "deceitful, fraudulent, dishonest, disrespectful," Leary v. DiBlasi, 674 N.Y.S.2d 749, 251 A.D.2d 550, 551 (App. Div. 1998). A party's good faith communication with a party having a common interest creates a rebuttable presumption that a defamation action cannot be maintained. See Weldy, 985 F.2d at 62. The presumption is rebutted, however, if the statements were: (1) made for purposes beyond the scope of the privilege "where a defendant does not exercise the privilege in a reasonable manner, abuses the occasion, or makes the statement in furtherance of an improper purpose"; (2) made with common law malice, considering "defendant's personal spite or ill-will'"; or, (3) made with knowledge of falsity or reckless disregard of the truth. Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 410 (2d Cir. 2000) (internal quotations omitted).

> 3. Analysis of the Statements

As alleged, the statements constitute defamation *per se* because they disgraced plaintiff's business aptitude, chipping away at a pillar of the reputation plaintiff had worked hard to build. (See Compl. ¶¶ 11, 14-19, 46.) This point is not contested by defendants. Instead, defendants contend the statements, even as vaguely alleged, are statements of opinion rather than fact.

The Court finds that at this stage of the proceedings, it cannot be said as a matter of law that the statements at issue were merely opinion rather than "reasonably understood as implying the assertion of undisclosed facts justifying the opinion," Steinhilber, 68 N.Y.2d at 292, 508 N.E.2d at 553. At the time these statements were made, Smartix was in obvious distress. That defendants assigned Henneberry responsibility for that distress does not, in itself, bring these statements out of the realm of opinion; for, assignation of blame is commonly regarded as opinion. See, e.g., Chittenden v. Schwartz, 653 N.Y.S.2d 375, 236 A.D.2d 503 (App. Div.

1997). However, the Red Sox and MasterCard could have assumed that SCOA had unique access to undisclosed facts precipitating the demise of Smartix. See Levin v. McPhee, 119 F.3d 189, 197 (2d Cir. 1997) ("Though some statements may be characterized as hypothesis or conjecture, they may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed.") (citing Gross v. N.Y. Times Co., 82 N.Y.2d 146, 154, 623 N.E.2d 1163, 1168 (1993)). SCOA had entered into an investment contract, prior to which it conducted due diligence, including an economic valuation of Smartix. (Compl. ¶ 50.) Also, SCOA held itself out as Smartix's lead investor and actively solicited outside investment on behalf of Smartix. (Id. ¶¶ 61, 62.) To satiate potential investors, SCOA "continually requested revised and updated documents from Smartix." (Id.. ¶ 62.) Further, SCOA was kept abreast of Smartix's financial situation, including a June 2003 meeting where SCOA was advised that Smartix could not sustain operations absent additional funding. (Id. ¶ 63; see also ¶¶ 70-74.) It is unclear whether the Red Sox or MasterCard knew of SCOA's special relationship with Smartix but it is a reasonable inference given that, in the same meetings in which the defamatory statements were made, SCOA informed the Red Sox that SCOA would be taking over operations of Smartix and removing Henneberry. (Id. ¶ 96.) This analysis plainly applies to the statement blaming Henneberry for Smartix's decline. It is equally applicable to the statement regarding Henneberry's business ability because the Red Sox and MasterCard could have inferred from SCOA's many personal dealings with Henneberry that SCOA had factual knowledge regarding his abilities to which the public was not privy. That the statements are vaguely alleged is not fatal to plaintiff's claim. It is reasonable to allow plaintiff to discover the specific wording of the oral, unrecorded statements prior to determining whether SCOA's comments "otherwise disparag[ing plaintiff's] business acumen" (Id. ¶ 90) identified "specific

defects or derelictions" to justify a claim for defamation (Defs.' Mem. at 16 (citing Cohen v. Feiden, 624 N.Y.S.2d 448, 449, 213 A.D.2d 696, 697-98 (App. Div. 1995); McGill v. Parker, 582 N.Y.S.2d 91, 98, 179 A.D.2d 98, 109-10 (App. Div. 1992)).

It is also not appropriate to dismiss plaintiff's defamation claim at this stage of the proceeding based on defendants' assertion of the qualified common interest privilege. The Court agrees with defendants that, as investors, they shared an interest in Smartix's success with both the Red Sox and MasterCard. However, plaintiff has sufficiently pleaded that defendants were acting outside the scope of the privilege when they advised the Red Sox and MasterCard that Henneberry was the cause of Smartix's demise. Plaintiff alleges that this advice was given in order to allow SCOA to take over control of Smartix. (Compl. ¶¶ 88, 124.) In fact, plaintiff states that SCOA informed the Red Sox that SCOA "would be taking over Smartix and making changes in management so as to remove Mr. Henneberry." (Compl. ¶ 96.) The Court does not find these to be conclusory allegations but rather specific statements of intent made by SCOA to third parties. See Stern v. Leucadia Nat'l Corp., 844 F.2d 997, 1004 (2d Cir. 1988) ("[I]t would be unworkable and unfair to require great specificity in pleading scienter, since 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'... Nonetheless, circumstances must be pleaded that provide a factual foundation for otherwise conclusory allegations of scienter.") When coupled with the preceding allegations of SCOA's failure to cooperate regarding investments even when faced with Smartix's self-declared inability to survive absent funding, the inference is plain that SCOA's statements to the Red Sox and MasterCard may have been motivated by SCOA's own interest in acquiring the Smartfan program through Smartix and ousting Henneberry, rather than any common interest in Smartix's survival. Compare Weldy, 985 F.2d at 63 ("The jury could also have found an abuse of the

privilege by determining that Hathaway had an improper purpose, in that he was deliberately exaggerating . . . so as to use Tripodi's failure to report the incident as a device to force Tripodi's discharge.") with Stillman v. Ford, 22 N.Y.2d 48, 53, 238 N.E.2d 304, 306 (1968) ("As long as the statements were motivated not by ill will or personal spite but by a sincerely held desire to protect the institution, they are not actionable.").[9]

Thus, plaintiff's claim for defamation survives defendants' motion for dismissal on the present record. (See Compl. ¶¶ 120-43 ("Second Count").)

E.    Injurious Falsehood

Plaintiff alleges that the statements underlying his defamation claim also give rise to a claim for injurious falsehood under New York State law. In order to recover for injurious falsehood, plaintiff must plead that (1) defendants had malicious intent, intended the statement to harm plaintiff, or uttered the statement with reckless disregard such that a reasonably prudent person would anticipate damage; (2) defendants knew of the statement's falsity or acted recklessly in disregard of the statement's veracity; (3) special damages directly resulted "in the form of lost dealings." See Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C., 136 A.D.2d 633, 523 N.Y.S.2d 875, 877 (App. Div. 1988); Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App. Div. 1959); Restatement

---

[9]    Defendants also argue that plaintiff's alleged damages such as "loss of stock value, failed loans, unreimbursed expenses and loss of salary" did not directly flow from defendants' alleged defamatory statements, but rather resulted from Smartix's general decline and ultimate failure. Defendants' objection fails, however, because a plea of special damages is not a necessary element of a well-pleaded tort for slander per se. While the Court recognizes, infra Discussion Parts II.E and II.F, that damages resulting from Smartix's failure could not have stemmed from SCOA's allegedly defamatory statements as demonstrated by the timeline of the Complaint, the purpose of removing the requirement to plead special damages is to allow plaintiff to assess his damages after discovery. Therefore, plaintiff's defamation claim cannot fail simply because he went beyond the call of the caselaw and alleged inappropriate specific damages.

(Second) of Torts § 623 (1981). Defendants argue that plaintiff has failed to sufficiently plead scienter and special damages.[10]

Plaintiff has sufficiently pled scienter. It is clear that a reasonable person would recognize that statements disparaging a CEO's business acumen would harm his reputation. Defendants' reliance on the argument that, "[t]hough there is an allegation of reckless disregard of falsity, that is different from the kind of reckless heedlessness of consequences that the case law requires" is specious. The Court will not engage in defendants' proposed duel of semantics.

Defendants' second argument, however, is more persuasive. Special damages are those that "flow directly from the injury to reputation caused by the defamation; not from the effects of the defamation." Matherson, 100 A.D.2d at 235, 473 N.Y.S.2d at 1001; see also supra note 8 and accompanying text. For special damages to be found, "actual losses must be identified and causally related to the alleged tortious act." L.W.C. Agency, Inc. v. St. Paul Fire & Marine Ins., Co., 125 A.D.2d 371, 373, N.Y.S.2d 97, 100 (App. Div. 1986).

Plaintiff alleges that he suffered damages of (1) $20,000,000 for lost future business opportunities with MasterCard and Major League Baseball ("MLB"); (2) $20,000,000 for injury to his reputation; (3) at least $2,610,999 for diminution of Smartix's stock value; (4) $662,425.37 for failed loans made to Smartix; (5) $18,000 for unreimbursed costs and expenses arising from

---

[10]    In their reply papers, defendants raised for the first time the argument that plaintiff's claim fails because it failed to allege the exact words giving rise to the tort of injurious falsehood. (Defs.' Reply at 4-5.) The Court will not address this argument because to do so would render the Court's procedural limits moot. See Dunlop-McCullen v. Pascarella, No. 97 Civ. 0195, 2002 U.S. Dist. LEXIS 21854, at *80 n.43 (S.D.N.Y. Nov. 13, 2002) (Leisure, J.). "[E]ntirely new but foreseeable points relevant to a motion [may not] be presented in a reply affidavit . . . . Such a procedure is foreign to the spirit and objectives of the Federal Rules of Civil Procedure. Were tactics of this type permitted, a sur-reply affidavit would be necessary from the adversary, followed by a further supplemental response by the moving party, and so on ad infinitum." Tetra Techs., Inc. v. Harter, 823 F. Supp. 1116, 1120 (S.D.N.Y. 1993) (citations omitted).

Smartix's operation; and, (6) $150,000 per year for lost salary. (Compl. ¶ 151.) The claim for reputational damage is undoubtedly insufficiently alleged as it cites no basis for its amount, nor specific repercussions of the tort which gave rise to the damage. See Korry v. Int'l Tel. & Tel. Corp., 444 F. Supp 193, 197 (S.D.N.Y.). Nor is the claim for lost future earnings sufficiently alleged, though that conclusion requires further elucidation. Generally, special damages must be itemized, and not pled with round figures. See Drug Research Corp. v. Curtis Publ'g Co., 7 N.Y.2d 435, 441 (1960); Matherson, 100 A.D.2d at 235, 473 N.Y.S.2d at 1001. Plaintiff's reliance on Sadowy v. Sony Corp. of Am., 496 F. Supp. 1071 (S.D.N.Y. 1980), to justify his pleading the amount in round numbers is unfounded. There, the Court allowed plaintiff to so plead $500,000 as representing the loss of a $50,000 annual salary for ten years. Id. at 1075-76 (finding that the damages pled were "a statement of reasonably identifiable losses sustained by the plaintiff") (quoting Bohm v. Holzberg, 47 A.D.2d 764, 764, 365 N.Y.S.2d 262, 264 (App. Div. 1975)). That case is readily distinguishable from the matter at hand. First, plaintiff alleges that he lost, at most, $25,000 per month, but he pleads no start or end date which would plausibly amount to the $20,000,000 sought. Further the Sadowy Court specifically noted that plaintiff alleged that he had sought employment "and, despite a successful professional record, was unable to find any." Id. at 1076. Plaintiff makes no such allegation here, only stating that he "is now no longer considered for consultancies with MasterCard or MLB and has lost his prior position of respect and confidence with those institutions." (Compl. ¶ 140.) This is a facially insufficient plea for special damages.

Plaintiff's remaining four pleas for special damages stem from the demise of Smartix. These damages, while lamentable, do not flow from defendants' statements and, therefore, are not appropriately characterized as special damages. Plaintiff's Complaint details Smartix's

hardship beginning in June 2003. Specifically, plaintiff states that, in June 2003, he told SCOA that Smartix could not continue without additional funding and advised them on June 16, 2003 that Smartix may need to cease operations. (Compl. ¶¶ 63, 71.) On September 8, 2003, plaintiff advised SCOA that Smartix's lack of funding would prevent continuation of the Smartfan program. (Compl. ¶ 78.) The next day, Henneberry advised Dee of the Boston Red Sox that Smartix's financial stability was not guaranteed for the following year. (Compl. ¶ 82.) Dee responded with concern that Smartix would not satisfy its financial obligations to the Red Sox. (Compl. ¶ 83.) Defendants' statements were not made until around September 19, 2003, after the occurrence of the above events. Thus, it is apparent that Smartix was plagued by financial difficulties well before those statements were made. Moreover, at least MLB was aware of this difficulty.

It is not necessary that defendants' statements be the only cause of Smartix failure, but they must be a contributing factor. Plaintiff's Complaint makes it clear that the statements did not contribute to the failure; rather they may have actually been Smartix's last ray of hope. After Henneberry made Dee aware of Smartix's woes, SCOA's statements reassured Dee that the cause of the problem, plaintiff, would be removed and Smartix would be run by new management, namely SCOA. (Compl. ¶ 96.) Thereafter, Dee called SCOA directly regarding the Smartfan program, the shareholders voted to continue Smartfan, SCOA represented that investors were still interested in Smartix, and plaintiff floated Smartix loans to continue operations. (Compl. ¶¶ 97, 111-13.) This evidences that MLB was aware of a problem prior to the statements and chose to continue its relationship with Smartix after the statements. Thus, any damages flowing from the decline of Smartix cannot be attributed to SCOA's statements regarding Henneberry. Regarding MasterCard, plaintiff does not allege what effect, if any,

SCOA's statements had on MasterCard's relationship with Smartix. Again, this causes the Court to conclude that any damages flowing from Smartix's failure were not caused by statements made to MasterCard.

Because plaintiff has failed to sufficiently plead special damages flowing from the allegedly tortious statements, his claim of injurious falsehood is dismissed. (See Compl. ¶¶ 144-51 ("Third Count").)

F.    Tortious Interference with Prospective Advantage

Plaintiff claims that defendants' tortious action in meeting with MLB and MasterCard and making the allegedly defamatory statements give rise to a claim of tortious interference with prospective economic advantage under New York law.

To establish a claim for tortious interference with prospective business advantage, plaintiff must prove that: (1) there was a business relationship with a third party; (2) defendants "knew of that relationship and intentionally interfered with it"; (3) defendants either acted "solely out of malice" or used wrongful means; and (4) defendants' "interference caused injury to the relationship" with the third-party. See Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003); see also Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002); Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994). This cause of action has a "limited scope." Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 168 (S.D.N.Y. 1998).

A properly pleaded complaint for this tort must allege relationships with specific third parties with which the respondent interfered. See Four Finger Art Factory, Inc. v. DiNicola, No. 99 Civ. 1259, 2000 U.S. Dist. LEXIS 1221, at *23-24 (S.D.N.Y. Feb. 9, 2000); Minnesota Mining & Mfg. Co. v. Graham-Field, Inc., No. 96 Civ. 3839, 1997 WL 166497, at *7 (S.D.N.Y. Apr. 9, 1997); Winner Int'l v. Kryptonite Corp., No. 95 Civ. 247, 1996 U.S. Dist. LEXIS 2182,

at *4 (S.D.N.Y. Feb. 27, 1996) ("As Winner does not allege that Kryptonite's conduct interfered with its business relationship with any specific party, it cannot establish the elements necessary for this tort . . . ."). Further, the relationship must be in existence at the time of the interference. See Minnesota Mining, 1997 WL 166497, at *7 ("A claim for interference with advantageous business relationships must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior.") (citations omitted).

The Complaint must also state how defendants interfered in those relationships. See Four Finger, 2000 U.S. Dist. LEXIS 1221, at *24. That interference must be "direct interference with a third party, that is, 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.'" Black Radio Network, Inc. v. NYNEX Corp., No. 96 Civ. 4138, 2000 WL 64874, at *4 (S.D.N.Y. Jan. 25, 2000) (quoting Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y. 1997)); see also Piccoli, 19 F. Supp. 2d at 167-68. Moreover, "as a general rule, the defendant's conduct must amount to a crime or an independent tort" because "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other non-binding economic relations." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 1103 (2004); see also Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc., 349 F. Supp. 2d 389, 423 (N.D.N.Y. 2004) (noting that the general rule following Carvel is that defendant's conduct must amount to a crime or an independent tort). The only recognized exception to the rule applies where a defendant engages in conduct "for the sole purpose of inflicting intentional harm on plaintiffs." Carvel, 3 N.Y.3d at 190, 818 N.E.2d at 1103 (quotation omitted); see also Carvel, 350 F.3d at 17-19

(providing that plaintiff may establish this element of the tort by showing either that defendant used "wrongful means" or acted "solely out of malice").

As stated supra Discussion Part II.D, plaintiff has adequately pled that defendants engaged in the tort of defamation when meeting with MLB and MasterCard in September 2003. Thus, wrongful means were used. However, plaintiff again fails to sufficiently allege a causal link between the tort and his injury giving rise to damages. Plaintiff's allegation of damages mirrors that listed supra Discussion Part II.E. (See Compl. ¶ 157.) As stated above in the same section, the damages flowing from the decline of Smartix are not attributable to SCOA's meetings with MLB and MasterCard. Plaintiff's allegation of reputational injury is again plainly inappropriately pled as it does not relate to any plausible prospective economic advantage. Finally, plaintiff's plea for damages resulting from lost future business opportunities as a consultant for MLB and MasterCard fails because he does not allege that any such consulting relationship existed at the time of the interfering meetings. See Huntington Dental, 1998 U.S. Dist. LEXIS 1526, at *4. In fact, his prior consulting for those entities was done three years prior to the alleged defamation. (See Compl. ¶ 139 (alleging plaintiff consulted for MLB and MasterCard from December 1995 through January 2000).) Plaintiff does not claim that he interacted with MLB and MasterCard at the time of SCOA's meeting with them in any other capacity than as CEO of Smartix.

Therefore, plaintiff's claim for tortious interference with prospective advantage fails and is dismissed. (See Compl. ¶¶ 152-57 ("Fourth Count").)

III.    Leave to Amend the Complaint

Defendant asks the Court to dismiss the Complaint with prejudice, prohibiting plaintiff from repleading his claims. Plaintiff can replead as of right one time without leave of the Court

prior to defendants' filing a responsive pleading under Federal Rule of Civil Procedure 15(a). However, this right extinguishes when the Court grants a motion to dismiss. Sbrocco v. Pacific Fruit, Inc., No. 82 Civ. 5650, 1983 U.S. Dist. LEXIS 14825, at *6-7 (S.D.N.Y. Aug. 8, 1983) ("[W]hile the law in this circuit is that a motion to dismiss is not a responsive pleading, and therefore the complaint may be amended without leave of the court, it is equally well established that this right terminates upon the granting of the motion to dismiss.") (citing Christophides v. Porco, 298 F. Supp. 403 (S.D.N.Y. 1968), and Swan v. Bd. of Higher Educ. of the City of New York, 319 F.2d 56 (2d Cir. 1963)). Therefore, plaintiff must seek leave to amend his complaint. Leave "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "[T]his mandate is to be heeded," Foman v. Davis, 371 U.S. 178, 182 (1962), in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Sbrocco, 1983 U.S. Dist. LEXIS 14825, at *7-8. Further, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (citing Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990), Devaney v. Chester, 813 F.2d 566, 569 (2d Cir. 1987), and Pross v. Katz, 784 F.2d 455, 459-60 (2d Cir. 1986)). The Court is guided by the Supreme Court which noted that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep . . . may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Conley, 355 U.S. at 48.

However, if the Court finds that it would be futile to allow plaintiff to replead because he cannot set forth facts supporting a viable claim, leave to amend should be denied. See Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003); Oneida Indian Nation of New York v. City of Sherrill,

New York, 337 F.3d 139, 168 (2d Cir. 2003); Hayden v. County of Nassau, 180 F.3d 42, 53-54 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."). Plaintiff has not submitted any facts or argument in his opposition papers that would rehabilitate the claims dismissed by this Opinion. However, given that plaintiff has yet to have an opportunity to replead and that defendants find protection in Federal Rules 11, 12, and 56 if plaintiff makes allegations in bad faith, without legal support, or without factual support, the Court grants plaintiff twenty days from the date of this Opinion in which to seek leave to replead. See Highland Capital Mgmt., L.P. v. Schneider, No. 02 Civ. 8098, 2004 U.S. Dist. LEXIS 18131, at *19 (S.D.N.Y. Sept. 9, 2004) (Leisure, J.); Sbrocco, 1983 U.S. Dist. LEXIS 14825, at *7 ("This court delayed entry of judgment for twenty days in order to allow plaintiffs the opportunity to seek such permission [to replead] without the necessity of moving for relief from the judgment under Fed. R. Civ. P. 59(e) or 60(b).") (citing 3 Moore's Federal Practice § 15.07 (2d ed. 1983)).

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART and DENIES IN PART defendants Sumitomo Corporation of America and Robert Graustein's motion to dismiss plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Only plaintiff's claim for defamation survives. Plaintiff's claims for detrimental reliance, breach of contract, breach of fiduciary duty, injurious falsehood, and tortious interference with prospective advantage are hereby DISMISSED. Plaintiff has TWENTY DAYS from the date of this Order to seek to leave to replead. The parties are ORDERED to appear before this Court at 500 Pearl Street,

Courtroom 18b for a status conference on May 19, 2005 at 10:00 a.m. unless a motion is

pending.

**SO ORDERED.**
**New York, New York**

April **26**, 2005


_____
                                    U.S.D.J.


Copies of this Opinion and Order have been mailed to:

John M. Deitch, Esq.
Mendes & Mount LLP
One Newark Center, 19th Floor
Newark, New Jersey 07102

Stuart M. Riback, Esq.
Siller Wilk LLP
675 Third Avenue
New York, New York 10017