UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

WILLIAM HENNEBERRY,                             :

              Plaintiff,                          :

      - against -                              :

SUMITOMO CORPORATION OF AMERICA,  :
ROBERT GRAUSTEIN, SUMITOMO
CORPORATION, and JOHN DOES nos. 1-50   :
(fictitiously named individuals),

                               :

              Defendants.

-------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

OPINION AND ORDER

04 Civ. 2128 (PKL)

## APPEARANCES

MENDES & MOUNT LLP
One Newark Center, 19th Floor
Newark, New Jersey 07102
John M. Deitch, Esq.

Attorneys for Plaintiff

SILLER WILK LLP
675 Third Avenue
New York, New York 10017
Stephen D. Hoffman, Esq.
Stuart M. Riback, Esq.
Pamela L. Kleinberg, Esq.

Attorneys for Defendants Sumitomo Corporation of America and Robert Graustein

**LEISURE, District Judge:**

This action arises out of a failed investment transaction between William Henneberry, the Chief Executive Officer and majority common stock shareholder of Smartix International Corp. ("Smartix"), and defendant-investor Sumitomo Corporation of America ("SCOA"), Robert Graustein, a Senior Vice president of SCOA, and Sumitomo Corporation ("Sumitomo"), SCOA's parent company. In a complaint dated March 17, 2004, plaintiff asserted causes of action against all defendants for (1) detrimental reliance, on the alternative bases of promissory estoppel and negligent misrepresentation; (2) breach of fiduciary duty; (3) slander per se; (4) tortious interference with prospective economic advantage; (5) injurious falsehood; and (6) breach of contract. Defendants SCOA and Robert Graustein then moved, in lieu of an answer, for dismissal of the action on all counts for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

In an Opinion and Order dated April 27, 2005, the Court granted the motion to dismiss all of the aforementioned claims save the slander per se claim. Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772 (S.D.N.Y. Apr. 27, 2005). In an Opinion and Order dated May 3, 2005, the Court granted Sumitomo's motion to dismiss all claims against it pursuant to Rule 12(b)(6). Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 1036260 (S.D.N.Y. May 3, 2005).

Plaintiff now brings this motion pursuant to Federal Rule of Civil Procedure 15(a), seeking leave to file an amended complaint re-asserting all of the aforementioned claims except for breach of contract. In the event the Court finds that plaintiff's claims for promissory estoppel and negligent misrepresentation have been pleaded adequately in plaintiff's proposed amended complaint, defendants cross-move for partial summary judgment as to those claims. For the

1

reasons set forth herein, plaintiff's motion is granted in part and denied in part, and defendants' cross-motion is denied.

## BACKGROUND

The following factual allegations are drawn from plaintiff's original complaint.

I.    Plaintiff's Original Complaint

A.    The Parties

Plaintiff William Henneberry is a Connecticut resident and a creative marketing entrepreneur specializing in developing new marketing strategies for credit cards. (Compl. ¶¶ 10-11.) He has worked frequently with athletic teams and credit card companies. (Compl. ¶¶ 15-19.) Prior to the venture giving rise to this action, plaintiff worked as a consultant for Major League Baseball and MasterCard between December 1995 and January 2000, earning between $10,000 and $25,000 per month. (Compl. ¶ 139.) At all times relevant to this action, Henneberry was the Chairman and majority common stock shareholder of Smartix, a non-publicly traded New York corporation. (Compl. ¶¶ 12-13, 21.) As Chairman, Henneberry was entitled to an annual salary of $150,000. (Compl. ¶ 20.) As of September 9, 2003, Henneberry owned 1,740,666 shares of Smartix stock. (Compl. ¶ 22.) Defendant SCOA is a New York corporation and a wholly owned subsidiary of former defendant Sumitomo. (Compl. ¶¶ 3, 34.) Defendant Robert Graustein is a New York resident who was a Senior Vice President of defendant SCOA at all times relevant to this lawsuit. (Compl. ¶¶ 5, 38.)

B.    SCOA's Investment Activities

Smartix was created to develop with MasterCard an electronic ticketing promotion program for Major League Baseball which would, *inter alia*, allow season ticket holders to sell unused tickets on the internet and at designated kiosks located at baseball stadiums (the

2

"Smartfan program"). (Compl. ¶¶ 23, 24.) The Smartfan program was tested with the Boston Red Sox and the St. Louis Cardinals baseball teams. (Compl. ¶ 25.) In order to finance the Smartfan program, Smartix sought and obtained various investors, including SCOA. (Compl. ¶ 31.)

### 1. Spring of 2002 Investment Agreement

As a part of SCOA's due diligence performed in anticipation of a future investment agreement, SCOA conducted an economic valuation of Smartix which valued the company at $10,000,000, or $1.50 per share. (Compl. ¶¶ 50-51.) In the Spring of 2002, SCOA agreed to invest between $3,000,000 and $5,000,000 in Smartix ("$3-5MM Investment") and share in Smartix's profits and losses. (Compl. ¶¶ 48-49.) In reliance on SCOA's agreement, Smartix changed its position by, *inter alia*, performing the following actions: (1) filing a restated certificate of incorporation with the Secretary of State of New York as directed by SCOA; (2) convincing its original investors to subordinate their class of shares to those to be issued to SCOA; (3) convincing its original investors to reduce their dividend percentages, forego dividends, and invest more cash into Smartix; (4) advising other potential investors of SCOA's that Smartix had accepted SCOA's offer and that future investment would be at a later round and, presumably, at a higher valuation; (5) agreeing to allow Hank Aaron to serve as a member of Smartix's Board of Directors; and (6) ordering special stock certificates with legends specifically requested by SCOA. (Compl. ¶ 53.) In reliance on the same agreement, plaintiff also made a bridge loan to Smartix for $100,000. (Compl. ¶ 54.) However, on June 4, 2002, after documents memorializing this agreement were sent by SCOA to Smartix's shareholders for execution, SCOA advised Henneberry that SCOA would not make the investment. (Compl. ¶ 57.)

##         2.      SCOA's Subsequent Investment Agreement

SCOA ultimately invested $1,000,000 in Smartix pursuant to a Stock Purchase Agreement, dated July 2, 2002 ("July 2002 Agreement"), which provided for, *inter alia*, the sharing of profits and losses among the different classes of Smartix stock. (Compl. ¶ 60; Riback Reply Aff. Ex. 2.) Thereafter, SCOA communicated to Smartix that it was Smartix's lead investor and that it would actively seek out new investments for Smartix. (Compl. ¶ 61.) Accordingly, between July 2002 and October 2003, SCOA continually represented to Smartix that it had found additional investors. (Compl. ¶ 62.) In June 2003, after Smartix advised SCOA that it could not continue operations without additional investment (Compl. ¶ 63), defendant Mr. Graustein told plaintiff and others at a meeting that SCOA "would not let you [Smartix] fail." (Compl. ¶ 64 (bracket in original).) At this same meeting, SCOA orally agreed to provide matching investments and promised a letter to Smartix confirming the same. (Compl. ¶ 65.) No such letter was ever received. At SCOA's request, Smartix prepared a plan for future investments by SCOA, which called for an additional $1,000,000 investment by SCOA and the implementation of the Smartfan program with ten sports teams. (Compl. ¶¶ 67-68.) Based on SCOA's indication that it was amenable to this plan (Compl. ¶ 68), plaintiff continued to make personal loans to Smartix through October 2003 in the following amounts, which are in addition to the initial loan of $100,000 made in the Spring of 2002: (1) $47,500; (2) $52,500; (3) $50,000; (4) $150,000; (5) $27,500; (6) $30,000; (7) $190,000; (8) $12,754.83; and (9) $2,170.54 (Compl. ¶¶ 55, 69). Smartix continually warned SCOA of its declining financial outlook, noting that, if the decline continued, Smartix would eventually be unable to perform those obligations it owed to the Red Sox and Cardinals (Compl. ¶¶ 70, 74), yet SCOA never objected. When, on June 16, 2003, plaintiff told Mr. Graustein that Smartix would have to

consider ceasing operations, Mr. Graustein responded by telling plaintiff that such an action was not within plaintiff's legal rights. (Compl. ¶¶ 71-72.)

On September 8, 2003, SCOA presented Smartix with a new investment proposal (Compl. ¶ 76) requiring plaintiff to convert his personal loans into company stock prior to any additional SCOA investment, which would be limited to matching investments up to the amount of $500,000 (Compl. ¶ 77). Plaintiff rejected this offer because it did not provide sufficient capital (Compl. ¶ 78) and because it attributed a lower valuation to Smartix, which would have allowed SCOA to trigger its right to obtain additional Smartix equity and thus increase its holdings (Compl. ¶ 79).

The next day, plaintiff was called into a meeting with Michael Dee, Executive Vice President of Business Affairs for the Boston Red Sox, regarding the continuation of the Smartfan program for the next year. (Compl. ¶¶ 45, 80.) Plaintiff was forced to concede Smartix's financial difficulties and its potential instability in the coming baseball season (Compl. ¶ 82), causing Dee to express concern about the future of the business relationship (Compl. ¶ 83).

C.     SCOA's Meetings with the Red Sox and MasterCard; Final Dealings with Smartix

On September 22 or 23, 2003, Mr. Graustein and other SCOA employees met with Mr. Dee and informed him, in sum and substance, that Henneberry "lacked the necessary skill and ability to manage Smartix . . . [,] otherwise disparaged his business acumen," and blamed Smartix's financial troubles and failure to pay monies owed to the Red Sox on Henneberry's mismanagement of the company. (Compl. ¶ 90.) SCOA went on to say that it would be taking over Smartix and removing plaintiff from his post. (Compl. ¶ 96.) Thereafter, Mr. Dee lost faith in Henneberry and began using Mr. Graustein as the contact for the Smartfan program. (Compl.

¶¶ 95, 97, 139-40, Ex. B.) Mr. Dee also refused to do business with Smartix if Henneberry was involved with the company (Compl. ¶ 108), which was contrary to Mr. Dee's July 2, 2003 statement that the Red Sox had "taken a leap of faith by aligning ourselves with Smartix, in large part due to my confidence and trust in you personally" (Compl. ¶ 109).

At some point between September 19 and 23, 2003, Graustein surreptitiously met with MasterCard, which meeting was attended by, *inter alia*, John Stuart, MasterCard's Senior Vice President of Global Sponsorship and Event Marketing, and informed MasterCard, in sum and substance, that Henneberry lacked the necessary skill and ability to manage Smartix, disparaged his business acumen, and blamed Smartix's financial condition and failure to pay monies owed to the Red Sox and Cardinals on Henneberry's mismanagement of the company. (Compl. ¶¶ 99, 100, 106.) MasterCard similarly lost faith in Henneberry. (Compl. ¶¶ 105, 139-40.)

SCOA did not notify Smartix about either of these meetings (Compl. ¶ 89) until a later meeting with Henneberry on September 24, 2003 (Compl. ¶ 107). Thereafter, Henneberry sent an e-mail to SCOA outlining SCOA's improper actions and their effect on Smartix. (Compl. Ex. C.)

On October 9, 2003, Smartix held a shareholder's meeting wherein it was decided that Smartix would continue to pursue the Smartfan program with the Red Sox. (Compl. ¶ 111.) At that meeting, SCOA represented that it had been in contact with investors who had expressed interest in investing in Smartix and again reiterated that it wanted Smartix to survive and succeed. (Compl. ¶ 112.) In reliance on these representations, plaintiff continued to personally loan money to Smartix. (Compl. ¶ 113.) SCOA never invested any additional funds in Smartix (Compl. ¶ 117) and, as a result of SCOA's various actions, Smartix's stock is presently worthless (Compl. ¶ 131).

## II. Plaintiff's Proposed Amended Complaint

Plaintiff includes with his motion papers a proposed amended complaint that seeks to remedy the deficiencies in the original complaint. Because leave to amend a complaint will be denied if the amended complaint could not withstand a motion to dismiss, see Halpert v. Wertheim & Co., 81 F.R.D. 734, 735 (S.D.N.Y. 1979) ("If the complaint, as amended, could not withstand a motion to dismiss, a motion to amend need not be granted." (citing DeLoach v. Woodley, 405 F.2d 496, 497 (5th Cir. 1968))), the Court will review the amended complaint through the prism of a Rule 12(b)(6) analysis and, consequently, accept as true all of the proposed complaint's factual allegations, and draw all reasonable inferences in favor of plaintiff, Pits, Ltd. v. Am. Express Bank Int'l, 911 F. Supp. 710, 713 (S.D.N.Y. 1996) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)). Accordingly, the following pertinent repleaded allegations, organized by cause of action, are drawn from the proposed amended complaint and do not constitute findings of fact by the Court.

### A. Detrimental Reliance Claims

Plaintiff has repleaded additional and differing allegations with respect to his detrimental reliance claims. Plaintiff first alleges that, in Spring 2002, he approached SCOA about providing a bridge loan to Smartix so that Smartix would have the necessary capital needed to enjoy uninterrupted operation until the $3-5MM Investment was disbursed. (Proposed Am. Compl. ¶ 125.) In response, Mr. Graustein told him that the multimillion dollar loan "was going to close," SCOA was not interested in fronting the bridge loan, and that plaintiff, and perhaps others from Smartix, "should provide the bridge loan themselves." (Proposed Am. Compl. ¶ 126.) He alleges that it was foreseeable to defendants that Mr. Graustein's statement would cause plaintiff and others to then make personal loans to Smartix. (Proposed Am. Compl. ¶ 127.) Indeed,

7

plaintiff told Mr. Graustein that he would make the loan (Proposed Am. Compl. ¶ 127), and then made the loan (Proposed Am. Compl. ¶ 128). Plaintiff's advancement of the loan was thus reasonable and made in reliance upon SCOA's "agreement" to provide the greater investment. (Proposed Am. Compl. ¶ 129.)

Second, plaintiff alleges that between July 2002 and October 2003, SCOA advised him that it had located investors who were "ready to invest in SCOA." (Proposed Am. Compl. ¶ 132.) Plaintiff was prodded by Mr. Henneberry to advance additional loans to Smartix while "SCOA was obtaining additional investment." (Proposed Am. Compl. ¶ 77.) However, upon information and belief, plaintiff alleges that these assertions regarding the investors' existence were false (Proposed Am. Compl. ¶ 135) and SCOA was less than candid in informing plaintiff "of the entirety of its dealings with these purported investors so as to create a false impression" of the investors' willingness to invest (Proposed Am. Compl. ¶ 136).

Third, plaintiff alleges that SCOA "indicated" to plaintiff that it "would be willing to make additional investments in Smartix should the need arise" (Proposed Am. Compl. ¶ 133), and that it would be "beneficial" for plaintiff to advance his own monies to cover operating expenses because doing so would be looked upon favorably by SCOA when it was called upon to make additional investments (Proposed Am. Compl. ¶ 134). However, SCOA's assertions regarding its willingness to make additional investments did not convey the "entirety of its intentions . . . so as to create a false impression" about SCOA's willingness to invest. (Proposed Am. Compl. ¶ 137.)

Plaintiff went on to make an additional nine loans, which combined with the original bridge loan totaled $662,425.37. (Proposed Am. Compl. ¶ 140.) He alleges that it was foreseeable to SCOA that SCOA's representations would induce him to make the nine additional

8

loans based upon his relationship of trust and confidence with SCOA; SCOA's ongoing representations regarding willing investors and its own willingness to further invest in Smartix; and SCOA's awareness of Smartix's financial condition and plaintiff's willingness to make personal loans to Smartix. (Proposed Am. Compl. ¶ 139.) Further, plaintiff "reasonably believed that SCOA would not let Smartix fail and would use its best efforts to locate investors and/or infuse additional capital into Smartix." (Proposed Am. Compl. ¶ 78.) In sum, plaintiff relied upon SCOA's statements and actions to his detriment. (Proposed Am. Compl. ¶ 144.) Had plaintiff been informed of "the true situation" concerning SCOA's true intent to invest, as well as the existence of the undisclosed investors, he would not have lent any money to Smartix. (Proposed Am. Compl. ¶ 138.)

## B.    Breach of Fiduciary Duty

Plaintiff alleges that SCOA was a member of Smartix's Board of Directors (Proposed Am. Compl. ¶ 196) and, as such, SCOA owed all of Smartix's shareholders, including plaintiff, a duty of utmost good faith and fair dealing (Proposed Am. Compl. ¶ 197). Further, SCOA was the *de facto* majority shareholder due to (1) the rights and powers set forth in Smartix's Amended Article of Incorporation and (2) SCOA's overwhelming operational control that it exercised over Smartix's day to day operations. (Proposed Am. Compl. ¶ 198.) Defendants exercised their "overwhelming operational control" of Smartix "through their development and implementation of Smartix'[s] business plan; management of Smartix personnel issues; the management of Smartix marketing decisions, . . . the overall management of Smartix" (Proposed Am. Compl. ¶ 199); and "through their control of information concerning outside investment and their own intentions regarding investing in Smartix" (Proposed Am. Compl. ¶ 200). Further, "[a]s Smartix'[s] lead investor, defendants could control the actions of outside investors based

upon the information provided to said investors as well as SCOA's own inaction in providing additional investment in Smartix." (Proposed Am. Compl. ¶ 200.) Plaintiff also alleges that he reasonably relied (Proposed Am. Compl. ¶¶ 202-03) on defendants' "special skill, knowledge and experience with regard to the management and development of a start-up company" (Proposed Am. Compl. ¶ 201). Plaintiff concludes the count by alleging that, "as set forth above," defendants breached the fiduciary duty owed to plaintiff (Proposed Am. Compl. ¶ 204), resulting in the loss of value in plaintiff's Smartix stock, lost future income as Chairman of Smartix, lost recoupment of the loans made to Smartix, irreparable injury to his reputation, and lost future earnings as a consultant to MLB and MasterCard (Proposed Am. Compl. ¶ 205).

## C. Slander Per Se

Plaintiff's slander per se claim, which survived defendants' prior motion to dismiss, re-alleges all of the allegations from the original complaint with a few additional allegations that plaintiff claims typify SCOA's statements concerning outside investors and its own willingness in making additional investments. (Proposed Am. Compl. ¶ 119.) To wit, SCOA instructed plaintiff to draft an e-mail to, *inter alia*, Mr. Graustein, which confirmed SCOA's prior instruction to tell Mr. Dee that "enough capital would be put into the company for it to operate for the [2004] season and that if the company cannot proceed to fulfill its' [sic] obligations," a licensing option would be given to the Red Sox to allow them to continue to use the Smartix program. (Proposed Am. Compl. ¶ 119 (first bracket in original).) Plaintiff then conveyed this position to Mr. Dee (Proposed Am. Compl. ¶ 120), but the Red Sox did not hire Smartix for the 2004 baseball season (Proposed Am. Compl. ¶ 122). Plaintiff alleges that had the Red Sox engaged Smartix, Smartix would be a viable company today. (Proposed Am. Compl. ¶ 123.)

D.    Tortious Interference with Prospective Economic Advantage

Plaintiff seeks to correct the failings in his original claim for tortious interference with prospective economic advantage through a number of additional allegations. First, plaintiff states that prior to defendants' tortious actions, he consulted with MLB and MasterCard "on a regular basis." (Proposed Am. Compl. ¶ 175.) This consulting relationship allowed him to pursue projects like the Smartix venture while "on hiatus" from consulting. (Proposed Am. Compl. ¶ 175.) Plaintiff further alleges that he was actively consulting with MasterCard "at the time the opportunity with Smartix presented itself," and that he received MasterCard's permission to "take leave to pursue the Smartix project." (Proposed Am. Compl. ¶ 176.) There was an understanding between plaintiff and MasterCard that plaintiff would be able to return as a consultant if and when plaintiff became available. (Proposed Am. Compl. ¶ 177.)

Plaintiff states that since defendants' tortious activity, plaintiff has attempted to consult for both MasterCard and MLB, but has failed (Proposed Am. Compl. ¶ 180) because those entities have "lost faith" in him because of SCOA's disparagement of his business acumen (Proposed Am. Compl. ¶ 181). Plaintiff names two specific consulting projects that he would have been hired to perform but for defendants' tortious actions. (Proposed Am. Compl. ¶ 183.) Plaintiff alleges upon information and belief that he would have earned at least $25,000 per month for at least eleven months for the first project and at least $15,000 per month for twelve months, plus potential profit sharing for at least three years, for the second project. (Proposed Am. Compl. ¶¶ 185-86.)

E.    Injurious Falsehood

Plaintiff maintains in the proposed amended complaint the same allegations regarding SCOA and Mr. Graustein's purported meetings with the Boston Red Sox (Proposed Am. Compl.

¶¶ 98-105) and MasterCard (Proposed Am. Compl. ¶¶ 106-12), wherein defendants informed the parties that plaintiff "lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen," and "placed blame for Smartix'[s] present financial condition, and inability to pay monies owed to Red Sox, upon the purported mismanagement of Smartix by Mr. Henneberry" (Proposed Am. Compl. ¶¶ 98, 107). At defendants' meeting with the Red Sox, SCOA informed Mr. Dee of the Red Sox further that "SCOA would be taking over Smartix and making changes in management so as to remove Mr. Henneberry." (Proposed Am. Compl. ¶ 103.) Mr. Graustein was acting within the scope of his employment during the time of these meetings. (Proposed Am. Compl. ¶¶ 99-108.) Plaintiff alleges the statements (1) "were made with the intent to cause harm to Mr. Henneberry or, alternatively, were of such a nature that SCOA should have recognized that they would cause harm to Mr. Henneberry if published" (Proposed Am. Compl. ¶¶ 188, 190); (2) "were made with the knowledge that they were false, or alternatively, were made with a reckless disregard as to whether they were true or false" (Proposed Am. Compl. ¶¶ 189, 191); (3) "constituted an injurious falsehood" (Proposed Am. Compl. ¶ 192); (4) "were the proximate cause of the Red Sox['s] failure to agree to sign with Smartix for the upcoming 2004 baseball season and the failure of Smartix" (Proposed Am. Compl. ¶ 193); and (5) resulted in a loss of value in plaintiff's Smartix stock, lost future income as Chairman of Smartix, lost recoupment of the loans made to Smartix, and irreparable injury to his reputation (Proposed Am. Compl. ¶ 194).

I.      Rule 15(a) Standards

Federal Rule of Civil Procedure 15(a) allows a litigant to amend a pleading by leave of court.[1] Fed. R. Civ. P. 15(a). The Rule provides that "leave shall be freely given when justice so requires," id., and, accordingly, the Second Circuit has followed the U.S. Supreme Court's direction that permission to amend a claim "should be freely granted." Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252 (2d Cir. 1991) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). When a district court grants a defendant's motion to dismiss a plaintiff's claims, as the Court has done in this action, the "'usual practice'" dictates that the court grant the plaintiff leave to amend its complaint. Id. at 253 (quoting Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990)). The decision to grant leave to amend is wholly within a district court's discretion, see id.; Kaster v. Modification Sys., Inc., 731 F.2d 1014, 1018 (2d Cir. 1984) (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971)); however, a decision to deny the motion must be based on a valid ground. Oliver Schs. Inc., 930 F.2d at 252; Kaster, 731 F.2d at 1018 (citing Foman, 371 U.S. at 182).

A district court may deny leave to amend where there has been undue delay or bad faith on the moving party's part, prejudice to the non-movant, or where leave would be futile.[2] See Klecher v. Metropolitan Life Ins. Co., 331 F. Supp. 2d 279, 282-83 (S.D.N.Y. 2004) (citing Foman, 371 U.S. at 182; Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)). Granting leave to file an amended complaint is futile where the claims

---

[1] Rule 15(a) also allows a party to amend a pleading
   once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by . . . written consent of the adverse party . . . .
Fed. R. Civ. 15(a).
[2] The parties have only addressed the question of the amended complaint's futility, and not the other named grounds upon which a district court may deny leave to amend.

therein would not survive a motion to dismiss. See Halpert v. Wertheim & Co., 81 F.R.D. 734, 735 (S.D.N.Y. 1979) ("If the complaint, as amended, could not withstand a motion to dismiss, a motion to amend need not be granted." (citing DeLoach v. Woodley, 405 F.2d 496, 497 (5th Cir. 1968))).

In order to survive a motion to dismiss, a proposed claim need only be "colorable." See Kaster, 731 F.2d at 1018 ("As long as appellants have 'at least colorable grounds for relief, justice does . . . require' leave to amend." (quoting S.S. Silberblatt, Inc. v. E. Harlem Pilot Block, 608 F.2d 28, 42 (2d Cir. 1979))); Grupke v. Linda Lori Sportswear, Inc., 921 F. Supp. 987, 992 (E.D.N.Y. 1996) ("A party may amend its pleading to assert a 'colorable' new claim." (quoting S.S. Silberblatt, Inc., 608 F.2d at 42)). Consequently, as former Judge Weinfeld stated, "[a]lthough Rule 15 provides that leave to amend shall be granted freely, leave need not be granted to permit an amendment embodying plainly defective claims." Valdan Sportswear v. Montgomery Ward & Co., 591 F. Supp. 1188, 1190 (S.D.N.Y. 1984) (citing Foman, 371 U.S. at 182).[3]

---

[3] The Court is aware of certain district court decisions from this Circuit which state that the party opposing a motion to amend a pleading bears the burden of demonstrating that a grant of the amendment would be futile. See, e.g., Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano, No. 03 Civ. 0015, 2005 WL 1706490, at *3 (S.D.N.Y. July 21, 2005) ("The party opposing a motion to amend bears the burden of establishing that an amendment would be futile."); Blaskiewicz v. County of Suffolk, 29 F. Supp. 2d 134, 137-38 (E.D.N.Y. 1998) (same); Harrison v. NBD Inc., 990 F. Supp. 179, 185 (E.D.N.Y. 1998) (same). All of the cases cite—either directly or through an intermediary case—as authority for this proposition this Court's decision in Panzella v. Skou, 471 F. Supp. 303 (S.D.N.Y. 1979). The pertinent language in the Panzella decision reads as follows: "Since plaintiff has failed to demonstrate that prejudice would result from such amendment, defendant's motion to amend its answer to assert the affirmative defense of assignment of this cause of action to the employer is granted." Id. at 305 (citing Fed. R. Civ. P. 15(a)). Regardless whether the Panzella court intended this proposition to mean what it has been interpreted to mean by the subsequent courts that have cited it, this Court finds no basis for those subsequent courts' interpretation in the text of Rule 15(a), the sole authority cited by Panzella. The Rule's text only states that where amendment is sought by leave of court, amendment "shall be freely given when justice so requires"; the Rule is silent as to either party's burden of persuasion or proof. Fed. R. Civ. P. 15(a). Even assuming that the later courts' interpretation of the Panzella statement is correct, this Court is not bound to follow it because the Court is not aware of any Second Circuit authority in line with the reasoning employed by those later courts. See Richardson v. Selsky, 5 F.3d 616, 623 ("[A] district court decision does not 'clearly establish' the law, even in its own circuit." (citation omitted)); see also Colby v. J.C. Penney Co., 811 F.2d 1119, 1124 (7th Cir. 1987) (Posner, J.) ("[D]istrict judges in this circuit must not treat decisions *by other district judges,* in this and *a fortiori* in other circuits, as controlling, unless of course the doctrine of res judicata or of collateral estoppel applies.").

14

## II. Standing

The parties maintain competing views as to whom—Smartix or plaintiff—defendants owed certain duties in tort. (See, e.g., Pl.'s Mem. Law Supp. Mot. 6-10; Def.'s Mem. Law Opp'n Mot. 18-20.) Clearly, if defendants owed no duty to defendant, plaintiff's claims must fail. See, e.g., 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc., 750 N.E.2d 1097, 1101 (N.Y. 2001) (Kaye, C.J.) ("Absent a duty running directly to the injured person there can be no liability in damages . . . ."). The Court is faced with the question whether plaintiff's alleged injuries resulted from defendants' breach of a duty or duties owed to him as an individual, or whether plaintiff was injured not because of a breach of duty owed to him, but as a collateral effect of defendants' breach of a duty or duties owed to Smartix as a corporation. The Court is inclined—indeed, compelled—to determine whether plaintiff maintains such standing to bring his claims in an individual capacity. See Southside Fair Hous. Comm. v. City of N.Y., 928 F.2d 1336, 1341 (2d Cir. 1991) (stating that district court's explicit decision to not address plaintiff's standing to maintain action was error because a circuit court of appeals lacks jurisdiction to hear an appeal where plaintiff fails to satisfy Article III's requirement that federal courts adjudicate actual "cases" and "controversies" (citing Allen v. Wright, 468 U.S. 737, 750 (1984); Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621, 624 (2d Cir. 1989))); Qantel Corp. v. Niemuller, 771 F. Supp. 1361, 1368 (S.D.N.Y. 1991) (Leisure, J.) (citing Southside with approval); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (Scalia, J.) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." (citing Allen, 468 U.S. at 751)). Regardless whether the parties raise standing on their own, the Court may address the issue at any time, *sua sponte*. Crigger v. Fahnestock & Co., No. 01 Civ. 781, 2005 WL 774240, at *1 (S.D.N.Y. Apr. 6, 2005)

(Keenan, J.) ("As standing implicates the Court's subject matter jurisdiction, the Court may consider the issue at any time, upon request or *sua sponte*."). Standing to maintain an action "'cannot be inferred argumentatively from averments in the pleadings, . . . but rather must affirmatively appear in the record,'" so that, on a motion to dismiss, "'it is the burden of the party who [seeks standing to sue] . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" Thompson v. County of Franklin, 15 F.3d 245, 249 (2d Cir. 1994) (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)), overruled on other grounds by City of Littleton v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774 (2004).

A district court's determination of whether a plaintiff-shareholder maintains standing to assert a claim under state law against a third party for its economic injuries requires the court to ask whether the alleged injuries are indeed personal, by virtue of the breach of a duty owed to plaintiff personally, or whether they are derivative of injuries to the corporation resulting from a breach of a duty owed to the corporation as a business entity. The applicable legal standards to be applied to this inquiry are found in New York state law. See Desiano v. Warner-Lambert Co., 326 F.3d 339, 348 (2d Cir. 2003) (reversing district court for applying Second Circuit case law interpreting proximate causation under RICO where plaintiff's claims arose under New Jersey's statutory and common law).[4] As a general matter, New York courts have held that "[a]n

---

[4] The Desiano Court's explicit decision to apply New Jersey state law's proximate cause standards to plaintiff's claims, rather than the standards used under RICO, stands in contrast to a prior Second Circuit decision in which the Court extended the application of RICO's proximate causation requirements to common law claims. See Excimer Assocs., Inc. v. LCA Vision, Inc., 292 F.3d 134, 139-40 (2d Cir. 2002). In Excimer, the Second Circuit applied a "direct injury" test developed previously in civil RICO cases to plaintiff's common law breach of contract and promissory estoppel claims. Id. ("'[T]he critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct.'" (citing Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 238-39 (2d Cir. 1999))). Excimer quoted its prior decision in Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 238-39 (2d Cir. 1999), a case in which the Second Circuit articulated the contours of standing requirements for a civil RICO claim. The Laborers Local 17 decision built on the Court's previous precedent dealing with standing in the civil RICO context. See id. at 237-38 (citing, *inter alia*, GICC Capital Corp. v. Tech. Fin. Group, Inc., 30 F.3d 289, 290 (2d Cir. 1994); Ceribelli v. Elghanayan, 990 F.2d 62, 64 (2d Cir. 1993); Standardbred Owners Assoc. v. Roosevelt Raceway Assocs., 985 F.2d 102 (2d Cir. 1993); Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1101 (2d

16

individual shareholder has no right to bring an action in his own name and in his own behalf for a wrong committed against the corporation, even though the particular wrong may have resulted in a depreciation or destruction of the value of his corporate stock." Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Ass'n, 396 N.Y.S.2d 925, 927 (App. Div. 1977) (citing, *inter alia*, Bonneau v. Bonneau, 195 N.Y.S.2d 443, 445 (Sup. Ct. 1959)); see New Castle Siding Co. v. Wolfson, 468 N.Y.S.2d 20, 21 (App. Div. 1983) ("Generally, corporations have an existence separate and distinct from that of their shareholders." (citing Billy v. Consolidated Mach. Tool Corp., 412 N.E.2d 934, 941 (N.Y. 1980))), aff'd, 470 N.E.2d 868 (N.Y. 1984). The New York Court of Appeals has held that this prohibition includes recovery for any personal liability the shareholder incurs "in an effort to maintain the solvency of the corporation." Abrams v. Donati, 489 N.E.2d 751, 751 (N.Y. 1985). This rule applies regardless whether the corporation is a larger, publicly traded corporation, or a closely held corporation. See Wolf v. Rand, 685 N.Y.S.2d 708, 710 (App. Div. 1999) ("Even where the corporation is closely held, and the

---

Cir. 1988)). In Laborers Local 17, the Court also held that the direct injury test's principles applied in "general terms" to plaintiff's New York state law claims of fraud and breach of a special duty. Id. at 242. It is unclear whether the Laborers Local 17 Court's application of the direct injury test to plaintiff's fraud and breach of a special duty claims was meant to apply in the future to *all* New York state law causes of action; however, the Excimer Court's application of the test to state law tort claims ostensibly demonstrates that that court thought as much. 292 F.3d at 139-40; see also Bank of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 220 (S.D.N.Y. 2005) (stating that "courts in this Circuit have consistently found 'injuries that are wholly derivative of harm suffered by a third party' to be 'too remote' to establish the proximate causation necessary for a plaintiff to have standing to sue in tort" (citing, *inter alia*, Laborers Local 17, 191 F.3d at 236, 242)). While Desiano did not overrule, or even cite to Excimer, this Court will follow the former's holding given it is the most recent Second Circuit authority on the issue. This finding is supported by the fact that other courts have applied the direct injury test to state law claims. See Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) (citing Excimer, 292 F.3d at 140; Ceribelli, 990 F.2d at 63); Roffler v. Spear, Leeds & Kellogg, 788 N.Y.S.2d 326, 329 (App. Div. 2004) (citing Ceribelli, 990 F.2d at 63). The Court further notes that the direct injury test may have been extended to state law causes of actions in part because of its similarity to the causation standards used by courts in assessing when a shareholder maintains standing to sue in an individual capacity for her own injuries. Compare Laborers Local 17, 191 F.3d at 238-39 ("[T]the critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct."), with, e.g., New Castle Siding Co., Inc. v. Wolfson, 468 N.Y.S.2d 20, 21 (App. Div. 1983) ("The fact that an individual closely affiliated with a corporation (for example, a principal shareholder, . . .), is incidentally injured by an injury to the corporation does not confer on the injured individual standing to sue on the basis *of either that indirect injury or the direct injury to the corporation*.") (emphasis added), aff'd, 470 N.E.2d 868 (N.Y. 1984).

17

defendants might share in the award, the claims belong to the corporation, and damages are awarded to the corporation rather than directly to the derivative plaintiff.").

However, there is an exception to this general principle of law: "Where the injury to the shareholder results from a violation of a duty owing to the shareholder from the wrongdoer, having its origin in circumstances independent of and extrinsic to the corporate entity, the shareholder has a personal right of action against the wrongdoer." Fifty States, 396 N.Y.S.2d at 927 (citing Shapolsky v. Shapolsky, 279 N.Y.S.2d 747, 751 (Sup. Ct. 1996), aff'd, 282 N.Y.S.2d 163 (App. Div. 1967)); see New Castle Siding Co., 468 N.Y.S.2d at 21 ("Where . . . the injury to a shareholder resulted from the violation of a duty owing to the shareholder from the wrongdoer, having its origin in circumstances independent of and extrinsic to the corporate entity, an individual cause of action may exist for a shareholder of an allegedly wronged corporation." (citing Shapolsky, 279 N.Y.S.2d at 751)).[5] Thus, an individual shareholder lacks standing to bring his or her claim where "the duty owed to the shareholder[] is . . . indistinguishable from the duty owed to the corporation." Vincel v. White Motor Corp., 521 F.2d 1113, 1121 (2d Cir. 1975). Absent an independent duty, the shareholder's perceived injury is deemed to be considered the same injury as that to the corporation and, consequently, the shareholder maintains no separate right of action separate and apart from the corporation's. Fifty States, 396 N.Y.S.2d at 927 (citing Shapolsky, 279 N.Y.S.2d at 751).

Therefore, this Court may only find that plaintiff maintains standing to assert his New York state law claims where his injuries resulted from the violation of an independent duty or

---

[5] For example, where an individual, through her S corporation, enters into an employment contract with an employer, the employer maintains an independent duty, grounded in tort, to provide the employee, as an individual, with a safe workplace, notwithstanding the fact that the employee is a shareholder in the contracting S corporation. See Behrens v. Metro. Opera Ass'n, Inc., 794 N.Y.S.2d 301, 303 (App. Div. 2005) ("In the instant case, plaintiff has alleged precisely such a duty—an independent tort duty on the part of the . . . [employer] to exercise reasonable care to avoid causing injury to her.").

18

duties owed to him by defendants.[6] See id. ("[T]here is no tort liability absent a duty independent of the contract obligation."); see also EJS-Assoc Ticaret Ve Danismanlik Ltd. Sti. v. Am. Tel. & Tel. Co., No. 92 Civ. 3038, 1993 WL 546675, at *3 (S.D.N.Y. Dec. 30, 1993) (Sotomayor, J.) ("The fact that a shareholder has suffered separate and distinct injuries is relevant only to the extent it demonstrates the existence of a separate and distinct *wrong* to such shareholder."). The Court thus will determine, as a threshold matter, whether plaintiff maintains standing to assert his respective claims.

III.     Plaintiff's Five Causes of Action

Plaintiff seeks leave to amend his complaint in order to re-assert the following five claims: (1) detrimental reliance, based on the alternative grounds of promissory estoppel and negligent misrepresentation; (2) breach of fiduciary duty; (3) slander per se; (4) tortious interference with prospective economic advantage; and (5) injurious falsehood. The legal standards governing these causes of action follow.[7]

---

[6] The Court notes that, notwithstanding plaintiff's standing to bring an action against Smartix in an individual capacity, a shareholder may bring an action derivatively in the name of the corporation for injuries to the corporation. N.Y. Bus. Corp. Law § 626(a) (McKinney 2003) ("An action may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor, by a holder of shares or of voting trust certificates of the corporation or of a beneficial interest in such shares or certificates.").

[7] None of the parties has raised in their motion papers any choice of law argument concerning what state's substantive law governs their claims. (Plaintiff is a resident of Connecticut, Mr. Graustein is a resident of New York, and SCOA has a principal place of business in New York.) Instead, they all appear to assume the application of New York law as they only cite to New York state case law in support of their arguments. Consequently, the Court applied New York state's substantive law in its prior Order, and will continue to apply it on this motion, as a court is not required to conduct a choice of law analysis *sua sponte*, and instead may apply the state law assumed by the parties in their papers. See Lehman v. Dow Jones & Co., 783 F.2d 285, 294 (2d Cir. 1986) (Friendly, J.) (declining to determine whether there was a difference between the substantive law of New York and California, and instead applying New York law, where the parties solely cited New York case law); Deep S. Pepsi-Cola Bottling Co., Inc. v. Pepsico, Inc., No. 88 Civ. 6243, 1989 WL 48400, at *12 n.3 (S.D.N.Y. May 2, 1989) (Leisure, J.) (citing Lehman with approval).

19

A.    Detrimental Reliance

    1.    Plaintiff's Standing to Plead Promissory Estoppel

Because plaintiff is not suing derivatively on behalf of Smartix, he may only maintain his promissory estoppel claim against defendants to the extent he pleads adequately injuries resulting from "the violation of a duty owing to . . . [him] from the wrongdoer, having its origin in circumstances independent of and extrinsic to the corporate entity." New Castle Siding Co., 468 N.Y.S.2d at 21. Plaintiff's close affiliation with Smartix, as its Chairman, CEO, and majority common stock shareholder alone does not confer upon him standing to sue for any injuries suffered by Smartix as a corporate entity, or any personal injuries incidental to those damages suffered by Smartix as a corporate entity. Id. The purpose of the Court's inquiry, then, is to determine whether SCOA and Mr. Graustein owed an independent duty to plaintiff.

The relevant allegations are that after plaintiff approached SCOA about making a bridge loan to Smartix (Proposed Am. Compl. ¶ 125), SCOA declined, but Mr. Graustein suggested that plaintiff and other Smartix individuals make the loan (Proposed Am. Compl. ¶ 126), and plaintiff acquiesced (Proposed Am. Compl. ¶¶ 127-28). The parties then entered into the July 2002 Agreement on July 2, 2002, and, thereafter, between July 2002 and October 2003, plaintiff made nine additional loans to Smartix (Proposed Am. Compl. ¶¶ 140-41) based on SCOA's continuous representations that it had located other investors ready to invest in Smartix (Proposed Am. Compl. ¶ 132) and that SCOA itself would make additional investments should the need arise (Proposed Am. Compl. ¶ 133). These additional loans were made by plaintiff, in part, because of "SCOA's relationship of trust and confidence with Mr. Henneberry." (Proposed Am. Compl. ¶ 139.)

The complaint is bereft of any explicit allegation that an independent "duty" existed between the parties. Language that arguably comes close to approximating an allegation of such a duty is the statement that there existed a "relationship of trust and confidence" between the parties, which induced plaintiff to continue loaning money to Smartix (after making the original $100,000 bridge loan). (Proposed Am. Compl. ¶ 139.) A "relationship of trust and confidence" does not, without more, establish an independent duty between plaintiff and defendants. Cf. Nat'l Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 679 (S.D.N.Y. 1991) ("Where parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances."), aff'd, Yaeger v. Nat'l Westminster, 962 F.2d 1 (2d Cir. 1992) (table). This notwithstanding, the allegation that a "relationship of trust and confidence" existed is legally conclusory and therefore deficient, see Moscowitz v. Brown, 850 F. Supp. 1185, 1190 (S.D.N.Y. 1994) (Preska, J.) ("Baldly conclusory statements that fail to give notice of the basic events of which the plaintiff complains need not be credited by the court."), abrogated on other grounds by Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258 (2d Cir. 2000), absent the pleading of other, factual allegations in support of such a relationship.

In explaining the dealings between the parties, the complaint contains few allegations that speak to a relationship between SCOA and *plaintiff*; the complaint, for the most part, speaks to the relationship between SCOA and *Smartix*. For example, plaintiff alleges that SCOA's Corporate Business Development Division ("CBDC") possessed special expertise (Proposed Am. Compl. ¶ 39) that allowed it to provide advice and guidance to Smartix in order to help Smartix get off the ground (Proposed Am. Compl. ¶ 40). That advice and guidance included, but was not limited to, the

21

formulation of a business plan for *Smartix*, the formulation of budgets . . . [and] staffing, the presentation of *Smartix* to investors, training *Smartix['s]* staff on how to make presentations to investors, locating additional investors, and sharing SCOA's institutional knowledge and experience with regard to the potential problems a start-up company like *Smartix* could face.

(Proposed Am. Compl. ¶ 40 (emphasis added).)

Similarly, plaintiff avers that Mr. Graustein, a Senior Vice President and General Manager in the CBDC, possesses specialized skill, knowledge, and experience which allowed him to provide to Smartix the same advice and guidance that SCOA provided. (Proposed Am. Compl. ¶ 41.) Plaintiff also alleges that Jeffrey Frank, SCOA's Director of Corporate Business Development (Proposed Am. Compl. ¶ 43), was assigned to provide *Smartix* with his special skills and expertise (Proposed Am. Compl. ¶ 46). Mr. Frank's division would conduct meetings "with *Smartix*" concerning "how to operate *Smartix*." (Proposed Am. Compl. ¶ 48 (emphasis added).)

The flaw in these allegations is that the "advice and guidance" that plaintiff describes was "provided by SCOA to *Smartix*." (Proposed Am. Compl. ¶ 40 (emphasis added).) Allegations concerning plaintiff's personal relationship with defendants merely state that he "was in constant contact" with Mr. Frank and Mr. Graustein (Proposed Am. Compl. ¶ 47) and that he came to "trust and rely" upon their counsel "with regard to business matters involving *Smartix*" (Proposed Am. Compl. ¶ 49 (emphasis added)). The fact that plaintiff was in "constant contact" with Mr. Graustein and Mr. Frank (Proposed Am. Compl. ¶ 47), and that the three maintained a "close working relationship" (Proposed Am. Compl. ¶ 49), alleges nothing more than a business relationship between an investors' two employees and the Chairman and CEO of the company receiving the investment. Such allegations describe an arms length transaction. Cf. Nat'l

Westminster Bank, 130 B.R. at 679 (requiring "extraordinary circumstances" within an arms length transaction in order to give rise to a fiduciary relationship).

However, plaintiff offers three other allegations that arguably imply an independent duty specific to plaintiff: (1) Mr. Graustein told plaintiff that he, and other Smartix employees, should make a $100,000 bridge loan to Smartix; (2) it would be beneficial for plaintiff to make additional loans to Smartix to cover operating expenses because SCOA would look favorably upon it when called upon to make additional investments; and (3) plaintiff should advance additional loans to Smartix to cover operating expenses while SCOA was obtaining additional investment. Making all reasonable inferences in favor of plaintiff, these allegations of a personal inducement by SCOA to plaintiff, and plaintiff's detrimental reliance thereon, may be read to imply the existence and breach of an independent duty running between defendants and plaintiff. The Court's determination turns on the fact that the statements are claimed to have been made to plaintiff *personally*, and not to *all* Smartix shareholders, thus raising the inference that a separate "wrong" solely injured plaintiff. Relevant case law compels such a conclusion. See, e.g., EJS-Assoc, 1993 WL 546675, at *3 (declining to find an independent duty owed to plaintiffs where plaintiffs made no "claim that . . . [defendant] made any statements to them *personally* upon which they relied, or did anything to cause them to change their position in any way" (emphasis added)); Koal Indus. Corp. v. Asland, S.A., 808 F. Supp. 1143, 1163-64 (S.D.N.Y. 1992) (requiring plaintiff's injury to arise out of a relationship with defendant separate and apart from plaintiff's relationship with defendant as a shareholder). Consequently, the Court finds that plaintiff maintains standing to assert his promissory estoppel claim.

## 2. Plaintiff's Standing to Plead Negligent Misrepresentation

Plaintiff maintains standing to assert his negligent misrepresentation claim for the same reasons he maintains standing to bring his promissory estoppel claim: SCOA's allegedly false representations that it would make the $3-5MM Investment, that plaintiff should made additional loans while SCOA obtained additional investment, and that it would make additional investments should the need arise were all made to plaintiff directly and, as a result, plaintiff changed his position individually, and not in his capacity as a Smartix shareholder, to his detriment.[8] See EJS-ASSOC, 1993 WL 546675, at *2.

## 3. Promissory Estoppel Standards

A claim for promissory estoppel under New York law requires a party to demonstrate that (1) a speaker made a clear and unambiguous promise; (2) it was reasonable and foreseeable for the party to whom the promise was made to rely upon the promise; and (3) the person to whom the promise was made relied on the promise to his or her detriment. Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc., 804 F.2d 787, 793 (2d Cir. 1986).

Courts have held that, absent a distinct communication to be bound, a statement by one party to another that evinces the speaker's desire to consummate or further a commercial transaction does not constitute a clear and unambiguous promise. For example, statements such

---

[8] The court notes that the conclusory allegation of a "relationship of trust and confidence" that failed to establish plaintiff's standing to assert his promissory estoppel claim is even less supportive of his negligent misrepresentation claim. Under New York law, such a relationship imposes liability on the person in a position of trust and confidence vis-à-vis the injured party. Kimmell v. Schaefer, 675 N.E.2d 450, 454 (N.Y. 1996) ("[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified."). As was the case with plaintiff's promissory estoppel claim, the absence of factual allegations in support of this conclusory allegation causes this purported relationship to fail to support an independent duty between the parties. See Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996) ("While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." (citing Albert v. Carovano, 851 F.2d 561, 572-73 (2d Cir. 1988) (en banc); Martin v. N.Y. State Dept. of Mental Hygiene, 588 F.2d 371, 372 (2d Cir. 1978) (per curiam))); Ross v. Mitsui Fudosan, Inc., 2 F. Supp. 2d 522, 528 (S.D.N.Y. 1998) (Leisure, J.) ("[T]he Court does not accept as true conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments." (citing Albert, 851 F.2d at 572; Clapp v. Greene, 743 F. Supp. 273, 276 (S.D.N.Y. 1990), aff'd, 930 F.2d 912 (2d Cir. 1991) (table)))).

24

as "'we're partners'" and "'we look forward to growing together,'" when made by experienced negotiators in the course of a collective bargaining agreement negotiation, are not clear and unambiguous promises to renew the subject agreement. Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates, & Pilots, 636 F. Supp. 384, 391 (S.D.N.Y. 1986) (Weinfeld, J.); see also Media Sport & Arts s.r.l. v. Kinney Shoe Corp., No. 95 Civ. 3901, 1997 WL 473968, at *13 (S.D.N.Y. Aug. 20, 1997) (Leisure, J.) (finding defendant's statements that "'FIBA may proceed to act on the enclosed offer without limitation'" and "'FL and FIBA are going to make a great team'" were not clear and unambiguous promises); Cohen v. Lehman Brothers Bank, 273 F. Supp. 2d 524, 529-30 (S.D.N.Y. 2003) (Preska, J.) (holding defendant's statement that "'she would work through' the issues raised by plaintiffs about the deal" prior to execution of a loan mortgage agreement could not be construed as a clear and unambiguous promise (citing Media Sport & Arts s.r.l., 1997 WL 473968, at *13)); Chemical Bank v. City of Jamestown, 504 N.Y.S.2d 908, 909-10 (App. Div. 1986) (finding plaintiff's promissory estoppel claim inapplicable where defendant's statements that the subject loan would close could not constitute clear and unambiguous promises because defendant further stated that closing was subject to the execution of governing documents).

According to the second element, plaintiff must demonstrate that the actions it took in reliance on defendant's promise were "unequivocally referable" to the alleged promise. Ripple's of Clearview, Inc. v. Le Havre Assocs., 452 N.Y.S.2d 447, 449 (App. Div. 1982) (citing Woolley v. Stewart, 118 N.E. 847, 848 (N.Y. 1918)). A plaintiff fails to demonstrate that its actions were "unequivocally referable" to the promise where they instead may be attributable to the performance of plaintiff's normal business operations. Id. The third and last element requires the plaintiff to have relied on the promise to his or her detriment, thus resulting in damages. See

25

Silver v. Mohasco Corp., 462 N.Y.S.2d 917, 920 (App. Div. 1983) ("For promissory estoppel to apply herein there must have been pleaded by plaintiff an injury stemming from his reliance upon a clear and unambiguous promise by Mohasco . . . ."), aff'd, 465 N.E.2d 361 (N.Y. 1984); see also Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000) (citing Silver with approval).

4. Plaintiff's Allegations in the Proposed Amended Complaint

Plaintiff avers that he relied to his detriment on the following promises made by defendants: (1) SCOA's promise in Spring 2002 to make the $3-5MM Investment; (2) SCOA's continuing "advise[ments]" (Proposed Am. Compl. ¶ 132) and "representations" (Proposed Am. Compl. ¶ 139) from July 2002 through October 2003, that it had located investors who were "ready" and/or "willing" to invest in Smartix; and (3) SCOA's repeated "indicat[ions]" (Proposed Am. Compl. ¶ 133), from July 2002 through October 2003, that it "would be willing" to make additional investments to Smartix "should the need arise," including Mr. Graustein's representation that SCOA would "look favorably" upon investing additional monies in Smartix if plaintiff himself made additional loans to Smartix.[9] Plaintiff alleges that, as a result of the first promise, he made the $100,000 bridge loan to Smartix, which he could not recoup because SCOA never made the $3-5MM Investment. With respect to the second and third groups of representations, plaintiff alleges that he made the nine additional loans to Smartix, none of which he has been able to recoup.

_____

[9] Organizing defendants' purported promises to plaintiff into three categories is somewhat difficult in that plaintiff does not use the word "promise" in any of the allegations listed under the "First Count: Detrimental Reliance" heading in the proposed amended complaint. However, the proposed amended complaint and accompanying memoranda of law do refer consistently to three separate categories of promises, albeit without mention of the term "promise." The Court finds further basis for its distinction between three groups of promises in Plaintiff's Memorandum of Law in Support of his motion. The Memorandum's Promissory Estoppel section is sub-divided under two headings: the first is titled "The $100,000 bridge loan" and the second is titled "Mr. Henneberry's other loans." The first section addresses SCOA's alleged promise to loan Smartix $3,000,000 to $5,000,000 (Pl.'s Mem. Law Supp. Mot. 2-3), while the second addresses defendants' willingness to invest further monies in Smartix if plaintiff also made additional loans, and SCOA's representations concerning the willingness of third-party investors to invest in Smartix (Pl.'s Mem. Law Supp. Mot. 3-6). The two sections thus articulate three categories of promises.

## 5. Promissory Estoppel Standards as Applied to Plaintiff's Allegations

### i. Defendants' Promise to Make the $3-5MM Investment

In its prior Order, the Court held that plaintiff satisfied the first element of his promissory estoppel claim by alleging a clear and unambiguous promise: SCOA's commitment to plaintiff to make the $3-5MM Investment. Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at *8 (S.D.N.Y. Apr. 27, 2005).

The Court previously dismissed the claim, though, on the ground that plaintiff failed to plead that it was foreseeable that plaintiff would make the $100,000 bridge loan to Smartix, noting that plaintiff's loan did not appear to be "an ordinary course of conduct that SCOA should have anticipated." Id. In the proposed amended complaint, plaintiff seeks to remedy this deficiency by including an allegation that "[i]t was foreseeable that Mr. Graustein's statement [that SCOA would not make a bridge loan] would induce Mr. Henneberry, and others, to personally issue a bridge loan to Smartix until the $3/5 million investment from SCOA closed." (Proposed Am. Compl. ¶ 127.) While this statement is arguably conclusory and thus inadequate, plaintiff further alleges the fact that he expressly told Mr. Graustein that he would make "at least" a $100,000 loan to Smartix based on Mr. Graustein's statement. (Proposed Am. Compl. ¶ 127.) Thereafter, plaintiff alleges, he made the $100,000 bridge loan to Smartix. (Proposed Am. Compl. ¶ 128.) The latter communication between plaintiff and Mr. Graustein satisfies this element of plaintiff's claim beeause, if accepted as true, Mr. Graustein—and, by extension, SCOA—were put directly on notice by plaintiff that the loan would be made. Because his action was directly related to SCOA's promise, see Ripple's of Clearview, Inc., 452 N.Y.S.2d at 449 (citing Woolley, 118 N.E. at 848), the foreseeability of the loan being made is properly alleged.

The final element requires plaintiff to rely on the promise to his detriment. Plaintiff

alleges that SCOA's promise was made in Spring 2002 (Proposed Am. Compl. ¶ 56) with a

closing on the investment to occur in June 2002 (Proposed Am. Compl. ¶ 57). Noticeably

missing from the amended complaint is the date on which plaintiff made the $100,000 bridge

loan to Smartix.[10] The amended complaint only states that "[p]rior to the closing date" of the $3-

5MM Investment (Proposed Am. Compl. ¶ 125), plaintiff approached Mr. Graustein about

SCOA making a bridge loan to Smartix, and after Mr. Graustein declined and suggested that

plaintiff and other Smartix employees make it themselves, plaintiff went ahead and made the

loan (Proposed Am. Compl. ¶¶ 126-28). His detrimental reliance—the provision of the bridge

loan to Smartix—was therefore made before Mr. Graustein's oral revocation of the promise on

June 4, 2002.[11] (Proposed Am. Compl. ¶ 62.) Consequently, plaintiff has pleaded sufficiently

his detrimental reliance on defendants' promise.

> ii. Defendants' Continuing Representations Regarding Willing Third-
>
> Party Investors

The Court held previously in its April 27, 2005 Order that SCOA's representations that it

"had located investors interested in investing in Smartix" were neither clear nor ambiguous

promises to obtain investors. Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005

WL 991772, at *9 (S.D.N.Y. Apr. 27, 2005). Instead, the Court held as a matter of law that the

---

[10] Plaintiff states for the first time in his Memorandum of Law in Further Support of his motion, and in his accompanying affidavit, that he made the $100,000 bridge loan to Smartix on March 11, 2002, as evidenced by a bank ledger entry showing a $100,000 debit from his account. (Pl.'s Mem. Law Further Supp. Mot. 2; Henneberry Aff. ¶ 2, Ex. 1.) Plaintiff did not reference the date or the bank ledger in the amended complaint, nor has he relied on it in any way. Because a plaintiff's reliance on the terms and effect of a document in drafting a complaint is a prerequisite to this Court's consideration of such document on a motion to dismiss, the Court cannot consider the March 11, 2002 date and instead must abide by the more amorphous timeline set forth in the amended complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)).

[11] As was stated in the Court's previous Order, any preclusive effect that the July 2002 Agreement's merger clause might have on plaintiff's claim of detrimental reliance is mooted because the promise of the $3-5MM Investment was revoked prior to the July 2002 Agreement's effective date. See Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at *8 (S.D.N.Y. Apr. 27, 2005).

28

claim was facially deficient because, at most, the statements "constituted representations that SCOA had already contacted interested investors." Id. Plaintiff now alleges that between July 2002 and October 2003, SCOA told plaintiff that it had "located investors who were ready to invest in Smartix" (Proposed Am. Compl. ¶ 132) and "who were willing to invest in Smartix" (Proposed Am. Compl. ¶ 139), as distinguished from the "*interested*" third-party investors in the original complaint. The question before the Court, then, is whether SCOA's purported representations to plaintiff that SCOA had identified "ready" and/or "willing" investors, rather than mere "interested" investors, transform his previously deficient claim into a viable one. That question must be answered in the negative.

Plaintiff's modification of his original allegations to claim that SCOA had located ready and willing investors misses the mark entirely. The gist of plaintiff's allegations regarding third-party investors, in no better terms, is that he was duped into making loans to Smartix because defendants were not truthful when they were continually representing to him that they were in the process of seeking out investors to invest in Smartix. (See Proposed Am. Compl. ¶ 135.) Plaintiff claims that defendants nefariously made these representations to induce him to make loans to Smartix out of his own pocket in order to keep Smartix afloat. (See Proposed Am. Compl. ¶ 136.) Nowhere, however, is there any allegation that amounts to a preceding *promise* made by defendants to plaintiff to locate such investors. For instance, there is no mention of any preliminary conversation or meeting between defendants and plaintiff in which they promised to undertake the procurement of outside investors.[12] Plaintiff merely asserts that, in hindsight,

---

[12] The proposed amended complaint's allegation that "SCOA advised Smartix that SCOA was its lead investor and would actively solicit and obtain new investment for Smartix" (Proposed Am. Compl. ¶ 67) does not suffice. While this allegation includes a statement by SCOA that it would actively solicit and obtain new investment, it explicitly avers that the statement was made to Smartix, *i.e.*, a corporate entity, and does not aver in any way that the statement was made to plaintiff as an individual. Because New York state law is clear that a shareholder must allege an *independent* duty owed to him or her that is extrinsic and separate from any duty owed to the corporation as a business entity, this allegation must fail. Green v. Victor Talking Mach. Co., 24 F.2d 378, 381 (2d Cir. 1928) ("For

29

defendants' representations that they were looking for investors were false. Without a personal promise to undertake this obligation—*i.e.*, to obtain third-party investors—the actions taken were gratuitous and are, therefore, not actionable under a promissory estoppel theory. This reasoning applies, *a fortiori*, to plaintiff's other allegations that Mr. Graustein told him that "SCOA was obtaining additional investment" (Proposed Am. Compl. ¶ 77) and that plaintiff believed that SCOA was employing its "best efforts" to locate investors (Proposed Am. Compl. ¶ 78). Again, a statement by SCOA that it was obtaining additional investment does not allege a promise to do so, nor does it even imply that the steps being taken were being done in fulfillment of a previous promise to do so. Plaintiff's belief that SCOA was employing its best efforts is an entirely different allegation than one which states that SCOA had promised to employ its best efforts. One's belief about another party's intentions does not a promise make. As discussed below, these representations are better characterized under negligent or fraudulent misrepresentation theories.[13]

_____

a shareholder to obtain a personal right of action there must be relations between him and the tort-feasor independent of those which the shareholder derives through his interest in the corporate assets and business."); EJS-Assoc Ticaret Ve Danismanlik Ltd. Sti. v. American Tel. & Tel. Co., No. 92 Civ. 3038, 1993 WL 546675, at *3 (S.D.N.Y. Dec. 30, 1993) (Sotomayor, J.) (holding that individual shareholder standing requires "the existence of a separate and distinct *wrong*" to the shareholder stemming from an independent duty to the shareholder); New Castle Siding Co. v. Wolfson, 468 N.Y.S.2d 20, 21 (App. Div. 1983) (establishing an individual shareholder's personal cause of action where there exists a "duty owing to the shareholder from the wrongdoer, having its origin in circumstances independent of and extrinsic to the corporate entity"). See generally discussion *infra* Part III.B.2.i-iii.
[13] The representations discussed above are included in plaintiff's first count for "Detrimental Reliance," which the Court previously bifurcated and analyzed under both promissory estoppel and negligent misrepresentation theories. Because plaintiff does not attribute any of the alleged representations made to him by defendants as belonging to either legal theory or both, the Court, reading the proposed amended complaint as liberally as possible in favor of plaintiff, has analyzed all of the representations under both theories. While the Court can only surmise what plaintiff's intentions are absent separate counts for promissory estoppel and negligent misrepresentation, plaintiff may have only intended to assert that these representations are actionable under a negligent misrepresentation theory.

iii.     Defendants' Various Representations Concerning SCOA Making
Additional Investments in Smartix

Plaintiff's proposed amended complaint contains various allegations that defendants

repeatedly told him that SCOA would make additional investments in Smartix. Plaintiff claims

that he reasonably and foreseeably relied on these continuous representations by making nine

additional loans to Smartix for which he expected to be made whole down the line. The specific

allegations are as follows: (1) between July 2002 and October 2003, SCOA "indicated" to

plaintiff that SCOA "would be willing to make additional investments in Smartix should the

need arise" (Proposed Am. Compl. ¶ 133); (2) Mr. Graustein informed plaintiff "that it would be

beneficial for Mr. Henneberry to advance monies to cover operating expenses" because SCOA

would look upon such advancements "favorably" when asked to make additional investments in

Smartix (Proposed Am. Compl. ¶ 134); (3) SCOA stated at a October 9, 2003 meeting that it was

"interested" in investing in Smartix (Proposed Am. Compl. ¶ 118); and (4) SCOA instructed

plaintiff to tell Mr. Dee of the Boston Red Sox that "enough capital would be put into the

company for it to operate for the [2004] season and that if the company cannot proceed to fulfill

its' [sic] obligations as an ongoing entity (at that point) that a licensing option would be part of

the Red Sox agreement so that they could continue to operate the program in that event."[14]

(Proposed Am. Compl. ¶ 119). Plaintiff alleges that he reasonably and foreseeably relied on

these purported promises (Proposed Am. Compl. ¶ 139) to his detriment by making an additional

---

[14] Plaintiff also includes in the proposed amended complaint two unchanged allegations from the original
complaint: (1) Graustein told plaintiff at a June 2003 meeting that SCOA, "as the lead investor, 'would not let you
[Smartix] fail'" (Proposed Am. Compl. ¶ 134 (bracket in original)), and then agreed to "pursue a plan for matching
investments" (Proposed Am. Compl. ¶ 73); and (2) after plaintiff rejected SCOA's September 8, 2003 proposal to
provide up to a $500,000 investment on a matching basis (Proposed Am. Compl. ¶ 84), SCOA "continued to assert
its willingness to provide additional investments in Smartix" (Proposed Am. Compl. ¶ 94). In its previous Order,
the Court held as a matter of law that these statements did not constitute clear and ambiguous promises and,
consequently, they failed to support claims for promissory estoppel. Henneberry v. Sumitomo Corp. of Am., No. 04
Civ. 2128, 2005 WL 991772, at *9 (S.D.N.Y. Apr. 27, 2005). Because these allegations are unchanged, the Court
finds that they fail as a matter of law for the reasons set forth in the April 27, 2005 Order.

nine loans to Smartix (Proposed Am. Compl. ¶ 141) for which he was never repaid (Proposed
Am. Compl. ¶¶ 134-35).

The first purported promise asserts that SCOA "indicated" to plaintiff that it "would be
willing to make additional investments in Smartix should the need arise." (Proposed Am.
Compl. ¶ 133.) The Court first notes that plaintiff does not allege that SCOA "promised"
specific investments to Smartix, but only that SCOA "indicated" a *willingness* to invest. Once
again, a party *willing* to act is merely "inclined or favorably disposed in mind," Webster's Ninth
New Collegiate Dictionary 1350 (9th ed. 1985), to do so, which, as noted above, falls short of a
declaration to do or not do, as required by a claim for promissory estoppel. Compare Esquire
Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F.2d 787, 793 (2d Cir. 1986) (holding that
statements such as "[w]e will buy the parts" and "[w]e are going to buy them from you anyway"
constitute clear and unambiguous promises for purposes of promissory estoppel claim), with,
e.g., Marine Transport Lines, Inc. v. Int'l Org. of Masters, Mates, & Pilots, 636 F. Supp. 384,
391 (S.D.N.Y. 1986) (Weinfeld, J.) (finding one party's statements that "'we're partners'" and
"'we look forward to growing together'" to another party during a contract negotiation do not
constitute promises to finalize and enter into a contract). Moreover, the statement does not
constitute a firm declaration to invest in Smartix because it is *conditional*: SCOA's
willingness—which is deficient in itself—is only triggered "*should the need arise.*" (Proposed
Am. Compl. ¶ 133 (emphasis added).) Because of this condition, the statement is even less clear
and unambiguous than similar statements held to be too vague for promissory estoppel purposes
in other cases. For example, in Cohen v. Lehman Brothers Bank, a lender told prospective
borrowers prior to reaching an agreement on the loan that "'she would work through'" the issues
the borrowers had raised. 273 F. Supp. 2d 524, 529 (S.D.N.Y. 2003) (Preska, J.). While a

32

borrower may find solace in such words, just as plaintiff did in SCOA's indication that it would be willing to invest should the need arise, the law does not validate such assurances by transforming them into enforceable promises. Consequently, plaintiff's proposed promissory estoppel claim with respect to this specific allegation is found to not be colorable.

Plaintiff's second allegation is that he made additional loans to Smartix in reliance on Mr. Graustein's statement that SCOA would look "favorably" upon them when SCOA "was called upon" to make additional investments to Smartix. (Proposed Am. Compl. ¶ 134.) Similarly, this statement does not constitute a clear and unambiguous promise and, therefore, it fails as a matter of law to plead a claim for promissory estoppel. Plaintiff again fails to distinguish between a representation, such as this one, that SCOA might be more inclined to make an investment under certain circumstances, from a clear promise to invest. Statements that may lead another to act are not enforceable on a promissory estoppel theory unless they unequivocally communicate a promise. See Marine Transport Lines, Inc., 636 F. Supp. at 391 (finding one party's statements that "'we're partners'" and "'we look forward to growing together'" to another party during a contract negotiation do not constitute promises to finalize and enter into a contract).

The third allegation also fails to plead a clear and unambiguous promise. Plaintiff alleges that SCOA stated at an October 9, 2003 meeting that it was "interested" in investing in Smartix. (Proposed Am. Compl. ¶ 118.) Nothing in this statement equals a clear promise to invest. SCOA's interest, at most, communicated that plaintiff had grabbed SCOA's attention and was open to further dialogue. As the Court previously noted in the context of another allegation, a preliminary representation implying a desire to "*look into*" investing does not evidence a promise to be bound. Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at *9 (S.D.N.Y. Apr. 27, 2005) (emphasis added).

33

Plaintiff's fourth allegation is that SCOA instructed him to tell Mr. Dee of the Boston Red Sox the following statement concerning SCOA's "intentions" about future investments:

[E]nough capital would be put into the company for it to operate for the [2004] season and that if the company cannot proceed to fulfill its' [sic] obligations as an ongoing entity (at that point) that a licensing option would be part of the Red Sox agreement so that they could continue to operate the program in that event.

(Proposed Am. Compl. ¶ 119.) This instruction was made to plaintiff in his capacity as an officer of Smartix, and not by reason of any independent relationship with plaintiff as an individual. Plaintiff was directed to relate to Mr. Dee SCOA's intentions to invest in Smartix, and nothing was said to induce plaintiff's personal reliance. Even if plaintiff did maintain standing to use this purported promise to support his claim, it fails for other reasons.

The instruction came after plaintiff's September 9, 2003, meeting with Mr. Dee in which plaintiff told Mr. Dee that Smartix was having problems with its financing and, thus, could not guarantee that it would be financially stable for the 2003 season. (Proposed Am. Compl. ¶ 89.) Plaintiff alleges that he was forced into this situation after SCOA had previously rejected his request for an additional $1,000,000. (Proposed Am. Compl. ¶ 84.) While this allegation might be read to come closer to establishing a promise which defendants should be estopped from denying the enforcement of, it too lacks the clarity and unambiguousness to be actionable. First, plaintiff pleads that the statement concerns SCOA's "*intentions*" regarding future investments. SCOA's intention to make an investment is not an unequivocal promise to make an investment. Second, the communication that "enough capital would be put into the company for it to operate" is not supportive of a clear promise because it does not expressly state that SCOA will be the capital provider. Moreover, it leaves open the questions of how much capital will be provided and when it will be provided. It simply does not approach the clarity and unambiguousness of statements such as "[w]e will buy the parts," and "[w]e are going to buy them from you

34

anyway," which the Second Circuit requires. Esquire Radio & Elecs., Inc., 804 F.2d at 793. Because this statement was made to plaintiff in his capacity as an officer and director of Smartix, and because it is neither clear nor unambiguous, the claim for promissory estoppel as to this statement fails.[15]

### 6. Negligent Misrepresentation Standards

Under New York law, a claim for negligent misrepresentation lies where

(1) the defendant had a duty, as a result of a special relationship, to give correct

information; (2) the defendant made a false representation that he or she should

have known was incorrect; (3) the information supplied in the representation was

known by the defendant to be desired by the plaintiff for a serious purpose; (4)

the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied

on it to his or her detriment.[16]

---

[15] Because the Court has found that plaintiff has failed to plead that defendants' statements regarding the existence of third-party investors, and its own willingness to make additional investments in Smartix, constitute clear and ambiguous promises, it need not reach the question whether plaintiff reasonably relied on them. However, the Court writes briefly to dispel any notion that the July 2002 Agreement and, more specifically, its merger clauses, forestall plaintiff's reliance on any purported promises made to him between July 2002 and October 2003. Notwithstanding the fact that the July 2002 Agreement was between Smartix and SCOA, and any potential issues that this raises concerning plaintiff's standing, the agreement's merger clauses, see Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at *7 (S.D.N.Y. Apr. 27, 2005) (quoting the merger clauses), have a retroactive effect of destroying reliance on prior representations, and therefore would arguably not preclude any additional future promises—*i.e.*, those made between July 2002 and October 2003—made to plaintiff in a personal capacity and outside the scope of the July 2002 Agreement's terms.

[16] The New York Court of Appeals has quoted its prior decision in International Products Co. v. Erie R.R. Co., 155 N.E. 662, 664 (N.Y. 1927)), to hold that a claim for negligent misrepresentation lies where a speaker knows that the representation he or she makes

"is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that if false or erroneous he will because of it be injured in person or property. Finally the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care."

Heard v. City of N.Y., 623 N.E.2d 541, 545 (N.Y. 1993) (quoting Int'l Prods. Co. v. Erie R.R. Co., 155 N.E. 662, 664 (N.Y. 1927)); Pappas v. Harrow Stores, Inc., 528 N.Y.S.2d 404, 407 (App. Div. 1988). This definition does not address defendants' mental state—*i.e.*, that defendants "should have known" the statement was incorrect.

35

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citing King v. Crossland Sav. Bank, 111 F.3d 251, 257-58 (2d Cir. 1997)).

The first element of this claim, which plaintiff failed to plead adequately in his initial complaint, Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at *11 (S.D.N.Y. Apr. 27, 2005), requires the existence of a special relationship between the parties, see, e.g., Accusystems, Inc. v. Honeywell Info. Sys., Inc., 580 F. Supp. 474, 480 (S.D.N.Y. 1984) ("New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties." (citing, *inter alia*, Kimmell v. Schaefer, 675 N.E.2d 450, 454 (N.Y. 1996); Int'l Prods. Co. v. Erie R.R., 155 N.E. 662 (N.Y. 1927))); Coolite Corp. v. Am. Cyanamid Co., 384 N.Y.S.2d 808, 811 (App. Div. 1976) ("[W]hile generally there is no liability for words negligently spoken, there is an exception when the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller." (citing Dorsey Prods. Corp. v. U.S. Rubber Co., 251 N.Y.S.2d 311, 313 (App. Div. 1964), aff'd, 212 N.E.2d 435 (N.Y. 1965))). It is from this special relationship that an independent duty to speak with care arises. Kimmell, 675 N.E.2d at 453-54. The determination whether such a duty exists is an issue of law for the courts, and "once the nature of the duty has been determined as a matter of law, whether a particular defendant owes a duty to a particular plaintiff is a question of fact." Id. at 453.

A special relationship exists where one "possess[es] unique or specialized expertise, or who . . . [is] in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Id. at 454; see Murphy v. Kuhn, 682 N.E.2d 972, 974 (N.Y. 1997) (quoting Kimmell, 675 N.E.2d at 454). Thus, certain professionals, by reason of their educational training and specialized skill, often have such a duty imposed upon

36

them. Kimmell, 675 N.E.2d at 454 (citing cases in which liability for negligent misrepresentation was assessed on engineering consultants, accountants, and public weighers for not speaking with care). However, the duty may also arise in instances where, absent a particular professional relationship giving rise to the duty, such as an attorney-client relationship, there still exists between the parties "some identifiable source of a special duty of care." Id. In assessing whether this special duty of care still exists, a court considers "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Id.

Courts have held routinely that an arms-length commercial transaction, without more, does not give rise to a special duty to speak with care. See EED Holdings v. Palmer Johnson Acquisition Corp., 387 F. Supp. 2d 265, 281 (S.D.N.Y. 2004) (citing Kimmell, 675 N.E.2d at 454). This rule prevents otherwise "'casual statements and contacts'" made in the commercial workplace from being actionable. Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (quoting Kimmell, 675 N.E.2d at 454).

Also of importance to the consideration of this motion is the requirement that the alleged misrepresentation be made with respect to an existing fact, as opposed to a representation concerning future conduct. Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20-21 (2d Cir. 2000) (citing Murray v. Xerox Corp., 811 F.2d 118, 123 (2d Cir. 1987); Glanzer v. Shepard, 135 N.E. 275 (N.Y. 1922) (Cardozo, J.); Sheth v. N.Y. Life Ins. Co., 709 N.Y.S.2d 74, 75 (App. Div. 2000); Bango v. Naughton, 584 N.Y.S.2d 942, 944 (App. Div. 1992); Margrove Inc. v. Lincoln First Bank of Rochester, 388 N.Y.S.2d 958, 960 (App. Div. 1976)). As a consequence,

statements of puffery, or those concerning future expectations, are insulated from liability. Sheth, 709 N.Y.S.2d at 75.

7.  Negligent Misrepresentation Standards as Applied to Plaintiff's Allegations

    i.  Duty Arising from a Special Relationship

The Court finds that for the same reasons plaintiff has standing to assert this claim, he also has pleaded sufficiently circumstances establishing a relationship between the parties that justified his reliance on defendants' alleged misrepresentations. Specifically, plaintiff has pleaded that Mr. Graustein conversed with him on different occasions in an individual capacity in order to induce him to make personal loans to Smartix. (See, e.g., Proposed Am. Compl. ¶¶ 132-35.) In those conversations, Mr. Graustein misrepresented to plaintiff the existence of outside investors and SCOA's intentions to make further investments in Smartix (Proposed Am. Compl. ¶¶ 135-37), the knowledge of which was exclusively held by Mr. Graustein and SCOA. As the Second Circuit has noted, "[t]he New York Court of Appeals has observed that a relationship sufficiently special to justify reliance (and a subsequent action for negligent misrepresentation) may arise when a person 'wholly without knowledge seek[s] assurances from one with exclusive knowledge.'" Eternity Global, 375 F.3d at 189 (quoting Heard v. City of N.Y., 623 N.E.2d 541, 546 (N.Y. 1993)). Plaintiff's allegations paint a picture in which Mr. Graustein and SCOA, at best, failed to be fully candid with plaintiff concerning their intentions of making additional investments, as well as their dealings with third-party investors. (Proposed Am. Compl. ¶¶ 136-37.) Defendants had exclusive knowledge of these topics, and plaintiff thus relied on their representations.

38

Thus, under the Kimmell factors, while plaintiff's allegations concerning defendants' special expertise are cast such that the expertise is vis-à-vis defendants and Smartix, his allegations concerning trust and confidence in defendants, and defendants' actual awareness of the use to which the information would be put (Proposed Am. Compl. ¶ 142), were personal to plaintiff. Because the question whether a special relationship between two parties justifies one's reliance on the other representations "generally raises an issue of fact," Kimmell, 675 N.E.2d at 454; see also Century Pac., Inc. v. Hilton Hotels Corp., No. 03 Civ. 8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) ("Courts in this circuit have held that a determination of whether a special relationship exists is highly fact-specific and 'generally not susceptible to resolution at the pleadings stage.'" (quoting Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 536 (S.D.N.Y. 2001))), the Court finds that this element of the claim is met.

ii.     Defendants' Allegedly False Representations

The second element of this claim requires a plaintiff to demonstrate that the defendant made a false representation that defendant should have known was incorrect. The representation must also be factual, as opposed to promissory. U S W. Fin. Servs., Inc. v. Tollman, 786 F. Supp. 333, 344 (S.D.N.Y. 1992) ("No action for negligent misrepresentation lies where the alleged misrepresentation is promissory rather than factual." (citing Murray, 811 F.2d at 123; Margrove, Inc., 388 N.Y.S.2d at 960)). For example, in U S W. Financial Services, Inc. v. Tollman, plaintiff's allegation that defendant's senior officer told its representative in a face to face meeting that defendant "unequivocally agreed" to lend over $15,000,000 to plaintiffs, with a closing by a certain date and other pertinent details, was found to be promissory. Id. at 335-36. Likewise, in Hydro Investors, Inc. v. Trafalgar Power Inc., a prediction of a hydroelectric plant's energy output performance, which, in hindsight, was alleged to be overly optimistic, 227 F.3d at

12-13, was held to be a promise of future profit and not a representation of existing fact, id. at 21.

Here, plaintiff alleges that defendants made the following misrepresentations: (1) SCOA's promise in Spring 2002 to make the $3-5MM Investment; (2) SCOA's continuing promises, from July 2002 through October 2003, that it had located investors who were "ready" and/or "willing" to invest in Smartix; and (3) SCOA's repeated promises, from July 2002 through October 2003, that it "would be willing" to make additional investments to Smartix "should the need arise," including Mr. Graustein's representation that SCOA would "look favorably" upon investing additional monies in Smartix if plaintiff himself made additional loans to Smartix. The first and third statements fail to support a claim of negligent misrepresentation as a matter of law because they solely speak to future conduct: SCOA's promise of an initial investment *in the future*, and repeated statements that, should the need arise, it "would be willing" to make additional investments *in the future*. Precedent establishes clearly that the promise of a future investment is facially deficient. See, e.g., U S W. Fin. Servs., Inc., 786 F. Supp. at 344.

In reviewing the second and third allegations, the Court notes that the proposed amended complaint sets forth no allegations that speak to whether defendants knew or should have known that the representations were correct, thereby undermining a claim of negligent misrepresentation. Indeed, the allegations in support of these representations evince *intent* on defendants' part to defraud plaintiff. Plaintiff pleads that he was neither "informed of the true situation concerning undisclosed investors" nor of "SCOA's intention not to provide additional funding." (Proposed Am. Compl. ¶ 138.) He further pleads that SCOA failed to inform plaintiff of its actual intentions with respect to making additional investments in Smartix, and with

respect to procuring third-party investors, "*so as to create* a false impression" of the parties' true intentions. (Proposed Am. Compl. ¶¶ 136-37 (emphasis added).) These representations, then, are more accurately characterized under New York law as fraudulent misrepresentations because defendants made the statements with an *intent* to defraud.[17] Where the allegations in a complaint do not support the named cause of action, a district court has broad latitude in determining whether another theory of relief with respect to those same allegations is available. See Raine v. Lorimar Prods., Inc., 71 B.R. 450, 453 (S.D.N.Y. 1987) ("Under the liberal pleading standards applicable in federal courts, the fact that plaintiff's allegations do not support the particular legal theory advanced should not necessarily result in dismissal; rather, the court must examine the complaint to determine whether the allegations provide for relief on any possible theory.") However, the need to undergo a full fraudulent misrepresentation analysis is obviated because the promises in question fail to state a claim under either cause of action on other grounds.

Allegations in support of either a negligent misrepresentation or fraudulent misrepresentation claim must be pleaded with particularity pursuant to Federal Rule of Civil Procedure 9(b). See Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 578-79, 583 (2d Cir. 2005).[18] Rule 9(b) requires that "[i]n averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent,

---

[17] A claim for fraudulent misrepresentation under New York law requires a plaintiff to demonstrate that "'(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 186-87 (2d Cir. 2004) (quoting Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)).

[18] As noted above, the Aetna Court held explicitly that Rule 9(b)'s requirements apply to negligent misrepresentation claims, in contrast to the Second Circuit's prior decision in Eternity Global Master Fund Ltd. which stated that "Rule 9(b) may or may not apply to a state law claim for negligent misrepresentation." Id. The Eternity Court went on to state that "[d]istrict court decisions in this Circuit have held that the Rule is applicable to such claims[,] . . . but this Court has not adopted that view, and we see no need to do so here." Id. (citation omitted). While the Aetna Court did not address its prior decision in Eternity, the most recent decision in Aetna, whose language is clear, will be followed. Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 583 (2d Cir. 2005) ("Such a [negligent misrepresentation] claim must be pled in accordance with the specificity criteria of Rule 9(b).").

41

knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). Rule 9(b)'s pleading requirement obligates a plaintiff to "'(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'"[19] Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)). In other words, "'the who, what, when, where, and how: the *first paragraph* of any newspaper story.'" In re Initial Pub. Offering Secs. Litig., 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (Easterbrook, J.)). In assessing plaintiff's claims of fraud, the Court keeps in mind the fact that "Rule 9(b) is rigorously enforced in this circuit." Branch v. Tower Air, Inc., No. 94 Civ. 6625, 1995 WL 649935, at *4 (S.D.N.Y. Nov. 3, 1995) (Keenan, J.). However, the Court is also mindful of the fact that "courts in this circuit and others have repeatedly emphasized that Rule 9(b) must be read in harmony with the principles established by Rule 8(a)." In re Initial Pub. Offering, 241 F. Supp. at 326; see also Felton v. Walston & Co., 508 F.2d 577, 581 (2d Cir. 1974) ("[I]n applying rule 9(b) we must not lose sight of the fact that it must be reconciled with rule 8[,] which requires a short and concise statement of claims.").

The Court turns directly to Rule 9(b)'s requirement that plaintiff set forth specific factual allegations that explain why the statements are fraudulent. See Eternity Global Master Fund Ltd., 375 F.3d at 187; Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989) (requiring plaintiff to

---

[19] Defendants have not raised a Rule 9(b) objection in their memoranda in opposition to plaintiff's motion. It is well-settled law that a defendant must raise such an objection in its answer, or in a motion to dismiss if filed in lieu of an answer. See Todaro v. Orbit Int'l Travel, Ltd., 755 F. Supp. 1229, 1234 (S.D.N.Y. 1991) (Leisure, J.). This rule furthers the underlying policy that Rule 9(b)'s specificity requirements are "'imposed to ensure that a defendant is apprised of the fraud claimed in a manner sufficient to permit the framing of an adequate *responsive pleading.*'" Id. (quoting United Nat'l Records, Inc. v. MCA, Inc., 609 F. Supp. 33, 39 (N.D. Ill. 1984) (emphasis added)). Defendants have therefore not waived their Rule 9(b) objection because the Court is not evaluating a responsive pleading from defendants; the Court is only dealing with defendants' memoranda in opposition.

42

"give particulars as to the respect in which plaintiff contends the statements were fraudulent"). First, plaintiff's allegations that SCOA fraudulently misrepresented the existence of willing third-party investors, and SCOA's own willingness to make additional investments in Smartix, are made on information and belief. (See Proposed Am. Compl. ¶¶ 136-37.) In the Second Circuit, "[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990). However, where this is the case, "even then, to satisfy Rule 9(b), the allegations must be accompanied by a statement of facts upon which the belief is founded." Pits, Ltd. v. Am. Express Bank Int'l, 911 F. Supp. 710, 716 (S.D.N.Y. 1996) (citing Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir. 1974), overruled on other grounds by Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1100 n.9, 1100-06 (1991)); see also G-I Holdings, Inc. v. Baron & Budd, No. 01 Civ. 0216, 2004 WL 1277870, at *2 (S.D.N.Y. June 10, 2004) (collecting Southern District of New York cases that support the proposition that "the sources of the information and belief should be sufficiently identified so as to allow each defendant and the Court to review the sources and determine, at the pleading stage, whether an inference of fraud may be fairly drawn from the information contained therein").

Here, the fraud pleaded on information and belief is particularly within SCOA's knowledge because only it knows what its true intentions were concerning the making of future investments in Smartix, and it has knowledge which it did not share with plaintiff (see, e.g., Proposed Am. Compl. ¶ 138) of the actions it took or did not take to procure third-party investors. A statement of facts upon which plaintiff's belief is founded is therefore required. See Wexner, 902 F.2d at 172 ("Where pleading is permitted on information and belief, a

complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard."); Pits, Ltd., 911 F. Supp. at 716. The proposed amended complaint is wholly devoid of any facts upon which plaintiff bases its belief of fraudulent intent. After setting forth allegations that defendants told plaintiff that SCOA would make additional investments, and that SCOA had procured third-party investors (see, e.g., Proposed Am. Compl. ¶¶ 125-26, 132-34), plaintiff alleges in a wholly conclusory manner that the statements were made "so as to create a false impression" in plaintiff (Proposed Am. Compl. ¶¶ 136-37). There is an absence of any allegations in support of plaintiff's basis for belief. Plaintiff does not, for instance, allege that plaintiff learned from a SCOA employee after the fact that SCOA had never intended to make additional investments in Smartix, nor does he allege that he learned through other channels that certain third-party investors had never been contacted by SCOA. Indeed, there is no explanation at all. Cf. Cosmas v. Hassett, 886 F.2d 8, 12 (2d Cir. 1989) (finding that plaintiff's allegations adequately "give[] particulars as to the respect in which these five statements are believed to be fraudulent" by pinpointing specific reasons in support of each allegation). The Court does not address whether Rule 9(b)'s other requirements are met, as the deficiency detailed above is dispositive.

In sum, plaintiff has failed to plead colorable claims of promissory estoppel and negligent misrepresentation, except for the promissory estoppel claim as to defendants' alleged promise to make the $3-5MM Investment. The Court thus turns to defendants' cross-motion for partial summary judgment as to that claim.

### 8. Defendants' Cross-Motion for Partial Summary Judgment

Defendants have cross-moved for partial summary judgment to the extent the Court finds that plaintiff has pleaded sufficiently any of his promissory estoppel or negligent

44

misrepresentation claims. They submit in support of this cross-motion documentary evidence which they claim belies plaintiff's assertion that he reasonably relied on any promises made by defendants. Because the Court has found that plaintiff has pleaded sufficiently a promissory estoppel claim with regard to defendants' purported promise to make the $3-5MM Investment, the Court turns to the cross-motion.

i.    Summary Judgment Standards

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The question whether a fact is material is determined by the underlying substantive law: "[T]he judge must view the evidence presented through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. The moving party carries the burden of demonstrating that no genuine issue of any material fact exists, see Chambers, 43 F.3d at 36 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994) (citing Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975) (Kaufman, J.)), and, in considering whether the burden is met, a court draws all inferences, and resolves all ambiguities, in favor of the non-movant, Chambers, 43 F.3d at 36 (citing Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985)). Once the movant has demonstrated that

45

there is no genuine issue as to any material fact, the non-movant "must come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

Where the non-movant bears the burden of proof at trial, summary judgment should be granted if the non-movant fails to "'make a showing sufficient to establish the existence of an element essential to [its] case.'" Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); see Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir. 1996) (per curiam) (citing Celotex, 477 U.S. at 322). The non-movant may defeat summary judgment only by producing specific facts that show there is a genuine issue of material fact for trial. The moving party may discharge its burden under Rule 56 by showing—*i.e.*, by "pointing out"—an absence of evidence supporting the non-movant's claim. Celotex, 477 U.S. at 325. In assessing the motion before it, the Court is mindful of former Chief Judge Kaufman's admonition that summary judgment "is a drastic device since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975) (Kaufman, C.J.) (citing Donnelly v. Guion, 467 F.2d 290, 291 (2d Cir. 1972)).

Finally, Federal Rule of Civil Procedure 56(b) allows a party against whom a claim has been asserted to move for summary judgment "at any time." The Second Circuit has specified that a "[d]efendant may move for summary judgment at any time after a pleading stating a claim is served upon him provided it clearly appears that no valid claim against him exists." Schwartz v. Compagnie Gen. Transatlantique, 405 F.2d 270, 274 (2d Cir. 1968). Given the Court has found that plaintiff has stated a claim for promissory estoppel with respect to the promise of the \$3-5MM Investment, the timing of this motion is appropriate. Id.

46

## ii.     Defendants' Argument

Defendants argue that partial summary judgment is appropriate because any claim of detrimental reliance on SCOA's promise to make the $3-5MM Investment was eviscerated by the terms of a Letter of Intent, dated April 2, 2002, and entered into by and between Smartix and SCOA, with plaintiff as Smartix's signatory ("Letter of Intent"). (Def.'s 56.1 ¶ 3; Riback Aff. at Ex. B.) As a preliminary matter, the Court notes that the initial interpretation of a contract's terms is a matter of law for this Court to decide. Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England, 136 F.3d 82, 86 (2d Cir. 1998) (citing K. Bell & Assoc., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir.1996)).

The Letter of Intent states that it is a "preliminary, non-binding letter of interest . . . regarding the proposed convertible preferred stock investment" in Smartix by SCOA. (Riback Aff. at Ex. B.) It goes on to state that it does not constitute a binding agreement or commitment by SCOA to make any investment, and that any such agreement or commitment to invest "shall only be contained in definitive agreements (containing the usual representations, warranties, conditions and covenants for this type of transaction) to be executed and delivered, if at all," after SCOA completes its due diligence and only with the final approval of SCOA's senior management. (Riback Aff. at Ex. B.) After conducting its due diligence (Def.'s 56.1 ¶ 4), defendants advised plaintiff that SCOA would not make the $3-5MM Investment (Def.'s 56.1 ¶ 5). Defendants thus argue that the Letter of Intent, on its face, demonstrates that no promise to make the $3-5MM Investment was ever made, and any purported reliance by plaintiff on any statements made to him concerning the investment were, therefore, unreasonable. (Def.'s Mem. Law Opp'n Mot. 24-25.)

It is unquestioned that where two parties enter into a letter of intent or any similar agreement which states that neither party has any obligations to the other until they enter into a formal, binding agreement, either party's claim of reliance on a representation made by the other party prior to entering into the formal, binding agreement must fail. Prestige Foods, Inc. v. Whale Sec. Co., L.P., 663 N.Y.S.2d 14, 15 (App. Div. 1997); see also R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 79 (2d Cir. 1984) (holding that plaintiff's promissory estoppel claim failed under New York law where "the entire history of the parties' negotiations made it plain that any promise or agreement at that time was conditional upon the signing of a written contract"). One difference in the case at bar is that plaintiff was not a party to the Letter of Intent—he only signed it in his corporate capacity as Chairman and CEO of Smartix.

A party who signs a contract in his corporate capacity generally lacks standing to enforce that contract in an individual capacity. Gen. Motors Acceptance Corp. v. Kalkstein, 474 N.Y.S.2d 493, 495 (App. Div. 1984) ("The documentary evidence indicates that Marvin signed the agreement with GM in his corporate capacity as president of Blair. That agreement can in no way be construed as a contract with him personally."); Kirby v. Coastal Sales Ass'n Inc., 82 F. Supp. 2d 193, 197 (S.D.N.Y. 2000) (same). A signatory's ability to enforce a contract her or she signed on behalf of a corporation is only allowed where there is "'clear and explicit evidence' of the defendant's intent to add personal liability to the liability of the entity." Mason Tenders Dist. Council Welfare Fund v. Thomsen Const. Co., 301 F.3d 50, 53 (2d Cir. 2002).

However, there is authority supportive of the position that where an individual who signed an agreement in his or her corporate capacity knew of and helped draft the agreement, he or she may be estopped from relying on a representation made outside of the contract that is contradicted by the contract's terms. See Greenberg v. Chrust, 282 F. Supp. 2d 112, 120

48

(S.D.N.Y. 2003). This precedent seemingly would allow defendants to estop plaintiff from arguing that he relied to his detriment on defendants' oral representations that the $3-5MM Investment would close because plaintiff was aware of the plain terms of the Letter of Intent. Defendants' motion must fail, though, for another reason. Plaintiff states for the first time in his reply papers that he made the $100,000 bridge loan to Smartix on March 11, 2002, as evidenced by a bank ledger entry showing a $100,000 debit from his account. (Pl.'s Mem. Law Further Supp. Mot. 2; Henneberry Aff. at Ex. 1.) Because plaintiff's act of reliance—issuing the loan to Smartix—was made almost one month before he signed the Letter of Intent on Smartix's behalf, there was no contradictory contract term yet in existence which would have made his reliance unreasonable. Consequently, the Court cannot hold that plaintiff's claim is foreclosed as a matter of law by the Letter of Intent's terms.[20]

B.     Breach of Fiduciary Duty

    1.     Breach of Fiduciary Standards

Under New York law, a breach of fiduciary duty claim requires (1) the existence of a fiduciary relationship between the parties and (2) a breach of the duty flowing from that relationship. See Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs., 388 F. Supp. 2d 292, 304 (S.D.N.Y. 2005) (citing Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman, 277 B.R. 20, 37 (S.D.N.Y. 2002)); Cramer v. Devon Group, Inc., 774 F. Supp. 176, 184-85 (S.D.N.Y. 1991) (Leisure, J.). In order to establish plaintiff's standing, the fiduciary duties owed to plaintiff must be independent of any fiduciary duties owed to Smartix as a whole. Standing is established where the plaintiff demonstrates the existence of a direct fiduciary

---

[20] Given the motion is denied, there is no danger that plaintiff has been deprived of potentially fruitful discovery because of the timing of the motion. See Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 573 (2d Cir. 2005) ("[I]t is true that caution should be exercised in granting summary judgment when the non-moving party lacks relevant discovery.").

relationship with another party. While New York courts have noted the difficulty in establishing this relationship because of its amorphous nature, see, e.g., Penato v. George, 383 N.Y.S.2d 900, 904 (App. Div. 1976) ("The exact limits of such a [fiduciary] relationship are impossible of statement."), at bottom it is a relationship "founded upon trust or confidence reposed by one person in the integrity and fidelity of another . . . in which influence has been acquired and abused, in which confidence has been reposed and betrayed," id.; see WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (App. Div. 2001) ("A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge." (citing Wiener v. Lazard Freres & Co., 672 N.Y.S.2d 8, 14 (App. Div. 1998); Penato, 383 N.Y.S.2d at 904)); Wiener, 672 N.Y.S.2d at 14 ("[A] court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge."); P. Chimento Co. v. Banco Popular de Puerto Rico, 617 N.Y.S.2d 157, 159 (App. Div. 1994) ("[I]t is true that an informal fiduciary relationship may arise when one party places special trust and confidence in another such that the first party becomes dependent upon the second party." (citing Matter of Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc., 385 N.E.2d 285, 288 (N.Y. 1978))).

In determining whether a fiduciary relationship exists, a court will "'conduct a fact-specific inquiry into whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge.'" Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs., 388 F. Supp. 2d 292, 305 (S.D.N.Y. 2005) (quoting Facella v. Fed'n of Jewish Philanthropies of N.Y., Inc., No. 98 Civ. 3146, 2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004); Mandelblatt v. Devon Stores, Inc., 521 N.Y.S.2d 672, 676 (App. Div. 1987) (holding that "'[a] fiduciary relation exists between two persons when one of them is under a duty to act for or

to give advice for the benefit of another upon matters within the scope of the relation'" (quoting Restatement (Second) of Torts § 874 cmt. a (1977))); see also Wende C. v. United Methodist Church, 776 N.Y.S.2d 390, 397 (App. Div. 2004) ("A cause of action based upon breach of fiduciary duty rests not on the violation of a generalized professional standard, but on the abuse of a particularized relationship of trust." (citing Mandelblatt, 521 N.Y.S.2d at 676)), aff'd, 827 N.E.2d 265 (N.Y. 2005).

While a contract might embody a fiduciary relationship, there is no requirement that a fiduciary relationship be memorialized in writing. Fyrdman & Co. v. Credit Suisse First Boston Corp., 708 N.Y.S.2d 77, 79 (App. Div. 2000) (citing Wiener v. Lazard Freres & Co., 672 N.Y.S.2d 8, 14 (App. Div. 1998)); see also Lumbermens, 388 F. Supp. 2d at 305 ("It is well-settled that liability for breach of a fiduciary duty is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." (citing Sergeants Benevolent Ass'n Annuity Fund v. Renck, 796 N.Y.S.2d 77, 79 (App. Div. 2005))). However, where parties have entered into a contract, a fiduciary duty between the parties may arise out of the relationship created by the contract, but which is independent of the contract. Mandelblatt, 521 N.Y.S.2d at 676 (citing Meyers v. Waverly Fabrics, Div. of F. Schumacher & Co., 479 N.E.2d 236, 239 (N.Y. 1985); N. Shore Bottling Co. v. C. Schmidt & Sons, Inc., 239 N.E.2d 189, 193 (N.Y. 1968); Albemarle Theatre, Inc. v. Bayberry Realty Corp., 277 N.Y.S.2d 505, 509-10 (App. Div. 1967); see also Lumbermens, 388 F. Supp. 2d at 305 ("In addition, fiduciary duties may arise out of a contractual relationship which is independent of the contract itself.").

Absent extraordinary circumstances, however, parties dealing at arms length in a commercial transaction lack the requisite level of trust or confidence between them necessary to

51

give rise to a fiduciary obligation. Nat'l Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 679 (S.D.N.Y. 1991) ("Where parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." (citing, *inter alia*, Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 738-39 (2d Cir. 1984); Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 122 (2d Cir. 1984))), aff'd, Yaeger v. Nat'l Westminster, 962 F.2d 1 (2d Cir. 1992) (table); Beneficial Commercial Corp. v. Murray Glick Datsun, Inc., 601 F. Supp. 770, 772 (S.D.N.Y. 1985) ("[C]ourts have rejected the proposition that a fiduciary relationship can arise between parties to a business transaction." (citing Grumman Allied Indus., Inc., 748 F.2d at 738-39; Wilson-Rich v. Don Aux Assocs., Inc., 524 F. Supp. 1226, 1234 (S.D.N.Y. 1981); DuPont v. Perot, 59 F.R.D. 404, 409 (S.D.N.Y. 1973))); WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (App. Div. 2001) ("Under these circumstances, where the parties were involved in an arms-length business transaction involving the transfer of stocks, and where all were sophisticated business people, the plaintiff's cause of action to recover damages for breach of fiduciary duty should have been dismissed.").

Even absent the existence of a fiduciary relationship, however, a party's duty to disclose a material fact to another party it is negotiating with is triggered where "'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" Grumman Allied Indus., Inc., 748 F.2d at 739 (quoting Aaron Ferer & Sons Ltd., 731 F.2d at 123; Jana L. v. W. 129th St. Realty Corp., 802 N.Y.S.2d 132, 134 (App. Div. 2005) ("It is well established that, absent a fiduciary relationship between the parties, a duty to disclose arises only under the 'special facts' doctrine 'where one party's superior

52

knowledge of essential facts renders a transaction without disclosure inherently unfair.'"
(quoting Swersky v. Dreyer & Traub, 643 N.Y.S.2d 33, 37 (App. Div. 1996))).

## 2. Breach of Fiduciary Duty Standards as Applied to Plaintiff's Allegations

Plaintiff asserts three grounds giving rise to a fiduciary relationship between SCOA and plaintiff, and one ground giving rise to a fiduciary relationship between Mr. Graustein and plaintiff: (1) SCOA was a member of Smartix's Board of Directors from July 2002 onward while plaintiff was a shareholder of Smartix; (2) SCOA was the *de facto* majority common stock shareholder in Smartix; and (3) both defendants possessed special skill, knowledge, and experience with respect to the management and operation of start-up companies such as Smartix.

### i. SCOA's Position as a Director of Smartix

Plaintiff alleges that because of SCOA's role as a member of Smartix's Board of Directors (Proposed Am. Compl. ¶ 196), SCOA owed all of the company's shareholders, including plaintiff, a duty of utmost good faith and fair dealing (Proposed Am. Compl. ¶ 197). While the parties contest whether SCOA did, in fact, maintain a seat on Smartix's Board (See Proposed Am. Compl. ¶ 197; Def.'s Mem. Law Opp'n Mot. 14 n.2), this dispute need not be addressed because plaintiff's argument clearly fails for other reasons. Plaintiff offers no other allegations in support of an *independent* duty owed to plaintiff that are extrinsic to any general obligations owed to all of the corporation's shareholders. See New Castle Siding Co. v. Wolfson, 468 N.Y.S.2d 20, 21 (App. Div. 1983) (establishing an individual shareholder's personal cause of action where there exists a "duty owing to the shareholder from the wrongdoer, having its origin in circumstances *independent of and extrinsic to* the corporate entity" (emphasis added)). Plaintiff's phrasing evidences this conclusion: "SCOA owed *the other Smartix shareholders*, including Mr. Henneberry, a duty of utmost good faith and fair dealing."

53

(Proposed Am. Compl. ¶ 197 (emphasis added).) Consequently, this allegation, on its face, fails to establish plaintiff's standing to bring suit as an individual. Cf. Bank of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 224 (S.D.N.Y. 2005) (holding that an officer or director "generally owes a fiduciary duty only to the corporation over which he exercises management authority, and any breach of fiduciary duty claims arising out of injuries to the corporation in most cases may only be brought by the corporation itself or derivatively on its behalf" (citing, *inter alia*, Glenn v. Hoteltron Sys., Inc., 547 N.E.2d 71, 74 (N.Y. 1989); Abrams v. Donati, 489 N.E.2d 751, 752 (N.Y. 1985))); Abrams, 489 N.E.2d at 752 ("[A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually." (citing Niles v. N.Y. Cent. & Hudson Riv. R.R. Co., 68 N.E. 142, 144 (N.Y. 1903); Carpenter v. Sisti, 360 N.Y.S.2d 13, 16 (App. Div. 1974))).

## ii. SCOA as *De Facto* Majority Shareholder in Smartix

Plaintiff's second argument is that SCOA was the *de facto* majority shareholder in Smartix. (Proposed Am. Compl. ¶ 198.) Under this theory, SCOA was the *de facto* majority shareholder by virtue of (1) the rights and powers granted to it under the Amended Article of Incorporation and (2) SCOA's "overwhelming operational control" over Smartix's day to day operations. (Proposed Am. Compl. ¶ 198.)

The Amended Certificate of Incorporation speaks to SCOA's rights and powers vis-à-vis Smartix alone (see, e.g., Riback Aff. Ex. A at Art. 6.7), with, not surprisingly given its function, no mention of a relationship between SCOA and plaintiff at all.[21] For example, it provides

---

[21] The Court notes that plaintiff's name appears in the Certificate of Amendment of Certificate of Incorporation because he signed the document on behalf of Smartix International Corporation as its Chief Executive Officer, not in an individual capacity. (Riback Aff. Ex. A at Ex. A.) An officer's execution of a contract on behalf of a corporation does not give rise to an independent relationship between the officer and the other signatory, see Gen. Motors

54

Smartix the right to object to a reorganization, consolidation, or merger by Smartix. (Riback Aff. Ex. A at Art. 6.7.) Plaintiff next alleges that SCOA's "overwhelming operational control" over Smartix's day to day operations includes the "development and implementation of *Smartix'[s]* business plan; management of Smartix personnel issues; the management of *Smartix* marketing decisions, and the overall management of *Smartix*." (Proposed Am. Compl. ¶ 199 (emphasis added).) Plaintiff avers that overwhelming operational control was also exercised by SCOA through its control of "information concerning outside investment and . . . [SCOA's] own intentions regarding investing in *Smartix*." (Proposed Am. Compl. ¶ 200 (emphasis added).) Further, SCOA, as Smartix's "lead investor," "could control the actions of outside investors based upon the information provided to said investors as well as SCOA's own inaction in providing additional investment in *Smartix*." (Proposed Am. Compl. ¶ 200 (emphasis added).) These allegations clearly do not evince any independent duty owed by SCOA to plaintiff. They repeatedly reference SCOA's functions with respect to Smartix, but not plaintiff.

### iii. Defendants' Special Skill, Knowledge, and Expertise

Plaintiff alleges that "[d]efendants possessed special skill, knowledge and experience with regard to the management and development of a start-up company" (Proposed Am. Compl. ¶ 201), and he reasonably relied upon such special skill, knowledge, and experience (Proposed Am. Compl. ¶¶ 202-03). The relevant allegations in support of plaintiff's contention that defendants possessed special skill, knowledge, and experience with regard to Smartix show that

Acceptance Corp. v. Kalkstein, 474 N.Y.S.2d 493, 495 (App. Div. 1984) ("Marvin signed the agreement with GM in his corporate capacity as president of Blair. That agreement can in no way be construed as a contract with him personally. Moreover, he may not sue GM simply because he is the sole shareholder of Blair." (citing Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Assoc., 396 N.Y.S.2d 925, 927 (App. Div. 1977))). Individual liability only lies in the rare instance where there is "'overwhelming evidence of the signatory's intention to assume personal liability'" due to the fact that most commercial transactions are between corporations and not individual shareholders or officers. Mason Tenders Dist. Council Welfare Fund v. Thomsen Const. Co., 301 F.3d 50, 53-54 (2d Cir. 2002) (quoting Lerner v. Amalgamated Clothing & Textile Workers Union, 938 F.2d 2, 5 (2d Cir. 1991)). This argument has not been advanced by plaintiff. Regardless, there is no allegation of an intention on either party's part for plaintiff to have assumed personal liability under the July 2002 Agreement.

55

plaintiff has failed to allege the existence of an independent fiduciary duty owed to him personally. Plaintiff alleges that the advice and guidance provided by SCOA included the formulation of a business plan, budgets, and staffing; the presentation of Smartix to investors; the training of Smartix employees on making presentations to investors; locating additional investors; and sharing SCOA's knowledge and experience in addressing the potential problems a start-up company like Smartix could face. (Proposed Am. Compl. ¶ 40.)

The flaw in these allegations is that plaintiff states that such "advice and guidance" was "provided by SCOA to *Smartix*." (Proposed Am. Compl. ¶ 40 (emphasis added).) Similarly, plaintiff alleges that Jeffrey Frank, SCOA's Director of Corporate Business Development (Proposed Am. Compl. ¶ 43), was assigned to provide *Smartix* with his special skills and expertise (Proposed Am. Compl. ¶ 46). Mr. Frank's division would conduct meetings "with *Smartix*" concerning "how to operate *Smartix*." (Proposed Am. Compl. ¶ 48 (emphasis added).) Allegations concerning plaintiff's personal relationship merely state that he "was in constant contact" with Mr. Frank and Mr. Graustein (Proposed Am. Compl. ¶ 47) and that he came to "trust and rely" upon their counsel "with regard to business matters involving *Smartix*" (Proposed Am. Compl. ¶ 49 (emphasis added)). The fact that plaintiff was in "constant contact" with Frank and Mr. Graustein, and any trust he put in them fails, as a matter of law, to provide the basis of a fiduciary relationship. See Nat'l Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 679 (S.D.N.Y. 1991) ("Where parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances."), aff'd, Yaeger v. Nat'l Westminster, 962 F.2d 1 (2d Cir. 1992) (table).

Following the allegations in support of this third argument is the following conclusory allegation: "As set forth above, defendants breached their fiduciary duty owed to Mr. Henneberry." (Proposed Am. Compl. ¶ 204.) It is unclear whether plaintiff's intent is for this conclusion to be supported by any or all of the three grounds addressed above, but this inquiry is moot because a conclusory allegation must follow from the factual allegations preceding it. See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) ("'[C]ourts do 'not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened.'" (quoting Kadar Corp. v. Milbury, 549 F.2d 230, 233 (1st Cir. 1977))); Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir. 1993) (holding district court's dismissal of plaintiff's claims proper where plaintiff only made "wholly conclusory and inconsistent allegations"); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 548-53 (3rd ed. 2004) (stating that a review of federal case law reveals the fact that "court[s] will not accept conclusory allegations concerning the legal effect of the events the plaintiff has set out if these allegations do not reasonably follow from the pleader's description of what happened, or if these allegations are contradicted by the description itself").

These three grounds for a fiduciary relationship thus only establish that plaintiff has set forth allegations concerning SCOA's special expertise and knowledge, see Wiener v. Lazard Freres & Co., 672 N.Y.S.2d 8, 14 (App. Div. 1998) (holding that in determining whether a fiduciary relationship exists, "a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge"), *vis-à-vis* Smartix, rather than plaintiff, cf. Benedict v. Whitman Breed Abbott & Morgan, 722 N.Y.S.2d 586, 588 (App.

57

Div. 2001) (requiring "an independent fiduciary duty owed by" a partnership to a partner in order to imbue standing on the partner).

### iv. Defendants' Inducement of Plaintiff's Personal Loans

However, while the grounds for a fiduciary relationship set forth above fail, plaintiff has pleaded that between July 2002 and October 2003, SCOA continually advised plaintiff that it had located ready investors that it would not name, that SCOA would be willing to make additional investments "should the need arise," and that it would be beneficial for plaintiff to advance monies to cover operating expenses, as it would be looked upon favorably by SCOA when it came time for SCOA to make additional investments. (Proposed Am. Compl. ¶ 134.) These representations thus were made to plaintiff in a direct capacity, rather than to the entire corporate entity. Plaintiff alleges that such representations were false (Proposed Am. Compl. ¶¶ 135-36), and had SCOA been truthful, plaintiff would not have made his personal loans (Proposed Am. Compl. ¶138). A party's duty to disclose material facts—for example, the nonexistence of third-party investors and SCOA's own unwillingness to invest—is triggered where that party "possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 739 (2d Cir. 1984) (quoting Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir. 1984)). Such a duty was triggered here.

Rule 9(b)'s heightened pleading standards apply to breach of fiduciary duty claims where the breach is premised on the defendant's fraudulent conduct, see Rahl v. Bande, 328 B.R. 387, 412 (S.D.N.Y. 2005) (citing cases that support the proposition that "the heightened pleading standard is applicable to breach of fiduciary claims only when the breach is premised on a defendant's fraudulent conduct"), such as an attempt "'to induce action or inaction on the part of

58

the investors by means of falsehoods or material omissions,'" In re Luxottica Group S.p.A., Sec. Litigation, 293 F. Supp. 2d 224, 238 (E.D.N.Y. 2003) (quoting Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc., 964 F. Supp. 783, 804-05 (S.D.N.Y. 1997), rev'd in part on other grounds sub nom., Strougo v. Bassini, 282 F.3d 162 (2d Cir. 2002)). Rule 9(b)'s heightened requirements do not apply to a breach of "'fiduciary obligations to act in the best interest of the Company and its shareholders,'" in which case the more liberal pleading requirements of Rule 8 apply. Id.

Plaintiff's breach of fiduciary claim is premised on the same statements that give rise to plaintiff's fraudulent misrepresentation claim. This claim is based on the idea that SCOA induced plaintiff to loan money to Smartix in reliance on SCOA's fraudulent representations that it had located outside investors willing to invest in Smartix, and that it would make additional investments to Smartix in the future. Consequently, Rule 9(b)'s heightened pleading requirements apply, and plaintiff fails to plead a colorable breach of fiduciary claim for the same reasons his fraudulent misrepresentation claims fail under Rule 9(b).

C.  Slander Per Se

Plaintiff's claim for slander per se was the sole cause of action that survived defendants' previous motion to dismiss. See Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at *14-19 (S.D.N.Y. Apr. 27, 2005). Plaintiff re-alleges the claim, adding a few allegations concerning SCOA's representations about future investments, but nothing relating to defendants' alleged defamation. (See, e.g., Proposed Am. Compl. ¶¶ 119-20.) Because these new allegations are immaterial to a defamation claim, they do not alter the Court's prior holding. Consequently, the Court finds that plaintiff has pleaded adequately a claim for slander per se for those reasons set forth in the Court's prior Order. The Court only writes to reinforce its prior

holding by noting that plaintiff maintains standing to bring this claim because defendants are alleged to have broken a duty owed to plaintiff separate and apart from any duties they owed to the corporation, *i.e.*, they defamed his personal business acumen, thus injuring him directly. Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) (holding a direct injury against a shareholder exists where "'the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged'" (quoting Abrams v. Donati, 489 N.E.2d 751, 752 (N.Y. 1985))).

Defendants argue in their opposition papers that certain damages pleaded by plaintiff lack a causal connection to the alleged defamation (Def.'s Mem. Law Opp'n Mot. 15-17) and, consequently, plaintiff is only entitled to nominal damages (Def.'s Mem. Law Opp'n Mot. 15). As the Court stated in its prior Order, a plaintiff asserting a claim for slander per se is not required to plead special damages because they are assumed. Henneberry, 2005 WL 991772, at *19 n.9. Therefore, the fact that plaintiff went beyond this pleading requirement and included specific damages that may or may not be recoverable does not warrant dismissal of his claim. Plaintiff is allowed to assess his damages through the discovery process. Id.[22]

---

[22] This reasoning accords with that of other jurisdictions, including New York state. See Estate of Coggins ex rel. Madis v. Wagner Hopkins, Inc., 183 F. Supp. 2d 1126, 1132 (W.D. Wis. 2001) ("I agree that it is not necessary to know the precise extent of damages in order to make a determination as to the merits of the underlying claim."); A.S. Rampell, Inc. v. Hyster Co., 144 N.E.2d 371, 380 (N.Y. 1957) ("There is no requirement that the measure of damages be stated in the complaint so long as facts are alleged from which damages may properly be inferred."); Daukas v. Shearson, Hammill & Co., 270 N.Y.S.2d 760, 762 (App. Div. 1966) ("[I]t is immaterial that the complaint fails to disclose the method or the detail of computing the general damages sought by plaintiffs or that the allegations fail to justify a recovery for the sums claimed as damages. There is no requirement that the measure of damages shall be correctly set forth in a complaint . . . .").

60

## D. Tortious Interference with Prospective Economic Advantage[23]

### 1. Plaintiff's Standing to Plead Tortious Interference with Prospective Economic Advantage

As a threshold matter, courts have found that plaintiff-shareholders have standing to bring claims for tortious interference with prospective economic advantage where the plaintiff alleges that a wrongdoer owed him or her a duty independent of its duty to all shareholders and an injury distinct from an injury suffered by all other shareholders. See, e.g., PI, Inc. v. Ogle, No. 95 Civ. 1723, 1997 WL 37941, at *4 (S.D.N.Y. Jan. 30, 1997) (holding that plaintiff does not maintain standing to bring a tortious interference with prospective economic advantage where he did "not alleg[e] an injury distinct from the other shareholders, nor does he allege that . . . [wrongdoer] owed him a duty independent of its duty to all of the shareholders"). Plaintiff-employees also may not sue for interference with business relations between a third party and the plaintiff's employer. See Cumisky v. James River Corp., No. 93 Civ. 1975, 1995 WL 520021, at *4 (E.D.N.Y. Aug. 17, 1995) ("[A]n employee generally cannot state a claim against their employer or others for tortious interference with business relations *as business relationships with the employer's customer belong to the employer, not the employee.*").

Defendant alleges that prior to the Smartix venture he regularly consulted for both Major League Baseball and MasterCard. (Proposed Am. Compl. ¶ 175.) In fact, plaintiff was actively consulting with MasterCard when the Smartix venture arose, but MasterCard gave him permission to take leave to pursue the Smartix venture. (Proposed Am. Compl. ¶ 176.) There was an understanding between plaintiff and MasterCard that plaintiff would be able to return as a

---

[23] Courts refer to this cause of action by a number of different names, including "prospective economic advantage, beneficial business relations, prospective business advantage, and business or economic relations." PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir. 1987), abrogated on other grounds by Hannex Corp. v. GMI, Inc., 140 F.3d 194, 206 (2d Cir. 1998). Regardless of which term or phrase is used, the same legal standards apply. Id. (citing Martin Ice Cream Co. v. Chipwich, Inc., 554 F. Supp. 933, 945 (S.D.N.Y. 1983)).

consultant if and when plaintiff became available. (Proposed Am. Compl. ¶ 177.) He alleges that defendants tortiously and intentionally interfered with his consulting relationships by disparaging his business acumen. (Proposed Am. Compl. ¶ 181.) Because of this tortious interference, plaintiff alleges, he has lost the opportunity to perform two specific consulting projects that he would have been hired to perform but for defendants' tortious actions. (Proposed Am. Compl. ¶ 183.) He alleges that he has been injured by reason of the lost income he would have made from those projects in the amount of at least $1,955,000, plus interest, costs, attorneys fees, and expenses. (Proposed Am. Compl. ¶¶ 185-86.)

Plaintiff has alleged clearly separate and distinct injuries from any injuries to Smartix, as the alleged loss of future earnings from the named consulting projects are personal to him and not the class of Smartix shareholders as a whole. However, "[t]he fact that a shareholder has suffered separate and distinct injuries is relevant only to the extent it demonstrates the existence of a separate and distinct *wrong* to such shareholder." EJS-Assoc Ticaret Ve Danismanlik Ltd. Sti. v. Am. Tel. & Tel. Co., No. 92 Civ. 3038, 1993 WL 546675, at *3 (S.D.N.Y. Dec. 30, 1993) (citing Koal Indus. Co. v. Asland, S.A., 808 F. Supp. 1143, 1163-64 (S.D.N.Y. 1992)). Shareholder injuries arising out of the same wrong to the corporation are merely incidental to the corporation's injuries unless the plaintiff demonstrates that a corporation owes a separate and extrinsic duty to the shareholder. Id. (citing New Castle Siding Co., Inc. v. Wolfson, 468 N.Y.S.2d 20, 21 (App. Div. 1983)).

Plaintiff alleges that defendants "used improper means to attempt to take over and control Smartix." (Proposed Am. Compl. ¶ 171.) Defendants' actions were conducted "for the sole purpose of causing injury to Mr. Henneberry's reputation and thereby affording SCOA with the opportunity to take control of Smartix." (Proposed Am. Compl. ¶ 172.) The result of

defendants' action was that "Smartix was caused to fail" (Proposed Am. Compl. ¶ 173) and plaintiff's relationships with MasterCard and Major League Baseball were "irreparably damaged" (Proposed Am. Compl. ¶ 174). While plaintiff does not state explicitly that defendants breached a separate "duty" owed to him by disparaging his business acumen to MasterCard and the Boston Red Sox, the Court finds that one can reasonably infer such a duty from the allegations. Plaintiff alleges that Mr. Graustein referred to him personally, cf. EJS-Assoc, 1993 WL 546675, at *3 (holding that plaintiffs did not maintain standing to assert a personal negligent misrepresentation claim where, *inter alia*, defendant did not make any statements to them personally), when disparaging his personal business acumen in the meeting. (Proposed Am. Compl. ¶¶ 98, 107.) Such an individualized statement was distinct from any disparaging statements regarding Smartix as a whole. As noted above, the harm to plaintiff is thus greater than the harm to any other shareholder, as plaintiff alleges lost future earnings. See Abrams v. Donati, 489 N.E.2d 751, 752 (N.Y. 1985) (holding individual standing not available where, *inter alia*, "there is no claim that plaintiff sustained a loss disproportionate to that sustained by" the corporation). The Court, therefore, turns to the merits of plaintiff's claim.

2. Tortious Interference with Prospective Economic Advantage Standards

Under New York law, a claim for tortious interference with prospective economic advantage lies where (1) the plaintiff had a business relationship with a third party; (2) defendant knew of such relationship and intentionally interfered with it; (3) defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) defendant's actions injured the relationship between plaintiff and third party. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003) (citing Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997); Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)); Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d

209, 214 (2d Cir. 2002) (citing Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000); Purgess, 33 F.3d at 141; Burba v. Rochester Gas & Elec. Corp., 528 N.Y.S.2d 241, 243 (App. Div. 1988)). As was stated in the Court's previous Order, "[t]his cause of action has a 'limited scope.'" Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at *22 (S.D.N.Y. Apr. 27, 2005) (quoting Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 168 (S.D.N.Y. 1998)). The requirements of this tort are more demanding than those imposed on a party asserting tortious interference with the performance of an existing contract. See Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 258 (S.D.N.Y. 1995) (holding that the claim is "very difficult to sustain"); Gertler v. Goodgold, 487 N.Y.S.2d 565, 572 (App. Div.) ("The requirements for establishing liability for interference with prospective contractual relations are more demanding than those for interference with performance of an existing contract." (citing Guard-Life v. Parker Hardware Mfg. Corp., 406 N.E.2d 445, 449 (N.Y. 1980))), aff'd, 489 N.E.2d 748 (N.Y. 1985).

The third element of this action—interference with a business relationship out of malice, or through dishonest, unfair, or improper means—has recently been refined by the New York Court of Appeals. See Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004). The interference must be "'more culpable'" than that required where the tortious interference is with a binding contract. Id. (quoting NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 664 N.E.2d 492, 496 (N.Y. 1996)). The general rule is that the conduct must amount to a crime or an independent tort, or must be engaged in "'for the sole purpose of inflicting intentional harm on plaintiffs.'" Id. (quoting NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 628 N.Y.S.2d 408, 410 (App. Div. 1995), aff'd, NBT Bancorp Inc., 664 N.E.2d at 492). As stated in the Court's prior Order, this element was met because plaintiff adequately pleaded that defendants

64

intentionally defamed him at a meeting with MLB and MasterCard in September 2003, thus pleading an independent tort in satisfaction of the Carvel decision's requirements. Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at \*23 (S.D.N.Y. Apr. 27, 2005).

The first element of this claim requires plaintiff to have had a business relationship with a third party *at the time of* defendant's interference. See Hannex Corp. v. GMI, Inc., 140 F.3d 194, 205 (2d Cir. 1998) ("[I]t is well-settled that a plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'" (citing Restatement (Second) of Torts § 766B cmt. c (1977))); Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 74 (2d Cir. 1988) ("[A] plaintiff must demonstrate that the defendant interfered with business relations *existing between* a plaintiff and a third party." (emphasis added) (citing PPX Enters. v. Audiofidelity Enters., 818 F.2d 266, 269 (2d Cir. 1987), abrogated on other grounds by Hannex Corp., 140 F.3d at 206)); Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 Civ. 5499, 2000 WL 264295, at \*30 (S.D.N.Y. Mar. 9, 2000) ("Plaintiff 'must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior.'" (quoting Minn. Mining & Mfg. Co. v. Graham-Field, Inc., No. 96 Civ. 3839, 1997 WL 166497, at \*7 (S.D.N.Y. Apr. 9, 1997))); Sterling Interiors Group, Inc. v. Haworth, Inc., No. 94 Civ. 9216, 1996 WL 426379, at \*25 (S.D.N.Y. July 30, 1996) ("The cause of action for interference with prospective business dealings . . . is designed to address situations like the one at bar, in which there was an *ongoing business relationship* between the plaintiff and a third party, but no existing contractual arrangement." (emphasis added) (citing Volvo N. Am. Corp., 857 F.2d at 74)).

3. Tortious Interference with Prospective Economic Advantage Standards as Applied to Plaintiff's Allegations

Whether plaintiff has pleaded sufficiently the first element of this claim turns on whether plaintiff had an *existing* or *continuing* relationship with the third parties *at the time of* defendants' tortious interference. Plaintiff alleges that prior to the defendants' tortious interference, plaintiff "would consult with MLB and MasterCard on a regular basis." (Proposed Am. Compl. ¶ 175.) His consulting work for MLB and MasterCard "was, by its nature, periodic work," such that the companies periodically would call him to "engage his interest in proposed projects." (Proposed Am. Compl. ¶ 166.) This relationship allowed plaintiff to pursue his own projects, such as Smartix, while "on hiatus" from MLB and MasterCard. (Proposed Am. Compl. ¶ 175.) He was "actively consulting" for MasterCard "at the time the opportunity with Smartix presented itself." (Proposed Am. Compl. ¶ 176.) Finally, it was "understood" between plaintiff and MasterCard that plaintiff "would be free to return as a consultant for MasterCard if and when" he became available to consult. (Proposed Am. Compl. ¶ 177.) Plaintiff's allegation that he has been turned down for consulting jobs by MLB and MasterCard "[s]ince the time of defendants' tortious actions" (Proposed Am. Compl. ¶ 180) is only relevant if he can first establish that his relationship with those parties existed at the time of the tortious acts.

Plaintiff's first allegation that he consulted for MasterCard and MLB "on a regular basis" would seemingly allege an existing or continuing business relationship at the time of the tortious interference because of the purported regularity of the consulting. However, another allegation clarifies—if not contradicts—the precise frequency of the business relationship: Paragraphs 165 and 166 of the proposed amended complaint allege that plaintiff consulted on various projects for the parties between December 1995 and January 2000. (Proposed Am. Compl. ¶¶ 165-66.)

Consequently, as the Court noted in its prior Order, plaintiff ceased consulting for MLB and MasterCard three years before defendants' tortious activity. Henneberry v. Sumitomo Corp. of Am., No. 04 Civ. 2128, 2005 WL 991772, at \*23 (S.D.N.Y. Apr. 27, 2005). Even assuming as true, as the Court must, the prior allegation that plaintiff was actively consulting for MasterCard "at the time the opportunity with Smartix presented itself" (Proposed Am. Compl. ¶ 176), this allegation falls short because it does not allege the existence of a consulting relationship at the time of defendants' tortious activity. Plaintiff alleges that he was defamed in September 2003; however, the birth of the Smartix opportunity pre-dates the tortious activity by at least one and one-half years. Plaintiff was, therefore, not "actively consulting" for MasterCard at the time the defamatory statements were made. Plaintiff's other allegation that he was "on hiatus" from consulting with the parties while he started up the Smartix venture also fails. The word "hiatus" is defined as "an interruption in time or continuity." Webster's Ninth New Collegiate Dictionary 569 (9th ed. 1985). Under this definition, plaintiff's hiatus from his consulting position served as an interruption in time such that the relationship was no longer continuous (or even in existence). Plaintiff's last relevant allegation is that MasterCard "understood" that plaintiff could "return" as a consultant if and when he became available to do so. The word "return" means "to go back or come back again," Webster's Ninth New Collegiate Dictionary 1008 (9th ed. 1985). Implicit in plaintiff's potential return to his consulting position is the fact that he had to have left in the first place to warrant a return.

Plaintiff has therefore failed to plead adequately the first element of this claim—*i.e.*, that he had a continuing or existing business relationship with a third party with which defendant interfered. As the Court stated in its prior Order, plaintiff has failed to "claim that he interacted with MLB and MasterCard at the time of SCOA's meeting with them in any other capacity than

67

as CEO of Smartix." Henneberry, 2005 WL 991772, at \*23. Because the claim would not withstand a motion to dismiss, plaintiff's motion for leave to amend this cause of action in his complaint is denied.

E. Injurious Falsehood

1. Injurious Falsehood Standards

Injurious falsehood, which is also referred to as "trade libel," "product disparagement," and other variations thereof,[24] is a tort separate and distinct from the tort of defamation. Ruder & Finn Inc. v. Seabord Sur. Co., 422 N.E.2d 518, 522 (N.Y. 1981) ("[A]lthough defamation and disparagement in the commercial context are allied in that the gravamen of both are falsehoods published to third parties, there is a distinction."); see also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 59 (2d Cir. 2002) ("Under New York law, slander and disparagement of goods constitute distinct causes of action." (citing, *inter alia*, Ruder & Finn Inc., 422 N.E.2d at 522)). While both causes of action share the requirement that a speaker publish a falsehood to a third party, they differ with respect to the required subject matter of the speaker's statement. Ruder & Finn Inc., 422 N.E.2d at 522. The New York Court of Appeals has stated that injurious falsehood lies where "the statement is confined to denigrating the quality of the [plaintiff's] business' goods or services," id.; see Fashion Boutique, 314 F.3d at 59 ("To recover for disparagement of goods, the plaintiff must show that the defendant published an oral, defamatory statement directed at the quality of a business's goods . . . ." (citing, *inter alia*, Ruder & Finn Inc., 422 N.E.2d at 522)); Lampert v. Edelman, 261 N.Y.S.2d 450, 451 (App. Div. 1965) (holding that a cause of action for injurious falsehood existed where the statements concerned plaintiffs' real property); Cunningham v. Hagedorn, 422 N.Y.S.2d 70, 73 (App. Div. 1979)

---

[24] For example, in Waste Distillation Technology, Inc. v. Blasland & Bouck Engineers, P.C., 523 N.Y.S.2d 875, 877 (App. Div. 1988), the New York Supreme Court, Appellate Division, Second Department, used "trade libel" and "injurious falsehood" as alternative monikers for the same claim.

("The action for injurious falsehood lies when one publishes false and disparaging statements about another's property . . . ." (citing Lampert, 261 N.Y.S.2d at 451)), while a cause of action for defamation lies where the "statement impugns the basic integrity or creditworthiness of a business," Ruder & Finn, Inc., 422 N.E.2d at 522; see also Angio-Med. Corp. v. Eli Lilly & Co., 720 F. Supp. 269, 274 (S.D.N.Y. 1989) (construing New York law to stand for the proposition that where "disparaging statements impeach the business methods or integrity of the plaintiff himself[,] . . . . [t]he action would then qualify as slander per se instead of trade libel").[25] A principal effect of this distinction between the two claims is that a claim for injurious falsehood requires a showing of special damages, whereas a claim for defamation does not. See Fashion Boutique, 314 F.3d at 59 (holding that plaintiff must prove "that the statements caused special damages" for disparagement of goods claims but that "general damages to the reputation of the business are presumed" for claims of slander per se); Ruder & Finn Inc., 422 N.E.2d at 522 (stating that injury is conclusively presumed in a defamation action, but an action for disparagement requires special damages to be proven).

While the enunciation of these general principles of law seems somewhat straightforward, various courts and commentators have noted that the application of these principles is often confused, due in part to the fact that many statements of falsehood often fall

---

[25] The differentiation between the two torts is rooted in their different historical origins:

> The action for defamation is to protect the personal reputation of the injured party; it arose out of the old actions for libel and slander. The action for injurious falsehood is to protect economic interests of the injured party against pecuniary loss; it arose as an action on the case for the special damage resulting from the publication.

Restatement (Second) of Torts § 623A cmt. g (1977). The New York Court of Appeals has spoken to the historical development of injurious falsehood/disparagement of goods:

> We start with product defamation, whose delineation is relatively uncomplicated. Perhaps more properly known in this context as product disparagement, legal historians trace its ancestry to the common-law tort of slander of title. Fashioned originally to provide a remedy against one who cast oral aspersions upon the legitimacy of an owner's right to his land, as this tort evolved it was enlarged to cover written aspersions as well. Next it was extended to include title to property other than land and, eventually, to the disparagement of the quality of, as distinguished from title to, property.

Ruder & Finn Inc. v. Seaboard Sur. Co., 422 N.E.2d 518, 521-22 (N.Y. 1981).

69

within the boundaries of both claims. See Lampert, 261 N.Y.S.2d at 451 (noting the "confusion" arising from plaintiffs' mischaracterization of certain claims as sounding in defamation rather than injurious falsehood); Restatement (Second) of Torts § 623A cmt. g (1977) ("Although the torts of defamation and injurious falsehood protect different interests, they may overlap in some fact situations. This happens particularly in cases of disparagement of the plaintiff's business or product."); see also Auvil v. CBS "60 Minutes," 800 F. Supp. 928, 932 (E.D. Wash. 1992) (noting that for California courts, "[t]he distinction between the two [torts] has often proven troublesome from a semantical standpoint").[26]

However, a review of the pertinent case law makes clear when a claim of injurious falsehood is proper and when it is improper. For instance, a claim for product disparagement was held to be properly pleaded where plaintiff alleged that defendant had falsely disparaged plaintiff's aerosol products by claiming that they would endanger the ozone layer. Ruder & Finn Inc., 422 N.E.2d at 522. Similarly, a claim for injurious falsehood was proper where one clothing store alleged that another competing clothing store's employees made disparaging misrepresentations to its customers regarding the quality and authenticity of the products sold at the former's store. Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 91 Civ. 4544, 1998

---

[26] Other times, confusion may arise where a court relies on certain cases that are out of step with the rest of the case law. For example, in at least one instance, injurious falsehood has been defined as to require the "knowing publication of false matter derogatory to the plaintiff's business." Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C., 523 N.Y.S.2d 875, 877 (App. Div. 1988). The plain language of this statement of law requires that the disparagement need only be made as to "plaintiff's *business*," id. (emphasis added), as opposed to a disparagement of "the quality of the business' goods or services," as defined by the New York Court of Appeals in Ruder & Finn Inc., 422 N.E.2d at 522. The former statement is broader and somewhat ambiguous because a plaintiff's "business" could, arguably, be construed to include the "integrity or creditworthiness" of such business, which would conflict with Ruder & Finn Inc.'s mandate that a statement impugning the integrity or creditworthiness of a business give rise to a defamation claim, and not an injurious falsehood claim. Id. While other courts have cited this language from Waste Distillation, see, e.g., Nevin v. Citibank, N.A., 107 F. Supp. 2d 333, 345 (S.D.N.Y. 2000) ("Under New York law, '[t]he tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business or property.'" (quoting Waste Distillation, 523 N.Y.S.2d at 877)), this Court will follow the language used by the New York Court of Appeals in Ruder & Finn Inc. It should be noted that, notwithstanding a misstatement of the law, the statements at issue in Waste Distillation were criticisms of plaintiff's proposal to build a waste disposal facility.

70

WL 259942, at *2 (S.D.N.Y. May 21, 1998) (holding that a disparagement of goods claim is proper where "defendants' employees told . . . [customers] that plaintiff sold a line of goods inferior to the line sold at" plaintiff's store), aff'd, 314 F.3d 48 (2d Cir. 2002). Other statements that plaintiff's parent company was having problems with the store, plaintiff's store would be closing soon, and plaintiff's store sold bogus items were properly characterized as slanderous per se because a reasonable juror could conclude that the speaker "was impugning plaintiff's integrity or business methods." Id. at *1-2; see also Angio-Med. Corp. v. Eli Lilly & Co., 720 F. Supp. 269, 272, 274 (S.D.N.Y. 1989) (characterizing as defamatory claims that impute fraud, dishonesty, or unfitness to a company, and characterizing as trade libel claims that would cause a listener to assume plaintiff's cosmetic skin and hair product did not meet safety and efficacy standards). Additionally, where a prosecutor presented to a grand jury transcripts of recordings of conversations between a plaintiff and others, but edited them so as to be unfair and detrimental to plaintiff, plaintiff's claim for injurious falsehood against the defendant-prosecutor for the latter's publication of the transcripts to the grand jury was dismissed because the acts in the transcripts did not concern plaintiff's property. See Cunningham v. Hagedorn, 422 N.Y.S.2d 70, 72, 73-74 (App. Div. 1979). Instead, the acts in the transcripts supported a claim for defamation. Id. at 74.

2.      Injurious Falsehood Standards as Applied to Plaintiff's Allegations

Case law thus elucidates the difference between, on the one hand, statements concerning a party's "integrity or business methods," Fashion Boutique, 1998 WL 259942, at *1, and, on the other hand, statements denigrating the quality of a party's goods or services, id. at *2, with the former providing a basis for a claim of defamation and the latter providing a basis for an injurious falsehood claim. Here, the alleged statements giving rise to plaintiff's proposed

71

injurious falsehood claim are the same statements used in support of plaintiff's defamation claim—namely, that SCOA surreptitiously met with representatives of the Boston Red Sox, and then MasterCard, and told them that plaintiff "lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen." (Proposed Am. Compl. ¶¶ 98, 107.) In those same meetings, plaintiff further "placed blame for Smartix' [sic] present financial condition, and inability to pay monies owed to the [party or parties], upon the purported mismanagement of Smartix by Mr. Henneberry." (Proposed Am. Compl. ¶¶ 98, 107.) These statements assert essentially that (1) plaintiff lacks the necessary skill and business acumen to manage Smartix which (2) has resulted in Smartix's poor financial condition. Such accusations clearly "impugn[] plaintiff's integrity . . . [and] business methods," id., and "call into question plaintiff's viability as a continuing enterprise," id. at *1. They do not speak to the quality of plaintiff's goods or services at all. Id. at *2. Consequently, because plaintiff fails to plead an essential element of this claim, the claim is not colorable, Kaster v. Modification Sys., Inc., 731 F.2d 1014, 1018 (2d Cir. 1984) ("As long as appellants have 'at least colorable grounds for relief, justice does . . . require' leave to amend." (quoting S.S. Silberblatt, Inc. v. E. Harlem Pilot Block, 608 F.2d 28, 42 (2d Cir. 1979))), and would thus not survive a motion to dismiss.[27]

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART and DENIES IN PART plaintiff's motion for leave to amend his complaint pursuant to Federal Rule of Civil Procedure 15(a). Plaintiff's motion for leave to amend his complaint to assert a claim for promissory estoppel as to defendants' alleged promise to make a $3-5MM Investment in Smartix is

---

[27] Plaintiff's misconstrual of what may constitute an injurious falsehood obviates the need to first establish plaintiff's standing. The reason is that plaintiff's misconstrual, in effect, demonstrates that he does not maintain standing to bring this claim because he has failed to allege a "'distinct and palpable injury to himself.'" Southside Fair Housing Comm. v. City of N.Y., 928 F.2d 1336, 1341 (2d Cir. 1991) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)). The standing analysis is implicit in the Court's discussion.

GRANTED, defendants' cross-motion for summary judgment as to this claim is DENIED, and plaintiff's motion for leave to amend his complaint to assert alternative bases for a promissory estoppel action are all DENIED; plaintiff's motion for leave to amend his complaint to assert a claim for slander per se is GRANTED; and plaintiff's motion for leave to amend his complaint to assert claims for negligent misrepresentation, breach of fiduciary duty, injurious falsehood, and tortious interference with prospective economic advantage are hereby DENIED in their entirety. Plaintiff has TWENTY DAYS from the date of this Order to seek leave to replead. The parties are ORDERED to appear before this Court at 500 Pearl Street, Courtroom 18b for a status conference on March 23, 2006 at 10:00 a.m. unless a motion is pending.

**SO ORDERED.**
**New York, New York**

February **2 1**, 2006

Peter K. Leine
U.S.D.J.

73

Copies of this Opinion and Order have been mailed to:

John M. Deitch, Esq.
Mendes & Mount LLP
One Newark Center, 19th Floor
Newark, New Jersey 07102

Stuart M. Riback, Esq.
Siller Wilk LLP
675 Third Avenue
New York, New York 10017