UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
WILLIAM HENNEBERRY,                 :
                                    :
                  Plaintiff,        :
                                    :
         - against -                :        OPINION AND ORDER
                                    :
SUMITOMO CORPORATION OF AMERICA,    :        04 Civ. 2128 (PKL)
ROBERT GRAUSTEIN, SUMITOMO          :
CORPORATION, and JOHN DOES          :
nos. 1-50 (fictitiously named       :
individuals),                       :
                                    :
                  Defendants.       :
-----------------------------------x

**APPEARANCES**

MENDES & MOUNT LLP
One Newark Center, 19th Floor
Newark, New Jersey 07102
John M. Deitch, Esq.

Attorneys for Plaintiff


SILLER WILK LLP
675 Third Avenue
New York, New York 10017
Stephen D. Hoffman, Esq.
Stuart M. Riback, Esq.
Pamela L. Kleinberg, Esq.

Attorneys for Defendants Sumitomo Corporation of America and
Robert Graustein

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/12/07

**LEISURE, <u>District Judge</u>**:

This action arises out of a failed investment transaction between plaintiff William Henneberry, the Chairman and majority common stock shareholder of Smartix International Corp. ("Smartix"), and defendant Sumitomo Corporation of America ("SCOA"), Robert Graustein, a Senior Vice president of SCOA, and Sumitomo Corporation ("Sumitomo"), SCOA's parent company. In a complaint dated March 17, 2004, plaintiff asserted causes of action against all defendants for (1) detrimental reliance on the alternative bases of promissory estoppel and negligent misrepresentation; (2) breach of fiduciary duty; (3) slander per se; (4) tortious interference with prospective economic advantage; (5) injurious falsehood; and (6) breach of contract. Defendants SCOA and Robert Graustein then moved, in lieu of an answer, for dismissal of the action on all counts for failure to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

In an Opinion and Order dated April 27, 2005, the Court granted the motion to dismiss all of the aforementioned claims as against SCOA and Graustein, save the slander per se claim. <u>Henneberry v. Sumitomo Corp. of Am.</u>, No. 04 Civ. 2128 (PKL), 2005 WL 991772 (S.D.N.Y. Apr. 27, 2005) [hereinafter <u>Henneberry I</u>]. In an Opinion and Order dated May 3, 2005, the Court granted Sumitomo's motion to dismiss all claims against it

1

pursuant to Rule 12(b)(6). <u>Henneberry v. Sumitomo Corp. of Am.</u>,
No. 04 Civ. 2128 (PKL), 2005 WL 1036260 (S.D.N.Y. May 3, 2005).
In both of those Orders, plaintiff was given twenty days to seek
leave to replead his complaint.

On May 16, 2005, Henneberry timely filed a motion pursuant
to Federal Rule of Civil Procedure 15(a), seeking leave to file
an amended complaint re-asserting all of the prior claims
against SCOA and Graustein except for breach of contract. In its
opposition to that motion, SCOA[1] cross-moved for partial summary
judgment as to Henneberry's claims for promissory estoppel and
negligent misrepresentation, in the event that the Court were to
find that those claims were pleaded adequately in Henneberry's
proposed amended complaint. In an Opinion and Order dated
February 21, 2006, Henneberry's motion was granted in part and
denied in part, and SCOA's cross-motion was denied. <u>Henneberry
v. Sumitomo Corp. of Am.</u>, 415 F. Supp. 2d 423 (S.D.N.Y. 2006)
(Leisure, J.) [hereinafter <u>Henneberry II</u>]. Specifically,
Henneberry's motion for leave to amend his complaint to assert a
claim for promissory estoppel as to his $100,000 loan to Smartix
based on SCOA's alleged promise to make a $3-5MM Investment in
Smartix, as well as to assert a claim of slander per se were
granted, and SCOA's cross-motion for summary judgment as to

---

[1] As has been the practice throughout the history of this case, and because
the claims against Sumitomo Corporation of America and Graustein are
indistinguishable, the Court will hereinafter refer to both defendants
collectively as "SCOA."

Henneberry's claims for promissory estoppel was denied.
Henneberry's motion for leave to amend his complaint to assert
alternative bases for a promissory estoppel action was denied,
as was his motion for leave to amend his complaint to assert
claims for negligent misrepresentation, breach of fiduciary
duty, injurious falsehood, and tortious interference with
prospective economic advantage.  Again, Henneberry was granted
twenty days to seek leave to replead those causes of action
denied by the Court.

   Henneberry now brings yet another motion pursuant to Rule
15(a), seeking leave to file an amended complaint ("Third
Amended Complaint"), asserting causes of action against SCOA for
(1) detrimental reliance on the basis of promissory estoppel;
(2) negligent misrepresentation; (3) fraudulent
misrepresentation; (4) defamation (slander per se); (5) tortious
interference with prospective economic advantage; and (6) breach
of fiduciary duty. Most of these causes of action have been
brought before; only the claim for fraudulent misrepresentation
is new.  SCOA requests that the Court deny plaintiff's motion to
amend the complaint in its entirety and not permit any further
attempts to replead.

   On April 17, 2007, Henneberry also filed a motion to lift
the stay of discovery that has been in place since this Court
issued Orders imposing the stay on June 10, 2004 and August 17,

3

2005.  Specifically, he requested that the Court lift the stay
as to the two claims not dismissed in Henneberry II. (Pl.'s Mem.
Req. Lift of Stay at 6.)  Defendants oppose this motion,
claiming that a lift in the stay of discovery would be unduly
burdensome given their perceived likelihood that the plaintiff's
motion for leave to amend the complaint would be denied. (Def.'s
Mem. Opp. Req. Lift of Stay at 2, 5-6.)

For the reasons set forth herein, Henneberry's motion for
leave to amend his complaint is GRANTED IN PART AND DENIED IN
PART.  His motion to lift the stay of discovery is GRANTED.

### BACKGROUND

Henneberry includes with his motion papers his Third
Amended Complaint, which seeks to remedy the deficiencies in the
prior two complaints.  Leave to amend a complaint will be denied
if the amended complaint could not withstand a motion to
dismiss. See Dougherty v. Town of N. Hempstead Bd. of Zoning
Appeals, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a
pleading will be futile if a proposed claim could not withstand
a motion to dismiss pursuant to Rule 12(b)(6).").  The Court
thus -- as it did in Henneberry II -- accepts as true all of the
proposed complaint's factual allegations and draws all
reasonable inferences in favor of plaintiff. See Pits, Ltd. v.
Am. Express Bank Int'l, 911 F. Supp. 710, 713 (S.D.N.Y. 1996)
(citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Cosmas v.

4

Hassett, 886 F.2d 8, 11 (2d Cir. 1989)).  Accordingly, the
following background information and repleaded allegations are
drawn from the Third Amended Complaint and do not constitute
findings of fact by the Court.

I.   The Parties

     Plaintiff William Henneberry is a creative marketing
entrepreneur specializing in developing new ways to market and
use credit cards. (Third Am. Compl. ¶¶ 10-11.)  He has worked
frequently with large corporations, athletic teams, and credit
card companies (Third Am. Compl. ¶¶ 15-19), and won numerous
awards for his work (Third Am. Compl. ¶ 20).  For five years
prior to the venture giving rise to this action, plaintiff
worked as a consultant for Major League Baseball and MasterCard,
earning between $10,000 and $25,000 per month. (Third Am. Compl.
¶¶ 19, 240.)  At all times relevant to this action, Henneberry
was the Chairman and majority common stock shareholder of
Smartix, a privately held New York corporation. (Third Am.
Compl. ¶¶ 12-13, 21-22.)  As Chairman, Henneberry was entitled
to an annual salary of $150,000. (Third Am. Compl. ¶ 21.)  As of
September 9, 2003, Henneberry owned 1,740,666 shares of Smartix
stock. (Third Am. Compl. ¶ 23.) Defendant SCOA is a New York
corporation and a wholly owned subsidiary of former defendant
Sumitomo. (Third Am. Compl. ¶¶ 4, 36-38.)  Defendant Robert
Graustein is a New York resident who was a Senior Vice President

of defendant SCOA at all times relevant to this lawsuit. (Third
Am. Compl. ¶¶ 5, 39.)

II.    Smartix and the SmartFan Program

        According to the Third Amended Complaint, Henneberry became
introduced to Smartix while performing due diligence into
Smartix as a consultant for MasterCard. (Third Am. Compl. ¶ 25.)
Smartix was created to develop with MasterCard an electronic
ticketing promotion program for Major League Baseball which
would, *inter alia*, allow season ticket holders to sell unused
tickets on the internet and at designated kiosks located at
baseball stadiums (the "SmartFan" program). (Third Am. Compl. ¶¶
24, 27-28.)   The SmartFan program was tested with the Boston Red
Sox and the St. Louis Cardinals baseball teams. (Third Am.
Compl. ¶ 29.)   Henneberry was then given permission by
MasterCard to work for Smartix. (Third Am. Compl. ¶ 26.)
Smartix's Smartfan program was funded, in part, through
investments made by MasterCard, and MasterCard later became a
sponsor of the SmartFan program. (Third Am. Compl. ¶ 28.)
However, Smartix also solicited additional investments from
other private individuals and groups in order to support its
further development. (Third Am. Compl. ¶¶ 30-31.)   These
additional investors included Cramer Berkowitz Partners, L.P.
and SCOA. (Third Am. Compl. ¶¶ 31, 35.)

III.   SCOA's Involvement With Smartix

Henneberry and Smartix became involved with SCOA's Corporate Business Development Division (the "CBDD"). (Third Am. Compl. ¶¶ 39-41.)   The CBDD is a special group at SCOA that provided guidance, special expertise, and advice to small companies like Smartix. (Third Am. Compl. ¶ 40.)   This included assistance in development of a business plan for Smartix, formulation of budgets, staffing, presenting Smartix to investors, training of Smartix staff on making presentations to investors, and locating additional investors. (Third Am. Compl. ¶ 41.)   Messrs. Frank and Graustein, who were both employed in the CBDD, controlled all information concerning SCOA's interest in investing in Smartix and SCOA's search for outside investment. (Third Am. Compl. ¶ 52.)

A.   Spring of 2002 Investment Agreement

At some point SCOA considered investing in Smartix.  As a part of SCOA's due diligence performed in anticipation of investing in Smartix, SCOA conducted an economic valuation of Smartix and valued the company at $10 million, or $1.50 per share. (Compl. ¶¶ 62-63.)   In the spring of 2002, SCOA agreed to invest between $3 million and $5 million in Smartix (the "$3-5MM Investment"). (Third Am. Compl. ¶¶ 60.)   In reliance on SCOA's agreement, Smartix changed its position by, *inter alia*, performing the following actions:  (1) filing a restated

7



certificate of incorporation with the Secretary of State of New
York as directed by SCOA; (2) convincing its original investors
to subordinate their class of shares to those to be issued to
SCOA; (3) convincing its original investors to reduce their
dividend percentages, forego dividends, and invest more cash
into Smartix; (4) advising other potential investors of SCOA's
that Smartix had accepted SCOA's offer and that future
investment would be at a later round and, presumably, at a
higher valuation; (5) agreeing to allow Hank Aaron to serve as a
member of Smartix's Board of Directors; and (6) ordering special
stock certificates with legends specifically requested by SCOA.
(Third Am. Compl. ¶ 65.)

     In reliance on the same agreement, Henneberry made a bridge
loan to Smartix for $100,000. (Third Am. Compl. ¶¶ 130-33.)
However, on June 4, 2002, after documents memorializing the $3-
5MM Investment agreement were sent by SCOA to Smartix's
shareholders for execution, SCOA advised Henneberry that SCOA
would not make the investment. (Third Am. Compl. ¶ 66.)
Henneberry informed SCOA that SCOA was in breach of its
agreement with Smartix, and a new agreement was reached (the
"July Agreement"), wherein SCOA invested $1 million in Smartix.
(Third Am. Compl. ¶¶ 68-69.)  This $1 million investment left
Smartix undercapitalized, a result of which SCOA was awar.
(Third Am. Compl. ¶ 70.)  Pursuant to the July Agreement, SCOA

obtained a seat on the Smartix Board of Directors. (Third Am. Compl. ¶ 71.)

B.   <u>SCOA's Subsequent Investment Agreement</u>

The July Agreement was made pursuant to a Stock Purchase Agreement, dated July 2, 2002, which provided for, *inter alia*, the sharing of profits and losses among the different classes of Smartix stock. (Third Am. Compl. ¶ 69; Fornshell Decl. Ex. 1.) Thereafter, SCOA communicated to Smartix that it was Smartix's lead investor and that it would actively seek out additional investors for Smartix. (Third Am. Compl. ¶¶ 72-75.)  On October 17, 2002, Graustein and Frank wrote to Henneberry to inform him that SCOA was performing upon its promise to locate investors. (Third Am. Compl. ¶ 75.)  In June 2003, Smartix advised SCOA that it could not continue operations without further investment (Third Am. Compl. ¶ 77), and that Smartix would possibly need to cease operations (Third Am. Compl. ¶ 78).  In response, Graustein informed Henneberry that it was not within his legal rights to cease operations of Smartix. (Third Am. Compl. ¶ 79.) Graustein also told Henneberry and others at a meeting in June 2003 that SCOA "would not let you [Smartix] fail." (Third Am. Compl. ¶ 80 (bracket in original).)  At this same meeting, SCOA orally agreed to "pursue a plan for matching outside investments and for SCOA to provide a bridge loan to, or additional investments in, Smartix." (Third Am. Compl. ¶ 81.)  At SCOA's

9

request, Smartix prepared a plan for future investments by SCOA, which called for an additional $1 million investment by SCOA and the implementation of the Smartfan program with ten sports teams, and included various other terms and conditions imposed by SCOA. (Third Am. Compl. ¶¶ 81-82.)

Subsequent to this conversation, SCOA was repeatedly advised of Smartix's declining financial outlook. (Third Am. Compl. ¶¶ 85-88.)  SCOA was also told that Smartix would eventually be unable to perform the obligations it owed to the Red Sox and Cardinals unless Henneberry advanced additional funds to Smartix (Third Am. Compl. ¶ 87), and SCOA never objected (Third Am. Compl. ¶ 88).  In fact, SCOA actively encouraged Henneberry to make personal loans to Smartix in addition to the initial loan of $100,000 made in the Spring of 2002, which Henneberry did in the following amounts:  (1) $47,500 on November 19, 2002; (2) $52,500 on January 6, 2003; (3) $50,000 on January 31, 2003; and (4) $150,000 on February 20, 2003. (Third Am. Compl. ¶¶ 88, 140, 149, 153, 156.)

On September 8, 2003, SCOA presented Smartix with a new investment proposal (Third Am. Compl. ¶ 89), requiring Henneberry to convert his personal loans into company stock prior to any additional SCOA investment, which would be limited to matching investments up to the amount of $500,000 (Third Am. Compl. ¶ 90).  Henneberry rejected this offer because it did not

10

provide sufficient capital (Third Am. Compl. ¶ 91), and because
it attributed a lower valuation to Smartix, which would have
allowed SCOA to trigger its right to obtain additional Smartix
equity and thus increase its holdings (Third Am. Compl. ¶ 92).

On September 9, 2003, Henneberry was called into a meeting
with Michael Dee, Executive Vice President of Business Affairs
for the Boston Red Sox, regarding the continuation of the
Smartfan program for the next year. (Third Am. Compl.¶ 93.)
Plaintiff was forced to concede Smartix's financial difficulties
and its potential instability in the coming baseball season
(Third Am. Compl. ¶ 95), causing Dee to express concern about
the future of the business relationship (Third Am. Compl. ¶ 96).

Following this meeting, Henneberry communicated Dee's
concerns to Smartix's shareholders, including SCOA. (Third Am.
Compl. ¶ 97.)  In addition, Henneberry expressed his concerns
about the September 8, 2003 offer by SCOA in an email to Frank,
sent September 19, 2003. (Third Am. Compl. ¶ 98, Ex. A.)
However, the two parties continued to discuss the September 8,
2003 proposal, and SCOA continued to assert its willingness to
provide additional investments in Smartix, and continued to
represent that it had investors willing to invest in Smartix.
(Third Am. Compl. ¶ 100.)

11

IV.   SCOA's Meetings with the Red Sox and MasterCard; Final
      Dealings with Smartix

On September 22 or 23, 2003, Graustein and other unnamed
SCOA employees met with Dee and informed him, in sum and
substance, that Henneberry "lacked the necessary skill and
ability to manage Smartix . . . [,] otherwise disparaged his
business acumen," and blamed Smartix's financial troubles and
inability to pay monies owed to the Red Sox on mismanagement of
the company by Henneberry. (Third Am. Compl. ¶¶ 104, 107.)  SCOA
allegedly also said that it would be taking over Smartix and
removing Henneberry.  (Third Am. Compl. ¶ 109.)  Thereafter, Dee
lost faith in Henneberry and began using Graustein as the
contact for the Smartfan program.  (Third Am. Compl. ¶¶ 108,
110-11, Ex. B.)

At some point between September 19 and 23, 2003, Graustein
also surreptitiously met with MasterCard in a meeting that was
attended by, *inter alia*, John Stuart, MasterCard's Senior Vice
President of Global Sponsorship and Event Marketing. (Third Am.
Compl. ¶ 112, 114, 118.)  At that meeting, Graustein and others
from SCOA informed MasterCard, in sum and substance, that
Henneberry lacked the necessary skill and ability to manage
Smartix, disparaged his business acumen, and blamed Smartix's
financial condition and failure to pay monies owed to the Red
Sox and Cardinals on Henneberry's mismanagement of the company.

12

(Third Am. Compl. ¶¶ 113, 116, 118.)  MasterCard similarly lost faith in Henneberry.  (Third Am. Compl. ¶¶ 117, 226, 239, 242.)

SCOA did not notify Smartix about either of these meetings until a later meeting with Henneberry on September 24, 2003 (Third Am. Compl. ¶¶ 101, 103, 107).  At that meeting, SCOA informed Henneberry that Dee now refused to do business with Smartix if Henneberry was involved with the company (Third Am. Compl. ¶ 119-20), which was contrary to Dee's July 2, 2003 statement that the Red Sox had "taken a leap of faith by aligning ourselves with Smartix, in large part due to my confidence and trust in you personally" (Third Am. Compl. ¶ 121).  Thereafter, Henneberry sent an e-mail to SCOA outlining SCOA's improper actions and their effect on Smartix.  (Third Am. Compl. ¶ 122, Ex. C.)

On October 9, 2003, Smartix held a shareholder's meeting wherein it was decided that Smartix would continue to pursue the Smartfan program with the Red Sox. (Third Am. Compl. ¶ 123.)  At that meeting and at times subsequent to the meeting, SCOA represented that it had investors who would invest in Smartix. (Third Am. Compl. ¶ 124.)  SCOA never invested any additional funds in Smartix (Third Am. Compl. ¶¶ 165, 208, 219) and, as a result of SCOA's various actions, Smartix's stock is presently worthless (Third Am. Compl. ¶ 232).

13

**DISCUSSION**

I.   Rule 15(a) Standards

These standards were set forth in detail in the Court's previous rulings.  Federal Rule of Civil Procedure 15(a) allows a litigant to amend a pleading by leave of court.[2] Fed. R. Civ. P. 15(a).  The Rule provides that "leave shall be freely given when justice so requires." Id.  Accordingly, the Second Circuit has followed the U.S. Supreme Court's direction that permission to amend a claim "should be freely granted." Oliver Schs., Inc. v. Foley, 930 F.2d 248, 252 (2d Cir. 1991) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  However, the decision to grant leave to amend is wholly within a district court's discretion. See id.; Kaster v. Modification Sys., Inc., 731 F.2d 1014, 1018 (2d Cir. 1984) (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971)).  Moreover, a decision to deny the motion must be based on a valid ground. Oliver Schs. Inc., 930 F.2d at 252; Kaster, 731 F.2d at 1018 (citing Foman, 371 U.S. at 182).

A district court may deny leave to amend where there has been undue delay or bad faith on the moving party's part,

---

[2] Rule 15(a) also allows a party to amend a pleading
     once as a matter of course at any time before a responsive
     pleading is served or, if the pleading is one to which no
     responsive pleading is permitted and the action has not been
     placed upon the trial calendar, the party may so amend it at any
     time within 20 days after it is served.  Otherwise a party may
     amend the party's pleading only by . . . written consent of the
     adverse party . . . .
Fed. R. Civ. 15(a).

14

prejudice to the non-movant, or where leave would be futile.[3] See

Klecher v. Metropolitan Life Ins. Co., 331 F. Supp. 2d 279, 282-

83 (S.D.N.Y. 2004) (citing Foman, 371 U.S. at 182; Dougherty,

282 F.3d at 87).  Granting leave to file an amended complaint is

futile where the claims therein would not survive a motion to

dismiss. Dougherty, 282 F.3d 83, 88 (2d Cir. 2002) ("An

amendment to a pleading will be futile if a proposed claim could

not withstand a motion to dismiss pursuant to Rule 12(b)(6).").

     In order to survive a motion to dismiss, a proposed claim

need only be "colorable." See Kaster, 731 F.2d at 1018 ("As long

as appellants have 'at least colorable grounds for relief,

justice does . . . require' leave to amend." (quoting S.S.

Silberblatt, Inc. v. E. Harlem Pilot Block, 608 F.2d 28, 42 (2d

Cir. 1979))); Grupke v. Linda Lori Sportswear, Inc., 921 F.

Supp. 987, 992 (E.D.N.Y. 1996) ("A party may amend its pleading

to assert a 'colorable' new claim." (quoting S.S. Silberblatt,

Inc., 608 F.2d at 42)).  Consequently, as former Judge Weinfeld

stated, "[a]lthough Rule 15 provides that leave to amend shall

be granted freely, leave need not be granted to permit an

amendment embodying plainly defective claims." Valdan Sportswear

v. Montgomery Ward & Co., 591 F. Supp. 1188, 1190 (S.D.N.Y.

1984) (citing Foman, 371 U.S. at 182).

_____

[3] The parties have only addressed the question of the amended complaint's
futility, and not the other named grounds upon which a district court may
deny leave to amend.

II.   Standing

The Court addressed the question of standing in great
detail in Henneberry II. See 415 F. Supp. 2d at 437-40.  While
the parties do not here raise the issue, the Court still must
consider standing, because if defendants owed no duty to
Henneberry personally, his claims must fail. See, e.g., 532
Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc., 750
N.E.2d 1097, 1101 (N.Y. 2001) (Kaye, C.J.) ("Absent a duty
running directly to the injured person there can be no liability
in damages . . . ."). Thus, the Court is again compelled to
determine whether plaintiff maintains standing to bring his
claims in an individual capacity. See Southside Fair Hous. Comm.
v. City of N.Y., 928 F.2d 1336, 1341 (2d Cir. 1991) (district
court's explicit decision not to address plaintiff's standing to
maintain action was error because a circuit court of appeals
lacks jurisdiction to hear an appeal where plaintiff fails to
satisfy Article III's requirement that federal courts adjudicate
actual "cases" and "controversies" (citing Allen v. Wright, 468
U.S. 737, 750 (1984); Fulani v. League of Women Voters Educ.
Fund, 882 F.2d 621, 624 (2d Cir. 1989))); Qantel Corp. v.
Niemuller, 771 F. Supp. 1361, 1368 (S.D.N.Y. 1991) (Leisure,
J.).  In conducting its analysis, the Court notes that standing
to maintain an action "'cannot be inferred argumentatively from
averments in the pleadings, . . . but rather must affirmatively

16

appear in the record,'" so that, on a motion to dismiss, "'it is
the burden of the party who [seeks standing to sue] . . .
clearly to allege facts demonstrating that he is a proper party
to invoke judicial resolution of the dispute.'" Thompson v.
County of Franklin, 15 F.3d 245, 249 (2d Cir. 1994) (quoting
FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)),
overruled on other grounds by City of Littleton v. Z.J. Gifts D-
4, L.L.C., 541 U.S. 774 (2004).

        Generally an individual shareholder lacks standing to bring
a claim where "the duty owed to the shareholder[] is . . .
indistinguishable from the duty owed to the corporation." Vincel
v. White Motor Corp., 521 F.2d 1113, 1121 (2d Cir. 1975).
Absent an independent duty, the shareholder's perceived injury
is deemed to be considered the same injury as that to the
corporation and, consequently, the shareholder maintains no
separate right of action separate and apart from the
corporation's. Fifty States Mgmt. Corp. v. Niagara Permanent
Sav. & Loan Ass'n, 396 N.Y.S.2d 925, 927 (App. Div. 1977)
(citing Shapolsky v. Shapolsky, 279 N.Y.S.2d 747, 751 (Sup. Ct.
1996), aff'd, 282 N.Y.S.2d 163 (App. Div. 1967)).  However,
"where the injury to the shareholder results from a violation of
a duty owing to the shareholder from the wrongdoer, having its
origin in circumstances independent of and extrinsic to the
corporate entity, the shareholder has a personal right of action

17

against the wrongdoer." Fifty States, 396 N.Y.S.2d at 927
(citing Shapolsky, 279 N.Y.S.2d at 751).  Thus, as the Court
found previously, Henneberry will have standing to assert his
New York state law claims only where his injuries resulted from
the violation of an independent duty or duties owed to him by
SCOA. See Henneberry II, 415 F. Supp. 2d at 437-40.

III. Plaintiff's Six Causes of Action

As noted above, plaintiff seeks leave to amend his
complaint this third time in order to assert the following six
claims:  (1) detrimental reliance on the grounds of promissory
estoppel; (2) negligent misrepresentation; (3) fraudulent
misrepresentation; (4) defamation (slander per se); (5) tortious
interference with prospective economic advantage; and (6) breach
of fiduciary duty.  The legal standards governing these causes
of action along with the Court's analysis of the claims follow.[4]

A.   Promissory Estoppel

1.   Plaintiff's Standing to Plead Promissory Estoppel

Again, Henneberry has standing to maintain his promissory
estoppel claim against defendants to the extent he adequately

---

[4] The Court has applied New York state's substantive law in its prior two
Orders in this matter, and will continue to apply it on this motion, as a
court is not required to conduct a choice of law analysis *sua sponte*, and
instead may apply the state law assumed by the parties in their papers. See
Lehman v. Dow Jones & Co., 783 F.2d 285, 294 (2d Cir. 1986) (Friendly, J.)
(declining to determine whether there was a difference between the
substantive law of New York and California, and instead applying New York
law, where the parties solely cited New York case law); Deep S. Pepsi-Cola
Bottling Co., Inc. v. Pepsico, Inc., No. 88 Civ. 6243, 1989 WL 48400, at *12
n.3 (S.D.N.Y. May 2, 1989) (Leisure, J.).

18



pleads injuries resulting from "the violation of a duty owing to
. . . [him] from the wrongdoer, having its origin in
circumstances independent of and extrinsic to the corporate
entity." New Castle Siding Co. v. Wolfson, 468 N.Y.S.2d 20, 21
(App. Div. 1983).  Here, Henneberry makes two allegations that
arguably imply an independent duty to him:  (1) Graustein told
Henneberry that Henneberry and other Smartix employees should
make a $100,000 bridge loan to Smartix (Third Am. Compl. ¶ 129);
and (2) Henneberry should advance additional loans to Smartix to
cover operating expenses while SCOA was obtaining additional
investment (Third Am. Compl. ¶ 138).  These allegations of a
personal inducement by SCOA to Henneberry, and his detrimental
reliance thereon, may be read to imply the existence and breach
of an independent duty running between SCOA and Henneberry.

As in its prior decision, the Court's determination turns
on the fact that the statements are claimed to have been made to
plaintiff *personally*, and not to *all* Smartix shareholders, thus
raising the inference that a separate "wrong" injured plaintiff.
See, e.g., EJS-Assoc Ticaret Ve Danismanlik Ltd. Sti. v. Am.
Tel. & Tel. Co., No. 92 Civ. 3038, 1993 WL 546675, at *3
(S.D.N.Y. Dec. 30, 1993) (Sotomayor, J.) (declining to find an
independent duty owed to plaintiffs where they made no "claim
that . . . [defendant] made any statements to them *personally*
upon which they relied, or did anything to cause them to change

19

their position in any way" (emphasis added)); <u>Koal Indus. Corp.</u>
<u>v. Asland, S.A.</u>, 808 F. Supp. 1143, 1163-64 (S.D.N.Y. 1992)
(requiring plaintiff's injury to arise out of a relationship
with defendant separate and apart from plaintiff's relationship
with defendant as a shareholder).  Consequently, the Court again
finds that Henneberry maintains standing to assert his
promissory estoppel claim.

2.   <u>Promissory Estoppel Standards</u>

A claim for promissory estoppel under New York law requires
a party to demonstrate that (1) a speaker made a clear and
unambiguous promise; (2) it was reasonable and foreseeable for
the party to whom the promise was made to rely upon the promise;
and (3) the person to whom the promise was made relied on the
promise to his or her detriment. <u>Esquire Radio & Elecs., Inc. v.</u>
<u>Montgomery Ward & Co., Inc.</u>, 804 F.2d 787, 793 (2d Cir. 1986).

As this Court has stated in <u>Henneberry II</u>, absent a
distinct communication to be bound, a statement by one party to
another that evinces the speaker's desire to consummate or
further a commercial transaction does not generally constitute a
clear and unambiguous promise. 415 F. Supp. 2d at 444.
Statements such as "'we're partners'" and "'we look forward to
growing together,'" when made by experienced negotiators in the
course of a collective bargaining agreement negotiation, are not
clear and unambiguous promises to renew the subject agreement.

20

<u>Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates, &</u>
<u>Pilots</u>, 636 F. Supp. 384, 391 (S.D.N.Y. 1986) (Weinfeld, J.);
<u>see</u> <u>also</u> <u>Media Sport & Arts s.r.l. v. Kinney Shoe Corp.</u>, No. 95
Civ. 3901, 1997 WL 473968, at *13 (S.D.N.Y. Aug. 20, 1997)
(Leisure, J.) (finding defendant's statements that "'FIBA may
proceed to act on the enclosed offer without limitation'" and
"'FL and FIBA are going to make a great team'" were not clear
and unambiguous promises); <u>Cohen v. Lehman Brothers Bank</u>, 273 F.
Supp. 2d 524, 529-30 (S.D.N.Y. 2003) (holding defendant's
statement that "'she would work through' the issues raised by
plaintiffs about the deal" prior to execution of a loan mortgage
agreement could not be construed as a clear and unambiguous
promise (citing <u>Media Sport & Arts s.r.l.</u>, 1997 WL 473968, at
*13)).  On the other hand, a situation where "defendant made
repeated promises to the plaintiff that the defendant would
purchase all of the plaintiff's spare parts inventory and had
urged the plaintiff to increase its inventory because it had the
defendant's promise" was found to constitute a clear and
unequivocal promise. <u>Artco, Inc. v. Kidde, Inc.</u>, No. 88 Civ.
5734, 1993 WL 962596 (S.D.N.Y. Dec. 28, 1993) (citing <u>Esquire</u>
<u>Radio</u>, 804 F.2d at 793).  Consequently determination of whether
a promise is clear and unambiguous requires consideration of
"specific factual circumstances." <u>U.S. West Financial Services,</u>
<u>Inc. v. Tollman</u>, 786 F. Supp. 333, 343 (S.D.N.Y. 1992).

21

To meet the second element, a plaintiff must demonstrate that the actions it took in reliance on a defendant's promise were "unequivocally referable" to the alleged promise.  Ripple's of Clearview, Inc. v. Le Havre Assocs., 452 N.Y.S.2d 447, 449 (App. Div. 1982) (citing Woolley v. Stewart, 118 N.E. 847, 848 (N.Y. 1918)).  A plaintiff fails to demonstrate that its actions were "unequivocally referable" to the promise where they instead may be attributable to the performance of that plaintiff's normal business operations. Id.  The third and last element requires the plaintiff to have relied on the promise to his or her detriment, thus resulting in damages.  See Silver v. Mohasco Corp., 462 N.Y.S.2d 917, 920 (App. Div. 1983) ("For promissory estoppel to apply herein there must have been pleaded by plaintiff an injury stemming from his reliance upon a clear and unambiguous promise by Mohasco . . . ."), aff'd, 465 N.E.2d 361 (N.Y. 1984); see also Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000) (citing Silver).

  3.   Promissory Estoppel Standards as Applied to Plaintiff's Allegations

     i.  Defendants' Promise to Make the $3-5MM Investment

In Henneberry II, this Court found that Henneberry had established a viable claim for detrimental reliance based on promissory estoppel as to his $100,000 bridge loan to Smartix.

22

Henneberry continues this cause of action on the same grounds here. (Third Am. Compl. ¶¶ 60-61, 129.)  Plaintiff alleges that, as a result of SCOA's promise in Spring 2002 to make a $3-5MM Investment in Smartix, he made the $100,000 bridge loan to Smartix, which he could not recoup because SCOA never made the $3-5MM Investment.  However, SCOA now argues that in his Third Amended Complaint, Henneberry has "fatally undermine[d] his promissory estoppel claim." (Def.'s Mem. Opp. Amend at 2.)  SCOA makes this claim as it relates to the first element of the promissory estoppel analysis:  whether a clear and unambiguous promise was made. See Esquire Radio, 804 F.2d at 793.

In both of its prior Orders, the Court held that plaintiff satisfied the first element of his promissory estoppel claim by alleging a clear and unambiguous promise:  SCOA's commitment to plaintiff to make the $3-5MM Investment. Henneberry II, 415 F. Supp. 2d at 445; Henneberry I, 2005 WL 991772, at *8.  Here, however, SCOA claims that, because information about the bridge loan made by Henneberry was included in the due diligence package Smartix provided to SCOA, "any statement about SCOA's 'commitment' that were made before completion of due diligence were necessarily tentative and conditional." (Def.'s Mem. Opp. Amend at 3.)  SCOA claims that due diligence must necessarily "take place *before* the person performing it is committed to the proposed transaction. (Id. (emphasis in original).)  It thus

23

believes that there was no clear and unambiguous promise between SCOA and Henneberry on which Henneberry could have relied in making his $100,000 bridge loan to Smartix.

Henneberry's Third Amended Complaint, however, points to specific statements made to him by Graustein prior to Henneberry making the bridge loan. (Third Am. Compl. ¶ 129.)  Henneberry claims that he went to Graustein to request bridge funding to ensure that Smartix could continue to operate until the time the $3-5MM Investment was disbursed by SCOA. (Third Am. Compl. ¶ 128.)  In response to that request, Graustein "promised Mr. Henneberry that the [$3-5MM Investment] was going to close," and recommended that "Mr. Henneberry, and perhaps other individuals within Smartix, should provide the bridge loan themselves." (Third Am. Compl. ¶ 129.)  Henneberry further claims that he then "informed Mr. Graustein that he was going to make at least a $100,000 bridge loan based upon Mr. Graustein's promises." (Third Am. Compl. ¶ 130.)

SCOA's argument is not without merit, as it seems reasonable that experienced businessmen would understand that a commitment to invest such a large sum of money would not be final before completion of due diligence by the investor. However, given the context of the promise Henneberry refers to in his Third Amended Complaint, Graustein made a promise to Henneberry that SCOA would be making the $3-5M Investment in

24

Smartix. See, e.g., Esquire Radio, 804 F.2d at 793 (holding that statements admonishing a worried plaintiff not to worry about the size of plaintiff's inventory because "[w]e will buy the parts" were "specific, clear and unambiguous statements" sufficient to survive summary judgment); Cyberchron Corp. v. Calldata Systems Development, Inc., 47 F.3d 39, 45 (2d Cir. 1995) (a clear and unambiguous promise existed where defendant was "exerting pressure on [plaintiff] to produce the units at great expense, and then abruptly terminating the transaction").

The question, then, is whether it was reasonable and foreseeable for Henneberry to have relied on that promise.  At this stage of the proceeding the Court must only determine whether plaintiff has stated a claim which he should be allowed to support factually.  It is certainly reasonable that Henneberry could present evidence that he relied on Graustein's promise that the deal would close when that statement was made in the context of the bridge loan.  Thus, taking all allegations as true, and resolving all ambiguity in favor of the plaintiff, Pits, Ltd., 911 F. Supp. at 713 (citations omitted)), and because this claim is not "plainly defective," Valdan Sportswear, 591 F. Supp. at 1190 (citations omitted), the Court cannot find that Henneberry was unreasonable in relying on Graustein's statement.  Moreover, for the same reasons it found in Henneberry II, the Court also finds Henneberry meets the

25

foreseeability aspect of this element,[5] and that he also shows sufficiently at this stage of the proceedings that he relied to his detriment on the promise.[6]  Thus, Henneberry's claim of promissory estoppel as to defendants' alleged promise to make the $3-5MM Investment survives.

     ii.  Defendants' Continuing Representations

                    Regarding Third-Party Investor Union Square

The Court held in Henneberry I that SCOA's representations that it "had located investors interested in investing in Smartix" were neither clear nor ambiguous promises to obtain investors. 2005 WL 991772, at *9.  Instead, the Court held as a matter of law that the claim was facially deficient because, at most, the statements "constituted representations that SCOA had already contacted interested investors." Id.  In Henneberry II, Henneberry attempted to remedy his pleadings by claiming that SCOA's purported representations to plaintiff that SCOA had

---

[5] See Henneberry II, 415 F. Supp. 2d at 445.  As in Henneberry II, Henneberry here alleges that he expressly told Graustein that he would make "at least" a $100,000 loan to Smartix based on Graustein's promises that the $3-5MM Investment would close. (Third Am. Compl. ¶ 130.)  Henneberry further alleges that he then made the $100,000 bridge loan to Smartix. (Third Am. Compl. ¶ 131.)  As in the prior Order, the latter communication between plaintiff and Graustein satisfies the foreseeability element because, if accepted as true as the Court must at this stage in the proceedings, Graustein -- and, by extension, SCOA -- were put on notice by plaintiff that the loan would be made.  Because his action was directly related to SCOA's promise, see Ripple's of Clearview, Inc., 452 N.Y.S.2d at 449 (citing Woolley, 118 N.E. at 848), the foreseeability of the loan being made is properly alleged.
[6] See Henneberry II, 415 F. Supp. 2d at 445-46.  Again, as in Henneberry II, Henneberry alleges adequately that his detrimental reliance -- the provision of the bridge loan to Smartix -- was made before Graustein's oral revocation on June 4, 2002 of the promise that the $3-5MM Investment would close. (Third Am. Compl. ¶¶ 131, 66.)  Consequently, Henneberry has pleaded sufficiently his detrimental reliance on defendants' promise.

identified "ready" and/or "willing" investors, rather than mere

"interested" investors, transformed the previously deficient

claim into a viable one. 415 F. Supp. 2d at 446.  The Court

found that it did not, and that Henneberry had failed to make

any allegation that amounted to a preceding *promise* made by SCOA

to Henneberry to locate such investors. Id.

Now, in his Third Amended Complaint, Henneberry again

changes his assertions.  He claims that SCOA repeatedly promised

him that one particular investor would invest $1 million in

Smartix. (Third Am. Compl. ¶¶ 134, 136, 139, 142, 144, 149, 152,

155.)  The investor at issue -- Union Square Partners ("Union

Square") -- was located by Frank, who claimed he had a close

relationship with Union Square. (Third Am. Compl. ¶ 135.)

Moreover, Henneberry claims that each of the four additional

bridge loans he made to Smartix -- one each in the amount of

$47,500, $52,500, $50,000, and $150,000 -- was made in reliance

on these promises by SCOA, and after discussion with SCOA.

(Third Am. Compl. ¶¶ 140-41, 149, 153, 155-56.)  Plaintiff

alleges that he has been unable to recoup any of these four

additional loans made to Smartix. (Third Am. Compl. ¶ 166.)

SCOA argues that, while Henneberry has finally introduced

alleged "promises" into his Complaint, there is no indication

that SCOA was in a position to make such promises.  That is,

SCOA claims that the promises referred to in the Third Amended

27

Complaint are conclusory, and that Henneberry is alleging that
he relied on "SCOA's prediction of what would happen in the
future, i.e., that Union Square would invest." (Def.'s Mem. Opp.
Amend at 4.)  It bases this claim on the fact that Henneberry
has alleged no fact in the Third Amended Complaint that SCOA
actually had any control over Union Square, and thus could not
have made promises regarding that company's actions.

First, given the information available to the Court at this
time, the four "promises" at issue here were clear and
unambiguous promises.  In each case, according to Henneberry,
Frank and/or Graustein unequivocally "promised" Henneberry that
the investment would close. (Third Am. Compl. ¶¶ 134, 136, 139,
142, 144, 149, 152, 155.)  SCOA's claim that there are no
allegations that SCOA had control over Union Square does raise
an important question, which the Court certainly considers, and
which will no doubt be at issue on a motion for summary judgment
or at trial.  However Henneberry alleges a statement by Frank
that, "because of his close relationship with Union Square, he
was privy to 'inside' information that the investment was going
to close." (Third Am. Compl. ¶ 139.)  In addition, Frank was to
receive a commission for finding the investment.

The allegations as currently set forth certainly differ
from allegations of SCOA's representations of intention to
locate ready and willing investors, as was alleged in Henneberry

28

II. (See Def.'s Opp. Amend at 4.)  Henneberry here states that

Frank and Graustein clearly promised him multiple times that

this specific investment would close.  Given Frank's alleged

relationship with Union Square, and because such statements were

made in the context of Henneberry advancing personal loans to

Smartix, they are more than simply "SCOA's prediction of what

would happen in the future." (Def.'s Opp. Amend at 4.)  As has

been previously mentioned, all Henneberry must do at this stage

of the proceeding is show the Court that he has stated a claim

which he should be allowed to support factually.  The Court thus

holds that the statements by SCOA to Henneberry meet the first

element of his promissory estoppel claim.

Still, the Court must consider whether Henneberry's

reliance on those promises was reasonable and foreseeable.

According to the allegations in the Third Amended Complaint,

SCOA represented to Henneberry that it had information about

Union Square's intention to invest prior to each of the bridge

loans Henneberry advanced to Smartix. (Third Am. Compl. ¶¶ 135-

36, 146-47, 150-52, 154-55.)  The Third Amended Complaint also

alleges that SCOA recommended to Henneberry that he "provide

additional personal loans while SCOA closed the Union Square

investment." (Third Am. Compl. ¶ 139.)  And finally, prior to

each of the loans Henneberry made to Smartix, he informed SCOA

of his intention to make those loans, and that he was doing so

29

based upon the promised closing of the Union Square investment.
(Third Am. Compl. ¶¶ 140-41, 149, 153, 155-56.)

SCOA certainly raises important questions about the
relationship between SCOA and Union Square, which presents a
factual question as to whether SCOA did, in fact, control Union
Square as Henneberry seems to have believed.  However, given the
context of the alleged promises and making all inferences in
favor of the plaintiff, it is reasonable that Henneberry
believed SCOA had control over Union Square such that the
promises by Frank and Graustein could be relied upon.  Moreover,
if accepted as true, the communications Henneberry had with
Frank and Graustein shows that SCOA was put on notice by
Henneberry that he would be making the loans.  His action was
directly related to SCOA's promise, see Ripple's of Clearview,
Inc., 452 N.Y.S.2d at 449 (citing Woolley, 118 N.E. at 848), and
thus the foreseeability of those loans is also properly alleged.

The final element of promissory estoppel is that Henneberry
adequately allege his detrimental reliance, namely the provision
of the bridge loans to Smartix.  Each of those loans was made
prior to Henneberry being informed that the Union Square
investment would not close. (Third Am. Compl. ¶ 157.)
Consequently, Henneberry has pleaded sufficiently his
detrimental reliance on defendants' promise.

Thus, Henneberry's request for leave to amend his complaint

30

as to his claims of detrimental reliance on the grounds of
promissory estoppel is granted.

    B.    <u>Negligent Misrepresentation</u>

        1.    <u>Plaintiff's Standing to Plead Negligent
Misrepresentation</u>

As with his promissory estoppel claim, Henneberry here
alleges statements made to him directly.  Specifically, He
claims that Graustein specifically encouraged him to make
personal loans to Smartix in anticipation of various other
financing, and that Graustein "asserted that Mr. Henneberry's
having 'skin in the game' would be looked upon favorably by SCOA
in connection with SCOA's promised future investments," (Third
Am. Compl. ¶ 172), both of which caused Henneberry to change his
position individually, rather than in his capacity as a Smartix
shareholder.  Because these changes in position were made to
Henneberry's detriment, he has standing to bring this claim.
<u>See</u> <u>EJS-ASSOC</u>, 1993 WL 546675, at *2.

        2.    <u>Negligent Misrepresentation Standards</u>

Under New York law, a claim for negligent misrepresentation
lies where

> (1) the defendant had a duty, as a result of a special
> relationship, to give correct information; (2) the
> defendant made a false representation that he or she
> should have known was incorrect; (3) the information

supplied in the representation was known by the

defendant to be desired by the plaintiff for a serious

purpose; (4) the plaintiff intended to rely and act

upon it; and (5) the plaintiff reasonably relied on it

to his or her detriment.[7]

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20

(2d Cir. 2000) (citing King v. Crossland Sav. Bank, 111 F.3d

251, 257-58 (2d Cir. 1997)).

The first element of this claim requires the existence of a

special relationship between the parties. See, e.g.,

Accusystems, Inc. v. Honeywell Info. Sys., Inc., 580 F. Supp.

474, 480 (S.D.N.Y. 1984) ("New York courts do not recognize a

cause of action for negligent misrepresentation in the absence

of some special relationship of trust or confidence between the

parties." (citations omitted)); Coolite Corp. v. Am. Cyanamid

Co., 384 N.Y.S.2d 808, 811 (App. Div. 1976) ("[W]hile generally

there is no liability for words negligently spoken, there is an

---

[7] The New York Court of Appeals has quoted its prior decision in International
Products Co. v. Erie R.R. Co., 155 N.E. 662, 664 (N.Y. 1927)), to hold that a
claim for negligent misrepresentation lies where a speaker knows that the
representation he or she makes

"is desired for a serious purpose; that he to whom it is given
intends to rely and act upon it; that if false or erroneous he
will because of it be injured in person or property.  Finally the
relationship of the parties, arising out of contract or
otherwise, must be such that in morals and good conscience the
one has the right to rely upon the other for information, and the
other giving the information owes a duty to give it with care."

Heard v. City of N.Y., 623 N.E.2d 541, 545 (N.Y. 1993) (quoting Int'l
Prods. Co. v. Erie R.R. Co., 155 N.E. 662, 664 (N.Y. 1927)); Pappas v.
Harrow Stores, Inc., 528 N.Y.S.2d 404, 407 (App. Div. 1988).  This
definition does not address defendants' mental state -- i.e., that
defendants "should have known" the statement was incorrect.

exception when the parties' relationship suggests a closer

degree of trust and reliance than that of the ordinary buyer and

seller." (citing Dorsey Prods. Corp. v. U.S. Rubber Co., 251

N.Y.S.2d 311, 313 (App. Div. 1964), aff'd, 212 N.E.2d 435 (N.Y.

1965))).  It is from this special relationship that an

independent duty to speak with care arises. Kimmell v. Schaefer,

675 N.E.2d 450, 454 (N.Y. 1996).  The determination whether such

a duty exists is an issue of law for the courts, and "once the

nature of the duty has been determined as a matter of law,

whether a particular defendant owes a duty to a particular

plaintiff is a question of fact."  Id. at 453.

    Generally, "liability for negligent misrepresentation has

been imposed only on those persons who possess unique or

specialized expertise, or who are in a special position of

confidence and trust with the injured party such that reliance

on the negligent misrepresentation is justified." Id. at 454;

see Murphy v. Kuhn, 682 N.E.2d 972, 974 (N.Y. 1997) (quoting

Kimmell, 675 N.E.2d at 454).  Thus, certain professionals, by

reason of their educational training and specialized skill,

often have such a duty imposed upon them. Kimmell, 675 N.E.2d at

454 (citing cases in which liability for negligent

misrepresentation was assessed on engineering consultants,

accountants, and public weighers for not speaking with care).

Additionally, the duty may arise in instances where, absent a

33

particular professional relationship giving rise to the duty,
such as an attorney-client relationship, there exists between
the parties "some identifiable source of a special duty of
care." Id.  In assessing whether this special duty of care still
exists, a court considers "whether the person making the
representation held or appeared to hold unique or special
expertise; whether a special relationship of trust or confidence
existed between the parties; and whether the speaker was aware
of the use to which the information would be put and supplied it
for that purpose." Id.

Courts have routinely held that an arms-length commercial
transaction, without more, does not give rise to a special duty
to speak with care. See EED Holdings v. Palmer Johnson
Acquisition Corp., 387 F. Supp. 2d 265, 281 (S.D.N.Y. 2004)
(citing Kimmell, 675 N.E.2d at 454).  This rule prevents
otherwise "'casual statements and contacts'" made in the
commercial workplace from being actionable. Eternity Global
Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d
168, 187 (2d Cir. 2004) (quoting Kimmell, 675 N.E.2d at 454).
Moreover, any alleged misrepresentation must be made with
respect to an existing fact, as opposed to a representation
concerning future conduct. Hydro Investors, 227 F.3d at 20-21
(citations omitted)).  As a consequence, statements of puffery,
or those concerning future expectations, are insulated from

34

liability. <u>Sheth v. N.Y. Life Ins. Co.</u>, 709 N.Y.S.2d 74, 75

(App. Div. 2000).

It is also important to note that allegations in support of

a negligent misrepresentation claim must be pleaded with

particularity pursuant to Federal Rule of Civil Procedure 9(b).

<u>See</u> <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.</u>, 404 F.3d

566, 578-79, 583 (2d Cir. 2005).  Rule 9(b)'s pleading

requirement requires that "[i]n averments of fraud or mistake,

the circumstances constituting fraud or mistake shall be stated

with particularity.  Malice, intent, knowledge, and other

condition of mind of a person may be averred generally." Fed. R.

Civ. P. 9(b).  The rule thus obligates a plaintiff to "'(1)

detail the statements (or omissions) that the plaintiff contends

are fraudulent, (2) identify the speaker, (3) state where and

when the statements (or omissions) were made, and (4) explain

why the statements (or omissions) are fraudulent.'"[8] <u>Eternity</u>

<u>Global Master Fund Ltd.</u>, 375 F.3d at 187 (quoting <u>Harsco Corp.</u>

<u>v. Segui</u>, 91 F.3d 337, 347 (2d Cir. 1996)). While "Rule 9(b) is

rigorously enforced in this circuit," <u>Branch v. Tower Air, Inc.</u>,

No. 94 Civ. 6625, 1995 WL 649935, at *4 (S.D.N.Y. Nov. 3, 1995)

---

[8] The Court notes that defendants have not waived their Rule 9(b) objection
because the Court is not evaluating a responsive pleading from defendants;
the Court is only dealing with defendants' memoranda in opposition. <u>See</u>
<u>Henneberry II</u>, 415 F.3d at 454 n.19 (reiterating the well-settled law that to
waive a Rule 9(b) objection, such objection must be raised in a defendant's
answer, or in a motion to dismiss if filed in lieu of an answer) (citing
<u>Todaro v. Orbit Int'l Travel, Ltd.</u>, 755 F. Supp. 1229, 1234 (S.D.N.Y. 1991)
(Leisure, J.)).

(Keenan, J.), the Court is also mindful that "courts in this
circuit and others have repeatedly emphasized that Rule 9(b)
must be read in harmony with the principles established by Rule
8(a)," In re Initial Pub. Offering Secs. Litig., 241 F. Supp. 2d
281, 326 (S.D.N.Y. 2003); see also Felton v. Walston & Co., 508
F.2d 577, 581 (2d Cir. 1974) ("[I]n applying rule 9(b) we must
not lose sight of the fact that it must be reconciled with rule
8[,] which requires a short and concise statement of claims.").

      2.   Negligent Misrepresentation Standards as Applied
to Plaintiff's Allegations

      i.   Duty Arising from a Special Relationship

The Court finds that for the same reasons he has standing
to assert this claim, Henneberry also has adequately pleaded
circumstances establishing a relationship between the parties
that justified his reliance on defendants' alleged
misrepresentations.  Specifically, he has pleaded that Graustein
conversed with him on different occasions in an individual
capacity in order to induce him to make personal loans to
Smartix. (See, e.g., Third Am. Compl. ¶¶ 170-73, 175-79.)  In
some of those conversations, Graustein misrepresented to
Henneberry the existence of outside investors and SCOA's
intentions to make further investments in Smartix (Third Am.
Compl. ¶¶ 170, 176, 183), the knowledge of which was exclusively
held by Graustein and SCOA (Third Am. Compl. ¶ 194).  As the

Second Circuit has noted, "[t]he New York Court of Appeals has observed that a relationship sufficiently special to justify reliance (and a subsequent action for negligent misrepresentation) may arise when a person 'wholly without knowledge seek[s] assurances from one with exclusive knowledge.'" Eternity Global Master Fund Ltd., 375 F.3d at 189 (quoting Heard, 623 N.E.2d at 546 (N.Y. 1993)).  Henneberry's allegations paint a picture in which SCOA perhaps failed to be fully candid with him concerning their intentions of making additional investments, as well as their dealings with Union Square. (Third Am. Compl. ¶¶ 136-37.)  SCOA allegedly had exclusive knowledge of these topics (Third Am. Compl. ¶ 194), and, consequently, Henneberry relied on its representations.

Thus, as the Court held in Henneberry II, plaintiff's allegations concerning his trust and confidence in defendants, as well as those regarding defendants' awareness of the use to which the information would be put were personal to plaintiff. Henneberry II, 415 F.3d at 452-53.  Because the question whether a special relationship between two parties justifies one's reliance on the other's representations "generally raises an issue of fact," Kimmell, 675 N.E.2d at 454; see also Century Pac., Inc. v. Hilton Hotels Corp., No. 03 Civ. 8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) ("Courts in this circuit have held that a determination of whether a special relationship

37

exists is highly fact-specific and 'generally not susceptible to resolution at the pleadings stage.'" (quoting <u>Nasik Breeding & Research Farm Ltd. v. Merck & Co.</u>, 165 F. Supp. 2d 514, 536 (S.D.N.Y. 2001))), the Court finds that this element of the claim is met.

ii.  <u>Defendants' Allegedly False Representations</u>

The second element of a negligent misrepresentation claim requires a plaintiff to demonstrate that a defendant made a false representation that he knew or should have known was incorrect.  The representation must be factual, as opposed to promissory. <u>U S W. Fin. Servs., Inc. v. Tollman</u>, 786 F. Supp. 333, 344 (S.D.N.Y. 1992) ("No action for negligent misrepresentation lies where the alleged misrepresentation is promissory rather than factual." (citations omitted)).  In <u>U S W. Fin. Servs.</u>, plaintiff's allegation that defendant's senior officer told its representative that defendant "unequivocally agreed" to lend over $15,000,000 to plaintiffs, with a closing by a certain date and other pertinent details, was found to be promissory. <u>Id.</u> at 335-36.  Similarly, in <u>Hydro Investors</u>, a prediction of a hydroelectric plant's energy output performance, which, in hindsight, was alleged to be overly optimistic, 227 F.3d at 12-13, was held to be a promise of future profit rather than a representation of existing fact, <u>id.</u> at 21.

Here, the Third Amended Complaint alleges that defendants

38

made the following misrepresentations[9]:  (1) SCOA's promise in

Spring 2002 to make the $3-5MM Investment; (2) SCOA's promise

that the Union Square investment would close; (3) SCOA's

continuing promises, from July 2002 through September 2003, that

it "was actively searching for, and in contact with, investors

who were ready to invest in Smartix"; (4) SCOA's representations

in September 2003 that it "had investors 'waiting on the

sidelines' to invest in Smartix upon the re-signing of the Red

Sox"; (5) SCOA's repeated promises, from July 2002 through

October 2003, that it "would be willing" to make additional

investments in Smartix "should the need arise," including

Graustein's representation that SCOA would "look favorably" upon

investing additional monies in Smartix if plaintiff himself made

additional loans to Smartix.  The first, second, and fifth

statements fail to support a claim of negligent

misrepresentation as a matter of law because they solely speak

to future conduct:  SCOA's promise of an initial investment *in

the future*, that an investment "would close," and repeated

statements that, should the need arise, it "would be willing" to

make additional investments *in the future*.  Moreover, any

---

[9] Plaintiff does not clearly state anywhere exactly which of the allegations
in the Third Amended Complaint are actually the specific misrepresentations
it believes were made negligently.  However, for purposes of its analysis,
the Court has collected the allegations into these five categories.  The
Court notes that this failure to specifically list those alleged
misrepresentations is arguably a violation of Rule 9(b), however, because it
was able to discern these five categories the Court will proceed with its
analysis.

assertions related to the claim in the third statement that SOCA

"was actively searching for" investors similarly fail as a

matter of law.   Precedent establishes clearly that the promise

of a future investment is facially deficient. See, e.g., U S W.

Fin. Servs., 786 F. Supp. at 344.

In reviewing the remainder of the third allegation, the

Court notes that this portion of that allegation -- that SCOA

had been "in contact with" investors who were willing to invest

in Smartix -- could arguably also be considered promissory in

nature, as it refers to investments that had not yet occurred.

However, reading the pleadings liberally, the Court will allow

this portion of the allegation to survive this first hurdle, and

finds that it was factual in nature, rather than promissory.

Similarly, the Court believes that the fourth allegation --

plaintiff's claim that SCOA had investors "waiting on the

sidelines" for after the Red Sox re-signed -- is arguably

promissory as well, as the investments were completely

conditional on the re-signing of the Red Sox.   But, again, the

Court will read the pleadings liberally, and take into account

the claim that the investors had already been found.

The Court thus turns to an analysis of whether these

remaining allegations adequately plead that SCOA knew or should

have known the misrepresentations were incorrect. See Hydro

Investors, 227 F.3d at 20.   Under Rule 9(b), to meet this

element of a negligent misrepresentation claim, Henneberry must
specifically plead facts that "'give rise to a strong inference'
that the defendants had an intent to defraud, knowledge of the
falsity, or a reckless disregard for the truth." Connecticut
Nat. Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987)
(quoting Ross v. A.H. Robbins Co., 607 F.2d 545, 555-58 (2d Cir.
1979), cert. denied, 446 U.S. 946 (1980)); see also Eternity
Global Master Fund Ltd., 375 F.3d at 187.  The more relaxed
specificity requirement for state of mind under Rule 9(b) do not
provide a "license to base claims of fraud on speculation and
conclusory allegations." Wexner v. First Manhattan Co., 902 F.2d
169, 172 (2d Cir. 1990).  Thus, the Second Circuit has held that
"[t]he requisite 'strong inference' of fraud may be established
either (a) by alleging facts to show that defendants had both
motive and opportunity to commit fraud, or (b) by alleging facts
that constitute strong circumstantial evidence of conscious
misbehavior or recklessness." Acito v. IMCERA Group, Inc., 47
F.3d 47, 52 (2d Cir. 1995) (citations omitted).

     First, though Henneberry sets forth allegations that SCOA
told him that it had been "in contact with" third-party
investors (see, e.g., Third Am. Compl. ¶¶ 169-70), Henneberry
provides absolutely no support for his wholly conclusory
allegations that those statements were "incorrect or should have
been known by them to be incorrect" (Third Am. Compl. ¶¶ 199).

                              41

Henneberry does not, for example, allege that he learned from a
SCOA employee or through other channels after the fact that
third-party investors had never been contacted by SCOA.  Indeed,
the Third Amended Complaint provides examples of instances in
which SCOA had, in fact, been "in contact with investors who
were ready to invest." (See Third Am. Compl. ¶¶ 146-47, 170;
Pl.'s Mem. Req. Amend at 9 ("SCOA would continually write to
Henneberry concerning its efforts in locating new investors, and
would speak to him almost daily on the topic).)  Henenberry even
notes that SCOA informed a third party -- John Morisano of
Alltrue, an investment brokerage firm -- that it had been
working with Union Square to close that deal. (Third Am. Compl.
¶¶ 146-47.)  Having failed to show motive and opportunity to
commit fraud or strong circumstantial evidence of conscious
misbehavior or recklessness, see Acito, 47 F.3d at 52,
Henneberry has, in no way, provided the Court with a strong
inference that SCOA knew or should have known that its
statements to Henneberry that it had been "in contact with" new
investors were false.[10]

Henneberry also attempts to provide some specific factual
allegations to explain why SCOA knew or should have known that
its statements regarding the existence of investors who would

---

[10] The Court does note that SCOA was under no obligation to actually find
outside investors for Smartix, and any of the allegations in the Third
Amended Complaint that involve promises by SCOA to speak with outside
investors are simply promissory statements.

invest in Smartix after the Red Sox were re-signed were fraudulent, as required by Rule 9(b). See Eternity Global Master Fund Ltd., 375 F.3d at 187. Specifically, Henneberry makes three claims he believes provide a strong inference of SCOA's intent to defraud: (1) that SCOA would not inform Henneberry of the identity of the investor(s); (2) that SCOA requested that a third party -- Brad Berkowitz of Cramer Berkowitz, which was one of the initial private investors in Smartix (Third Am. Compl. ¶ 31) -- do the same; and (3) that Berkowitz informed him at Smartix's December 2003 Shareholder and Board of Director's meeting that "SCOA had never had investors who would have invested in Smartix upon the re-signing of the Red Sox." (Third Am. Compl. ¶ 193.) As has been noted, Henneberry could do so by showing motive and opportunity, or strong circumstantial evidence of conscious misbehavior or recklessness. See Acito, 47 F.3d at 52. He has shown neither.

Henneberry's claim regarding SCOA's secrecy about the identity of potential investors does not provide a strong inference that SCOA knew or should have known its statements to Henneberry about those investors were false. SCOA had no obligation to provide Henneberry with information about the investors with whom it was meeting. Its decision not to do so provides no inference at all that SCOA intended to defraud him.

Henneberry's stronger claim is that Berkowitz told him that

43

"SCOA never had any investors who would have invested in Smartix upon the re-signing of the Red Sox." (Third Am. Compl. ¶ 193.) Yet, Henneberry provides absolutely no indication that Berkowitz was in a position to have information about these supposed investors.  Moreover, Henneberry specifically contradicts his assertion that Berkowitz may have had such information when he alleges that "SCOA was the sole source of information for Henneberry concerning the investors with which SCOA was purportedly dealing." (Third Am. Compl. ¶ 194.)  Thus, what might be considered circumstantial evidence, when coupled with this internal inconsistency, hardly rises to the level of "strong circumstantial evidence of conscious misbehavior or recklessness." <u>Acito</u>, 47 F.3d at 52.  It certainly does not provide a strong inference that SCOA knew or should have known that its statements were false.

Because Henneberry has not adequately shown that SCOA knew or should have known that its representations to Henneberry were incorrect under Rule 9(b), The Court finds the deficiencies detailed above to be dispositive.  Thus the Court does not address the other elements of a negligent misrepresentation claim or Rule 9(b)'s other requirements.  In sum, plaintiff has failed to plead colorable claims of negligent misrepresentation.

44

C.   Fraudulent Misrepresentation

1.   Fraudulent Misrepresentation Standards

The essential elements of a claim of fraudulent misrepresentation under New York law include (1) representation of a material existing fact, (2) falsity, (3) *scienter,* (4) deception, and (5) injury. See New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 639 N.Y.S.2d 283, 289, (1995) (internal quotation marks omitted).  Thus, a plaintiff must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Manning v. Utilities Mut. Ins. Co., Inc., 254 F.3d 387, 400 (2d Cir. 2001) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 19 (2d Cir. 1996); Eternity Global Master Fund Ltd., 375 F.3d at 186-87 (quoting Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)).  Any alleged misrepresentation must be made with respect to an existing fact, as opposed to a representation concerning future conduct. Hydro Investors, 227 F.3d at 20-21 (citations omitted).  As a consequence, statements of puffery, or those concerning future expectations, are insulated from liability. Sheth, 709 N.Y.S.2d at 75.

Finally, the Court notes again that allegations of fraud

45

must be pleaded with particularity, pursuant to Rule 9(b).  As

noted above, the Rule requires that "[i]n averments of fraud or

mistake, the circumstances constituting fraud or mistake shall

be stated with particularity.  Malice, intent, knowledge, and

other condition of mind of a person may be averred generally."

Fed. R. Civ. P. 9(b).  The rule thus obligates a plaintiff to

"'(1) detail the statements (or omissions) that the plaintiff

contends are fraudulent, (2) identify the speaker, (3) state

where and when the statements (or omissions) were made, and (4)

explain why the statements (or omissions) are fraudulent.'"[11]

Eternity Global Master Fund Ltd., 375 F.3d at 187 (quoting

Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)).  Thus,

"conclusory allegations that [a party's] conduct was fraudulent

or deceptive are not enough." Decker v. Massey-Ferguson Ltd.,

681 F.2d 111, 114 (2d Cir. 1982).  Moreover, while a plaintiff

must aver the circumstances of the fraud with particularity, it

also must show that the defendant acted with fraudulent intent,

which showing must "'give rise to a strong inference' that the

defendants had an intent to defraud, knowledge of the falsity,

or a reckless disregard for the truth." Connecticut Nat. Bank,

808 F.2d at 962 (quoting A.H. Robbins Co., 607 F.2d at 555-58);

see also Eternity Global Master Fund Ltd., 375 F.3d at 187;

---

[11]  For the same reasons detailed above, defendants have not waived their Rule
9(b) objection as to the claim of fraudulent misrepresentation.

46

Cosmas, 886 F.2d at 11 (requiring plaintiff to "give particulars as to the respect in which plaintiff contends the statements were fraudulent").

        2.   Fraudulent Misrepresentation Standards as Applied to Plaintiff's Allegations

        i.   Representations of Material Existing Facts

    As is required by Rule 9(b), the Third Amended Complaint identifies five representations of material fact Henneberry believes support his claim: (1) SCOA's promise that "it was going to close on its promised investment of $3/5 million in June 2002"; (2) SCOA's promise that the $1 million Union Square investment would close; (3) that "SCOA was actively pursing its promise to obtain investment into Smartix from third parties"; (4) that "in or about September 2003, SCOA had investors 'waiting on the sidelines' to provide investment sufficient to allow Smartix to operate for the 2004 season, upon the re-signing of the Red Sox"; and (5) that "in or about October 2003, SCOA itself would provide an investment sufficient to allow Smartix to operate for the 2004 season." (Third Am. Compl. ¶ 211.)  Henneberry claims that these representations by SCOA were false (Third Am. Compl. ¶ 212), that Graustein and Frank knew them to be false at the time they were made (Third Am. Compl. ¶ 213), and that they made such statements "with the intent to deceive Henneberry and to induce him to make personal loans to

47

Smartix" (Third Am. Compl. ¶ 214).

As with a claim of negligent misrepresentation, the representations must be factual, as opposed to promises of future conduct. See Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) ("[S]tatements will not form the basis of a fraud claim when they are mere "puffery" or are opinions as to future events."); see also U S W. Fin. Servs., 786 F. Supp. at 344. Thus the facts alleged may not be representations concerning future conduct. Cohen, 25 F.3d at 1172 ("The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made."); see also Hydro Investors, 227 F.3d at 20-21 (citations omitted). Four of plaintiff's five alleged misrepresentations refer entirely to conduct expected to occur in the future. SCOA's alleged promise that the initial $3-5M Investment "was going to close," its alleged promise that the Union Square $1 million investment "would close," and any claims regarding SCOA's plans to invest in Smartix so that it could operate in the 2004 season are all clearly the promise of a future investment. As Henneberry has provided no factual allegations showing that SCOA did not intend to perform these promises at the time they were made, all of these allegations are facially deficient. See Cohen, 25 F.3d at 1172; U S W. Fin. Servs., 786 F. Supp. at 344. This eliminates the first, second,

48

and fifth representations as a matter of law.  Further,

Henneberry seems to be using clever language to attempt to

circumvent this requirement as to the third representation.  By

claiming SCOA "was actively pursuing its promise to obtain

investment" from third parties Henneberry gives the impression

that some activity was actually taking place, rather than

describing conduct expected to occur in the future.  However,

the representation is about SCOA's efforts to obtain investments

in the future, and thus this representation is promissory rather

than factual in nature, and it too fails as a matter of law.

Thus, the only representation remaining is Henneberry's

allegation that "SCOA had investors 'waiting on the sidelines'

to provide investment" should the Red Sox re-sign with Smartix.

As with the Court's analysis of the negligent misrepresentation

claim, this allegation is arguably promissory rather than

factual in nature, as it is conditional upon the re-signing of

the Red Sox.  However, again, the Court will read the pleadings

liberally and allow this allegation to survive this first step

in the analysis based on the portion of the claim that alleges

already existing investors. (Third Am. Compl. ¶ 211d.)  Rather

than addressing all of the remaining elements of Henneberry's

claim of fraud as to this representation, however, the Court

turns directly to the question of intent, as it is dispositive.

ii.   Intent to Defraud

As has been noted, Rule 9(b) requires that plaintiff must allege facts that "give rise to a strong inference" of intent to defraud. Eternity Global Master Fund Ltd., 375 F.3d at 187; Cosmas, 886 F.2d at 11 (requiring plaintiff to "give particulars as to the respect in which plaintiff contends the statements were fraudulent").  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito, 47 F.3d at 52 (citations omitted).  Henneberry has provided no new information to the Court other than a claim on information and belief that "SCOA failed to inform Mr. Henneberry of the entirety of its dealings with these purported investors so as to create a false impression of the purported investors' willingness to invest in Smartix." (Third Am. Compl. ¶ 215.)  As the Court discussed in Henneberry II, fraud may be pleaded on information and belief "when facts are peculiarly within the opposing party's knowledge" as is the case here. Henneberry II, 415 F.3d at 455 (quoting Wexner, 902 F.2d at 172).  However, even in the case where the fraud pleaded is completely within the opposing party's knowledge, a plaintiff still must provide a statement of facts upon which plaintiff's belief is founded, and

50

which supports a strong inference of fraud. Id.

The Court addressed Henneberry's factual allegations regarding this representation in great detail above, and for the same reasons the Third Amended Complaint failed to provide sufficient factual allegations to support a claim of negligent misrepresentation as to this representation, it here finds that plaintiff has also failed to show sufficient "strong inference" of intent to defraud.  Thus, Henneberry fails to plead colorable claims of fraudulent misrepresentation.

D.   Defamation (Slander Per Se)

Plaintiff's claim for defamation survived the prior motion to replead and to amend the complaint, and also survived SCOA's original motion to dismiss. See Henneberry II, 415 F. Supp. 2d at 464; Henneberry I, 2005 WL 991772, at *14-19.  Specifically, Henneberry alleged in both prior complaints that statements made by SCOA about him to MasterCard and to Dee constituted slander per se.  He here re-alleges that claim, with only minor changes made to the language in some of the allegations.  As Henneberry's claims have not changed, the Court again finds that plaintiff has pleaded adequately a claim for slander per se for those reasons set forth in Henneberry I. See 2005 WL 991772, at *19; see also Henneberry II, 415 F.3d at 465 ("The Court only writes to reinforce its prior holding by noting that plaintiff maintains standing to bring this claim because defendants are

51

alleged to have broken a duty owed to plaintiff separate and apart from any duties they owed to the corporation, *i.e.*, they defamed his personal business acumen, thus injuring him directly." (citing <u>Solutia Inc. v. FMC Corp.</u>, 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005)).

Moreover, SCOA again argues in its opposition papers that certain damages pleaded by plaintiff lack a causal connection to the alleged defamation (Def.'s Mem. Opp. Amend 18-19.)   The Court reiterates its holding from <u>Henneberry II</u>, in which it found that a plaintiff asserting a claim for slander per se is not required to plead special damages because they are assumed. <u>Henneberry II</u>, 415 F.3d at 465; <u>see also</u> <u>Henneberry I</u>, 2005 WL 991772, at *19 n.9.   Thus, the fact that plaintiff went beyond this pleading requirement and included specific damages that may or may not be recoverable will not prove fatal to Henneberry's claim here.   The Court reiterates, also, that Plaintiff is allowed to assess his damages through the discovery process. <u>Id.</u>

E.   <u>Tortious Interference with Prospective Economic</u>
     <u>Advantage</u>

    1.   <u>Plaintiff's Standing to Plead Tortious</u>
         <u>Interference with Prospective Economic Advantage</u>

As the Court determined in <u>Henneberry II</u>, Henneberry has standing to bring this claim because he has alleged clearly separate and distinct injuries from any injuries to Smartix, as

the alleged loss of future earnings from the named consulting projects are personal to him and not the class of Smartix shareholders as a whole. See, e.g., PI, Inc. v. Ogle, No. 95 Civ. 1723, 1997 WL 37941, at *4 (S.D.N.Y. Jan. 30, 1997) (holding that plaintiff does not maintain standing to claim tortious interference with prospective economic advantage where he did "not alleg[e] an injury distinct from the other shareholders, nor does he allege that . . . [wrongdoer] owed him a duty independent of its duty to all of the shareholders").

Henneberry re-alleges here that defendants' actions were conducted "as part of a plan to destroy the faith these organizations had in Henneberry and improperly to take control of Smartix." (Third Am. Compl. ¶ 102.)  The result of defendants' action was that MasterCard and Major League Baseball "have lost faith in Mr. Henneberry to the extent that Mr. Henneberry can no longer obtain a consultancy with those organizations despite his efforts to do so." (Third Am. Compl. ¶ 256.)  Because the statements at issue here were allegedly about Henneberry personally, such an individualized statement was distinct from any disparaging statements regarding Smartix as a whole.  The harm to plaintiff is greater than the harm to any other shareholder, as plaintiff alleges lost future earnings. See Abrams v. Donati, 489 N.E.2d 751, 752 (N.Y. 1985) (holding individual standing not available where, inter alia, "there is

53

no claim that plaintiff sustained a loss disproportionate to
that sustained by" the corporation).  The Court, therefore,
turns to the merits of plaintiff's claim.

> 2.   Tortious Interference with Prospective Economic
>      Advantage Standards

Under New York law, a claim for tortious interference with
prospective economic advantage[12] lies where (1) the plaintiff had
a business relationship with a third party; (2) defendant knew
of such relationship and intentionally interfered with it; (3)
defendant acted solely out of malice, or used dishonest, unfair,
or improper means; and (4) defendant's actions injured the
relationship between plaintiff and third party. Carvel Corp. v.
Noonan, 350 F.3d 6, 17 (2d Cir. 2003) (citing Goldhirsh Group,
Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997); Purgess v.
Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)).  As this Court has
stated previously, "[t]his cause of action has a 'limited
scope.'" Henneberry I, 2005 WL 991772, at *22 (quoting Piccoli
A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 168
(S.D.N.Y. 1998)).  Moreover, the requirements of this tort are
more demanding than those imposed on a party asserting tortious

---

[12] Courts refer to this cause of action by a number of different names,
including "prospective economic advantage, beneficial business relations,
prospective business advantage, and business or economic relations." PPX
Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir.
1987), abrogated on other grounds by Hannex Corp. v. GMI, Inc., 140 F.3d 194,
206 (2d Cir. 1998).  Regardless of which term or phrase is used, the same
legal standards apply. Id. (citing Martin Ice Cream Co. v. Chipwich, Inc.,
554 F. Supp. 933, 945 (S.D.N.Y. 1983)).

54

interference with the performance of an existing contract. See
Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 258
(S.D.N.Y. 1995) (a tortious interference with prospective
economic advantage claim is "very difficult to sustain").  "Mere
suspicions are inadequate to support a claim for tortious
interference with business relations." Scutti Enters. v. Park
Place Entertainment Corp., 332 F.3d 211, 216 (2d Cir. 2003).

        To meet the first element of this tort, a properly pleaded
complaint must allege relationships with specific third parties
with which the defendant interfered. See Four Finger Art
Factory, Inc. v. Dinicola, No. 99 Civ. 1259, 2000 U.S. Dist.
LEXIS 1221, at *23-24 (S.D.N.Y. Feb. 9, 2000); Minnesota Mining
& Mfg. Co. v. Graham-Field, Inc., No. 96 Civ. 3839, 1997 WL
166497, at *7 (S.D.N.Y. Apr. 9, 1997).  Furthermore, the
relationship must be in existence *at the time* of the
interference. See Hannex Corp. v. GMI, Inc., 140 F.3d 194, 205
(2d Cir. 1998) ("[I]t is well-settled that a plaintiff can
recover if that plaintiff can prove that the defendant
tortiously interfered with 'a continuing business or other
customary relationship not amounting to a formal contract.'"
(citing Restatement (Second) of Torts § 766B cmt. c (1977)));
Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857
F.2d 55, 74 (2d Cir. 1988) ("[A] plaintiff must demonstrate that
the defendant interfered with business relations *existing*

55

*between* a plaintiff and a third party." (emphasis added) (citing PPX Enters., 818 F.2d at 269, abrogated on other grounds by Hannex Corp., 140 F.3d at 206)); Minnesota Mining, 1997 WL 166497, at *7; Sterling Interiors Group, Inc. v. Haworth, Inc., No. 94 Civ. 9216, 1996 WL 426379, at *25 (S.D.N.Y. July 30, 1996) ("The cause of action for interference with prospective business dealings . . . is designed to address situations like the one at bar, in which there was an *ongoing business relationship* between the plaintiff and a third party, but no existing contractual arrangement." (emphasis added) (citing Volvo N. Am. Corp., 857 F.2d at 74)).

To meet the second element, a complaint must state how the defendant interfered in those relationships. See Four Finger, 2000 WL 145466, at *7; Envirosource, Inc. v. Horsehead Res. Dev. Co., No. 95 Civ. 5106, 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996). That interference must be "direct interference with a third party, that is, 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.'" Black Radio Network, Inc. v. NYNEX Corp., No. 96 Civ. 4138, 2000 WL 64874, at *4 (S.D.N.Y. Jan. 25, 2000) (quoting Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y. 1997)); see also Piccoli, 19 F. Supp. 2d at 167-68.

56

To meet the third element, the interference must be "more
culpable" than that required where the tortious interference is
with a binding contract. Carvel Corp. v. Noonan, 818 N.E.2d
1100, 1103 (N.Y. 2004) (quotation omitted)).  The general rule
is that the conduct must amount to a crime or an independent
tort, or must be engaged in "'for the sole purpose of inflicting
intentional harm on plaintiffs.'"  Id. (quoting NBT Bancorp Inc.
v. Fleet/Norstar Fin. Group, Inc., 628 N.Y.S.2d 408, 410 (App.
Div. 1995), aff'd, NBT Bancorp Inc., 664 N.E.2d at 492).

> 3.   Tortious Interference with Prospective Economic
>       Advantage Standards as Applied to Plaintiff's
>       Allegations

Because this claim has been pleaded previously, the Court
first notes that, as stated in the Court's prior Orders, the
third element of this tort -- whether the defendant acted solely
out of malice, or used dishonest, unfair, or improper means --
has been met. See Henneberry II, 415 F.3d at 468; Henneberry I,
2005 WL 991772, at *23.  Because plaintiff adequately pleaded
that defendants intentionally defamed him at a meeting with MLB
and MasterCard in September 2003, he has pleaded an independent
tort in satisfaction of the Carvel decision's requirements. See
Carvel Corp., 818 N.E.2d at 1103.

However, whether plaintiff has pleaded sufficiently the
first element of this claim turns on whether plaintiff had an

*existing* or *continuing* relationship with the third parties *at the time of* defendants' tortious interference. See Minnesota Mining, 1997 WL 166497, at *7 ("A claim for interference with advantageous business relationships must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior.") (citations omitted).  SCOA claims that the allegations in the Third Amended Complaint are insufficient to show a continuing personal relationship between Henneberry and MasterCard or MLB. (Def.'s Mem. Opp. Amend at 20.) Specifically, SCOA points out that Henneberry's relationship with MasterCard at the time of the allegedly tortious conduct was solely as part of his role as the CEO of Smartix. (Id.)

Henneberry claims that he did, in fact, have an ongoing relationship with MasterCard and MLB and that this relationship existed at the time of the tortious acts.  To support this claim, he alleges that prior to the defendants' tortious interference he "would consult with MLB and MasterCard on a regular basis." (Third Am. Compl. ¶ 247.)  His consulting work for MLB and MasterCard "was, by its very nature," "project specific, but regular and continuous, in nature." (Third Am. Compl. ¶ 247.)  This relationship allowed plaintiff to pursue his own individual projects, such as Smartix. (Third Am. Compl. ¶ 247.)  He claims he was "actively consulting" for MasterCard

"at the time the opportunity with Smartix presented itself" and he "obtain[ed] the permission of MasterCard to pursue the Smartix project." (Third Am. Compl. ¶ 248.)  Finally, it was "understood" between plaintiff and MasterCard that plaintiff "could continue to consult for MasterCard on future projects." (Third Am. Compl. ¶ 252.)

Henneberry believes that his allegations are sufficient because a plaintiff is entitled to assert a claim of tortious interference with prospective advantage even when that plaintiff is not actively employed. (Pl.'s Mem. Req. Amend at 16.) However, the case law he cites in support of his claim merely makes the point that interference with "relations leading to potentially profitable contracts" is actionable. (Id. at 17); see Scutti Enters., 332 F.3d at 215 (quoting Hannex Corp., 140 F.3d at 205; Restatement (Second) of Torts § 766B cmt. c (1979)).  While Henneberry is correct that interference with a potentially profitable contract is actionable under New York law, he still "must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior." Kramer, 890 F. Supp. at 258 (citing PPX Enters., 818 F.2d at 269); see also Minnesota Mining, 1997 WL 166497, at *7.

Henneberry provides the Court with no factual allegations that would show an existing business relationship.  SCOA is

59

correct in noting that Henneberry's ongoing relationship with

MasterCard and MLB during the time he worked for Smartix was

solely in his capacity as Smartix's CEO. (See Def.'s Mem. Opp.

Amend at 20.)  There is no allegation by Henneberry as to a

personal business relationship of any kind between him and

MasterCard or MLB during the time he alleges SCOA allegedly

defamed him.  Henneberry does note that he "became introduced to

Smartix while performing due diligence into Smartix as a

consultant for MasterCard" (Third Am. Compl. ¶¶ 25, 248), and

that he "was given permission by MasterCard to work for Smartix"

(Third Am. Compl. ¶¶ 26, 248).  And while Henneberry alleges

that MasterCard's investment in Smartix was based on

Henneberry's "excellent ongoing relationship with MasterCard at

*that* time" (Third Am. Compl. ¶ 28 (emphasis added)), and that it

"was understood between Mr. Henneberry and MasterCard that he

could continue to consult for MasterCard on *future* projects"

(Third Am. Compl. ¶ 252 (emphasis added)), there is no

indication that an ongoing business relationship existed in

September 2003, when SCOA allegedly defamed Henneberry.  In

fact, by that point, Henneberry was clearly acting on behalf of

Smartix and as its CEO in his interactions with MasterCard and

MLB. (See Third Am. Compl. ¶¶ 249-51.)  Because Henneberry has

failed to allege the existence of a consulting relationship at

the time of SCOA' allegedly tortious activity, the Court must

60

find that he has failed to plead adequately the first element of
this claim:  that he had a continuing or existing business
relationship with a third party with which defendant interfered.
Even taking all allegations as true and making all inferences in
his favor, Henneberry has failed to "claim that he interacted
with MLB and MasterCard at the time of SCOA's meeting with them
in any other capacity than as CEO of Smartix." Henneberry II,
415 F. Supp. 2d at 469; Henneberry I, 2005 WL 991772, at *23.
Because the claim would not withstand a motion to dismiss,
Henneberry's motion for leave to amend this cause of action in
his complaint is denied.

     F.    Breach of Fiduciary Duty

        1.    Breach of Fiduciary Standards

     Under New York law, a breach of fiduciary duty claim
requires (1) the existence of a fiduciary relationship between
the parties and (2) a breach of the duty flowing from that
relationship.  See Lumbermens Mut. Cas. Co. v. Franey Muha
Alliant Ins. Servs., 388 F. Supp. 2d 292, 304 (S.D.N.Y. 2005)
(citing Official Comm. of Asbestos Claimants of G-I Holding,
Inc. v. Heyman, 277 B.R. 20, 37 (S.D.N.Y. 2002)); Cramer v.
Devon Group, Inc., 774 F. Supp. 176, 184-85 (S.D.N.Y. 1991)
(Leisure, J.).  Standing for a breach of fiduciary duty claim is
established where a plaintiff demonstrates the existence of a
direct fiduciary relationship with another party. See Henneberry

II, 415 F. Supp. 2d at 461.

New York courts have noted the difficulty in establishing the existence of a fiduciary relationship between parties because of its amorphous nature. See, e.g., Penato v. George, 383 N.Y.S.2d 900, 904 (App. Div. 1976) ("The exact limits of such a [fiduciary] relationship are impossible of statement."). However, courts generally describe it as a relationship "founded upon trust or confidence reposed by one person in the integrity and fidelity of another . . . in which influence has been acquired and abused, in which confidence has been reposed and betrayed." Penato, 383 N.Y.S.2d at 904; see WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (App. Div. 2001) ("A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge." (citing Wiener v. Lazard Freres & Co., 672 N.Y.S.2d 8, 14 (App. Div. 1998)).

However, a fiduciary obligation will not be imposed on one party "merely because it possesses relative expertise as compared to the other." Ross v. FSG PrivatAir Inc., No. 03 Civ. 7292, 2004 WL 1837366, at *6 (S.D.N.Y. Aug. 17, 2004); see also Mechigian v. Art Capital Corp., 612 F. Supp. 1421, 1430 (S.D.N.Y. 1985); Boley v. Pineloch Assoc., Ltd., 700 F. Supp. 673, 681 (S.D.N.Y. 1988) ("Allegations of reliance on another party with superior expertise, standing by themselves, will not

62

suffice."). Moreover parties dealing at arms length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation, absent extraordinary circumstances. Nat'l Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 679 (S.D.N.Y. 1991) (citations omitted), aff'd, Yaeger v. Nat'l Westminster, 962 F.2d 1 (2d Cir. 1992) (table); WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (App. Div. 2001) ("[W]here the parties were involved in an arms-length business transaction involving the transfer of stocks, and where all were sophisticated business people, the plaintiff's cause of action to recover damages for breach of fiduciary duty should have been dismissed."); see also DFP Mfg. Corp. v. Northrop Grumman Corp., No. 97 Civ. 4494, 1999 WL 33458384, *9 (E.D.N.Y. March 23, 1999) ("Generally, commercial transactions do not create fiduciary obligations, absent express language in the contract, or a prolonged prior course of dealings between the parties establishing the fiduciary relationship.").

Even absent the existence of a fiduciary relationship, however, a duty to disclose a material fact to a party it is negotiating with will be triggered where "'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,

63

748 F.2d 729, 739 (2d Cir. 1984) (quoting Aaron Ferer & Sons
Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir.
1984)); Jana L. v. W. 129th St. Realty Corp., 802 N.Y.S.2d 132,
134 (App. Div. 2005) ("[A]bsent a fiduciary relationship between
the parties, a duty to disclose arises only under the 'special
facts' doctrine 'where one party's superior knowledge of
essential facts renders a transaction without disclosure
inherently unfair.'" (quoting Swersky v. Dreyer & Traub, 643
N.Y.S.2d 33, 37 (App. Div. 1996))).

Thus, courts will determine if a fiduciary duty existed by
conducting "'a fact-specific inquiry into whether a party
reposed confidence in another and reasonably relied on the
other's superior expertise or knowledge.'" Lumbermens Mut. Cas.
Co., 388 F. Supp. 2d at 305 (quoting Facella v. Fed'n of Jewish
Philanthropies of N.Y., Inc., No. 98 Civ. 3146, 2004 WL 1700616,
at *6 (S.D.N.Y. July 30, 2004); Mandelblatt v. Devon Stores,
Inc., 521 N.Y.S.2d 672, 676 (App. Div. 1987)); see also Wende C.
v. United Methodist Church, 776 N.Y.S.2d 390, 397 (App. Div.
2004) ("A cause of action based upon breach of fiduciary duty
rests not on the violation of a generalized professional
standard, but on the abuse of a particularized relationship of
trust." (citing Mandelblatt, 521 N.Y.S.2d at 676)), aff'd, 827
N.E.2d 265 (N.Y. 2005).

Once a plaintiff has established that a duty exists, he

64

still must show that the breach claimed involved "matters within

the fiduciary obligation." FSG PrivatAir Inc., 2004 WL 1837366,

at *7.  A finding of breach will thus be "limited to matters

relevant to affairs entrusted." Rush v. Oppenheimer & Co., Inc.,

681 F. Supp. 1045, 1055 (S.D.N.Y. 1988); see also Restatement

(Second) of Torts § 874 cmt. a (1977) ("[a] fiduciary relation

exists between two persons when one of them is under a duty to

act for or to give advice for the benefit of another upon

matters within the scope of the relation.").

>          2.    Breach of Fiduciary Duty Standards as Applied to
>
>                Plaintiff's Allegations

In the Third Amended Complaint,[13] Henneberry asserts four

grounds giving rise to an alleged fiduciary relationship between

him and defendants:  (1) SCOA was a member of Smartix's Board of

Directors from July 2002 onward while plaintiff was a

shareholder of Smartix; (2) SCOA was the *de facto* majority

common stock shareholder in Smartix; (3) SCOA possessed special

skill, knowledge, and experience with respect to the management

and operation of start-up companies such as Smartix and

exercised "overwhelming operational control" of Smartix; and (4)

SCOA controlled the information flowing to Henneberry regarding

---

[13] In his Memo of Law in Support of the Third Amended Complaint, Henneberry outlines three reasons he believes the Court should find a fiduciary relationship existed between SCOA and him. (See Pl.'s Mem. Req. Amend at 19.) In attempting to identify the claims at issue here, the Court has taken into account those three reasons outlined in the Memo of Law as well as those allegations set forth in the Third Amended Complaint.

65

its own interest in investing in Smartix and the interests of
third-parties in investing in Smartix. (Pl.'s Mem. Req. Amend at
19; Third Am. Compl. ¶¶ 40-42, 263-68.)  The Court addresses
each of these allegations, as well as Henneberry's standing to
bring his claim, in turn.

> ### i.   SCOA's Position as a Director of Smartix

Plaintiff alleges that because of SCOA's role as a member
of Smartix's Board of Directors, "SCOA owed Mr. Henneberry a
duty of utmost good faith and fair dealing." (Third Am. Compl. ¶
263.)  As with the prior amended complaint, the parties contest
whether SCOA did, in fact, maintain a seat on Smartix's Board.
(See Proposed Am. Compl. ¶ 263; Def.'s Mem. Opp. Amend at 21.)
And as in Henneberry II, this dispute need not be addressed
because plaintiff's argument clearly fails for the same reasons
given in that Order.  Plaintiff has not provided any new
allegations in support of an *independent* duty owed to plaintiff
that are extrinsic to any general obligations owed to all of the
corporation's shareholders. See New Castle Siding Co., 468
N.Y.S.2d at 21 (establishing an individual shareholder's
personal cause of action where there exists a "duty owing to the
shareholder from the wrongdoer, having its origin in
circumstances *independent of and extrinsic to* the corporate
entity" (emphasis added)).  Plaintiff has attempted to fix the
problems in his prior amended complaint, in which he claimed

that "SCOA owed the other Smartix shareholders, including Mr.

Henneberry, a duty of utmost good faith and fair dealing."

Henneberry II, 415 F. Supp. 2d at 461.  There, the Court found

that such phrasing supported its conclusion that Henneberry had

not shown any duty owed to him independent of and extrinsic to

those duties owed to all of the shareholders. Id.

In his Third Amended Complaint Henneberry simply takes out

any mention of the other Smartix Shareholders, claiming that

"SCOA owed Mr. Henneberry a duty of utmost good faith and fair

dealing." (Third Am. Compl. ¶ 461.)  Henneberry fails, however,

to provide the Court with any factual allegations that show any

duty specifically owed to Henneberry that is separate and

outside of a duty SCOA may have owed all of the shareholders.

Simply stating a duty existed does not make it so where the

preceding factual allegations do not support such a claim. See

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772

(2d Cir. 1994) ("'[C]ourts do 'not accept conclusory allegations

on the legal effect of the events plaintiff has set out if these

allegations do not reasonably follow from his description of

what happened.'" (quoting Kadar Corp. v. Milbury, 549 F.2d 230,

233 (1st Cir. 1977))); Salahuddin v. Jones, 992 F.2d 447, 449

(2d Cir. 1993) (holding district court's dismissal of

plaintiff's claims proper where plaintiff only made "wholly

conclusory and inconsistent allegations"); 5B Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure §
1357, at 548-53 (3rd ed. 2004) (stating that a review of federal
case law reveals the fact that "court[s] will not accept
conclusory allegations concerning the legal effect of the events
the plaintiff has set out if these allegations do not reasonably
follow from the pleader's description of what happened, or if
these allegations are contradicted by the description itself").
Consequently, this allegation, on its face, fails to establish
plaintiff's standing to bring suit as an individual.  Cf. Bank
of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 224 (S.D.N.Y.
2005) (holding that an officer or director "generally owes a
fiduciary duty only to the corporation over which he exercises
management authority, and any breach of fiduciary duty claims
arising out of injuries to the corporation in most cases may
only be brought by the corporation itself or derivatively on its
behalf" (citing, *inter alia*, Glenn v. Hoteltron Sys., Inc., 547
N.E.2d 71, 74 (N.Y. 1989)); Abrams, 489 N.E.2d at 752
("[A]llegations of mismanagement or diversion of assets by
officers or directors to their own enrichment, without more,
plead a wrong to the corporation only, for which a shareholder
may sue derivatively but not individually." (citing Niles v.
N.Y. Cent. & Hudson Riv. R.R. Co., 68 N.E. 142, 144 (N.Y. 1903);
Carpenter v. Sisti, 360 N.Y.S.2d 13, 16 (App. Div. 1974))).

68

ii.   SCOA as *De Facto* Majority Shareholder in

Smartix

Plaintiff's second argument is that SCOA was the *de facto* majority shareholder in Smartix." (Third Am. Compl. ¶ 264.) Under this theory, SCOA was the *de facto* majority shareholder by virtue of (1) the rights and powers granted to it under the Amended Article of Incorporation and (2) SCOA's "overwhelming operational control . . . over the day to day operations of Smartix." (Third Am. Compl. ¶ 264.)  Again, however, Henneberry has not provided the Court with any new allegations that would impact its decision in Henneberry II.  As in its prior Order, the Court here finds that the Amended Certificate of Incorporation speaks to SCOA's rights and powers vis-à-vis Smartix alone (see Fornshell Decl. Ex. 1, Ex. A at Art. 6.7), with no mention of a relationship between SCOA and plaintiff at all. See Henneberry II, 415 F. Supp. 2d at 462.  Similarly, Henneberry's claim regarding SCOA's "overwhelming operational control" over Smartix's day to day operations continues to lack any allegations regarding a special duty owed by SCOA to Henneberry that is independent and extrinsic to that owed to Smartix. (Third Am. Compl. ¶ 264-65.)  They repeatedly reference SCOA's functions with respect to Smartix, but not Henneberry. Thus, Henneberry's claims regarding a fiduciary duty will not stand on these grounds.

69

### iii. Defendants' Special Skill, Knowledge, and Expertise

Henneberry alleges Graustein possessed "special skill, knowledge, and experience which Mr. Henneberry lacked with regard to managing a small company like Smartix." (Third Am. Compl. ¶ 42.)  He further alleges that SCOA provided "special guidance and expertise," which included the formulation of a business plan, budgets, and staffing; presentation of Smartix to investors; training of Smartix employees on making presentations to investors; locating additional investors; and sharing SCOA's knowledge and experience in addressing the potential problems a start-up company like Smartix could face. (Third Am. Compl. ¶ 40-42.)  Henneberry believes SCOA should have foreseen that he would rely on this special skill, knowledge, and experience in advancing personal loans to Smartix. (Third Am. Compl. ¶ 274.)

In order to make a claim for breach of fiduciary duty based on a claim of "special skill, knowledge, and experience" Henneberry must show that such skill placed SCOA in a "special position of trust and confidence" with him personally, rather than in his role as CEO of Smartix. See Nat'l Westminster Bank, 130 B.R. at 679 ("Where parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.").  Moreover, as

70

has been stated previously, a fiduciary obligation will not be imposed on a party "merely because it possesses relative expertise as compared to the other." FSG PrivatAir Inc., 2004 WL 1837366, at *6.  Henneberry has failed to show such special relationship or extraordinary circumstances, and has again failed to allege the existence of an independent fiduciary duty owed to him personally.

The Third Amended Complaint does allege that "special guidance and expertise" was provided by SCOA "to Smartix *and* Mr. Henneberry" (Third Am. Compl. ¶ 41), however the guidance provided related specifically to Smartix as a whole, and Henneberry as its CEO, not in an individual capacity. Similarly, the "special skill, knowledge, and experience" provided by Graustein and Frank were also for Smartix and its CEO, and not Henneberry in an individual capacity. (Third Am. Compl. ¶ 42, 48.)  As in the prior complaints, allegations concerning plaintiff's personal relationship merely state that he "was in constant contact" with Frank and Graustein (Third Am. Compl. ¶ 50) and that he came to "trust and rely" upon their counsel "with regard to his operation of *Smartix*" (Third Am. Compl. ¶ 52 (emphasis added)).

Henneberry simply fails to provide any allegations that would keep this Court from finding, as a matter of law, that the special expertise and knowledge of any of the defendants

71

provides sufficient extraordinary circumstances to provide the
basis of a fiduciary relationship with Smartix, and not with
Henneberry. See Nat'l Westminster Bank, 130 B.R. at 679.

> iv.   SCOA's Control Over Information Regarding
>       Investments

While Henneberry's attempts to establish existence of a
fiduciary relationship for the reasons set forth above fail, he
also raises the issue within the scope of his claims --
addressed in great detail in the sections preceding this one --
that SCOA misled him regarding the existence of outside
investors and the likelihood that it would make additional
investments in Smartix. (See Third Am. Compl. ¶¶ 262, 266-68.)
Specifically, in this context Henneberry claims that SCOA
"controlled all information concerning outside investment and
their own intentions regarding investing in Smartix." (Third Am.
Compl. ¶ 266.)  He further claims that SCOA "could control the
actions of outside investors" and that it was the "sole arbiter
of what information would be provided" to Henneberry concerning
these investments. (Third Am. Compl. ¶¶ 266-67.)

As the Court has held previously, some of the allegations
related to these claims involve statements by SCOA to Henneberry
that SCOA would be willing to make additional investments
"should the need arise," and that it would be beneficial for
plaintiff to advance monies to cover operating expenses, as it

72

would be looked upon favorably by SCOA when it came time for
SCOA to make additional investments. (Third Am. Compl. ¶ 172.)
These representations were made to Henneberry in an individual
capacity, rather than to the entire corporate entity.  Further,
Henneberry alleges that these representations were false (Third
Am. Compl. ¶¶ 193, 270-73), and that had SCOA been truthful, he
would not have made his personal loans (Third Am. Compl. ¶ 195).

A party's duty to disclose material facts -- for example,
the nonexistence of third-party investors and SCOA's own
unwillingness to invest -- is triggered where that party
"possesses superior knowledge, not readily available to the
other, and knows that the other is acting on the basis of
mistaken knowledge.'" Grumman Allied Indus., Inc., 748 F.2d at
739 (quoting Aaron Ferer & Sons Ltd., 731 F.2d at 123).  As this
Court held previously, such a duty was triggered here. See
Henneberry II, 415 F. Supp. 2d at 464.

To determine if SCOA breached this duty, however, the Court
first must determine the standard under which Henneberry must
plead this claim.  Rule 9(b)'s heightened pleading standards
apply to breach of fiduciary duty claims where the breach is
premised on the defendant's fraudulent conduct, see Rahl v.
Bande, 328 B.R. 387, 412 (S.D.N.Y. 2005) (citing cases), such as
an attempt "'to induce action or inaction on the part of the
investors by means of falsehoods or material omissions.'" In re

73

Luxottica Group S.p.A., Sec. Litigation, 293 F. Supp. 2d 224, 238 (E.D.N.Y. 2003) (quoting Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc., 964 F. Supp. 783, 804-05 (S.D.N.Y. 1997), rev'd in part on other grounds sub nom., Strougo v. Bassini, 282 F.3d 162 (2d Cir. 2002)).  Rule 9(b)'s heightened requirements do not apply to a breach of "'fiduciary obligations to act in the best interest of the Company and its shareholders,'" in which case the more liberal pleading requirements of Rule 8 apply. Id.

Here, Henneberry's breach of fiduciary duty claim is premised on the same statements that give rise to his negligent misrepresentation and his fraudulent misrepresentation claims: That SCOA induced plaintiff to loan money to Smartix in reliance on SCOA's fraudulent representations that it had located outside investors willing to invest in Smartix, and that it would make additional investments in Smartix in the future.  Thus, Rule 9(b)'s heightened pleading requirements apply.  However, for the same reasons the Court found that Henneberry did not plead with sufficient particularity his claims of negligent or fraudulent misrepresentation under Rule 9(b), it now finds Henneberry has failed to plead a colorable claim for breach of fiduciary duty.

IV.  Further Leave to Replead

The Court has now addressed Henneberry's third attempt to adequately plead his claims against SCOA.  In the two prior

74

Opinions it has issued in this matter, the Court granted
Henneberry leave to replead those claims he was unable to
sufficiently allege at the time, providing him with specific
information about why his claims had failed and with an
opportunity to remedy those deficiencies.  Henneberry has
failed, however, to do so for certain of his claims.

Therefore, the Court believes that any further granting of
leave to replead those claims the Court dismissed herein would
be inappropriate. See Fidenas AG v. Honeywell Inc., 501 F. Supp.
1029, 1039-40 (S.D.N.Y. 1980) ("[T]his Court has already
received three complaints based on essentially the same alleged
facts. Given the time and effort on the part of several New York
law firms already expended in drafting these complaints, this
Court concludes that the problem is not in the pleading, but in
the cause of action. No purpose would be served by inviting
additional amended complaints."); see also In re Lois/USA, Inc.,
283 B.R. 382, 387-88 (Bkrtcy. S.D.N.Y. 2002); Kolbeck v. LIT
America, Inc., 923 F. Supp. 557, 570 (S.D.N.Y. 1996), aff'd, 152
F.3d 918, 1998 WL 406036 (2d Cir. 1998) ("[B]ecause this is
defendants' second motion to dismiss, and because plaintiffs
already have been afforded an opportunity to make their
allegations more specific, leave to replead is denied").

V.   <u>Motion to Lift the Stay of Discovery</u>

Henneberry also requests that the Court lift the stay of discovery imposed in Orders by this Court issued June 10, 2004 and August 17, 2005.  As the Court has resolved the dispositive motion for which the most recent extension of the stay had been granted, and has denied plaintiff any leave to replead his failed claims, there is no reason for the stay to remain in place, and the Court need not address the specific arguments raised by the parties in their moving papers.  The Court therefore orders that the stay is hereby lifted, and discovery should proceed in accordance with the Court's Individual Rules and the Rules of this district.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for leave to amend his complaint to assert a claim for promissory estoppel as to defendants' alleged promise to make the $3-5MM Investment in Smartix and defendants' alleged promise that the Union Square investment would close are GRANTED.  Plaintiff's motion for leave to amend his complaint to assert a claim for slander per se is also GRANTED.  Plaintiff's motions for leave to amend his complaint to assert claims for negligent misrepresentation, fraudulent misrepresentation, tortious interference with prospective economic advantage and breach of fiduciary duty are all DENIED in their entirety without further leave to replead.

Plaintiff's motion to lift the stay of discovery is hereby GRANTED.

The parties are ORDERED to appear before this Court at 500 Pearl Street, Courtroom 18b for a status conference on September 6, 2007 at 9:30 a.m.  The parties are further ordered to submit a case management plan prior to, or at that conference, in accordance with the Court's individual rules.

**SO ORDERED.**
**New York, New York**

July **12** , 2007



U.S.D.J.

77

Copies of this Opinion and Order have been mailed to:

John M. Deitch, Esq.
Mendes & Mount LLP
One Newark Center, 19th Floor
Newark, New Jersey 07102

Stuart M. Riback, Esq.
Siller Wilk LLP
675 Third Avenue
New York, New York 10017